# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

| | |
|---|---|
| Parcel 49C Limited Partnership | ) |
| Plaintiff, | ) |
| v. | ) Case No. 17-1315 |
| United States of America | ) **NON-CONFIDENTIAL** |
| Defendant. | ) **VERSION** |

## MOTION FOR AN INJUNCTION PENDING APPEAL

Dated: December 15, 2016

Richard J. Conway
BLANK ROME LLP
1825 Eye Street, NW
Washington, DC 20006-5403
(202) 420-2235 (Telephone)
(202) 822-9544 (Facsimile)
RConway@blankrome.com
*Attorney of Record for Parcel 49C Limited Partnership*

Of Counsel:
Michael J. Slattery
BLANK ROME LLP
405 Lexington Avenue
New York, NY 10174-0208
(212) 885-5155 (Telephone)
(202) 822-9544 (Facsimile)
MSlattery@blankrome.com

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# TABLE OF CONTENTS

LEGAL ARGUMENT ................................................................................2

I.   PARCEL 49C WILL SUCCEED ON THE MERITS SINCE GSA HAS
     VIOLATED 48 C.F.R. 9.505-3 AND A WEALTH OF OTHER
     AUTHORITY BY FAILING TO  IDENTIFY AND MITIGATE AN
     ACTUAL AND APPARENT SELF-EVALUATION CONFLICT OF
     INTEREST ................................................................................3

     A.   FAR 9.505-3 And Controlling Authority Prohibit Award To
          Trammell Crow Due To Its Unmitigated Self-Evaluation Conflict......3

     B.   CBRE Never Disclosed Its Self-Evaluation Conflict And The
          Appearance Of Impropriety Has Never Been Addressed Or
          Mitigated ................................................................14

     C.   The COFC Erred In Holding That GSA Reasonably Determined
          That The CBRE-Trammell Crow Conflict Was Mitigated.................16

II.  PARCEL 49C WILL SUFFER IRREPARABLE HARM IN THE
     ABSENCE OF THE REQUESTED RELIEF ...............................................18

III. THE BALANCE OF THE HARDSHIPS FAVORS PARCEL 49C ............19

IV.  GRANTING INJUNCTIVE RELIEF  WILL SERVE THE PUBLIC
     INTEREST ................................................................20

CONCLUSION ................................................................21

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ala. Aircraft Indus., Inc. - Birmingham v. United States*,
   83 Fed. Cl. 666 (2008) *rev'd on other grounds*, 586 F.3d 1372
   (Fed. Cir. 2009) ............................................................................12, 13, 14, 17

*Command Management Services, Inc. v. United States*,
   111 Fed. Cl. 279 (2013) .................................................................................9

*Contracting, Consulting, Eng'g LLC v. United States*,
   104 Fed. Cl. 334 (2012) ...............................................................................18

*Doty Bros. Equipment Company*,
   B-274634, Dec. 19, 1996, 1996 U.S. Comp. Gen. LEXIS 619 .......................19

*Fed. Builders, LLC-The James R. Belk Trust - Costs*,
   B-409952.3, May 6, 2016, 2016 U.S. Comp. Gen. LEXIS 108 .......................18

*Filtration Dev. Co. v. United States*,
   60 Fed. Cl. 371 (2004) .........................................................................8, 9, 13

*FMC Corp. v. United States*,
   3 F.3d 424 (Fed. Cir. 1993) ...........................................................................2

*Helix Elec., Inc. v. United States*,
   68 Fed. Cl. 571 (2005) ..................................................................................7

*Int'l Rectifier Corp. v. Samsung Elecs. Co.*,
   361 F.3d 1355 (Fed. Cir. 2004) .....................................................................3

*L-3 Commc'ns Corp. v. United States*,
   99 Fed. Cl. 283 (2011) ....................................................................11, 12, 13

*MacAulay-Brown, Inc. v. United States*,
   125 Fed. Cl. 591 (2016) .................................................................................7

*Mori Assocs., v. United States*,
   102 Fed. Cl. 503 ............................................................................................7

*Netstar-1 Gov't Consulting, Inc., v. United States,*
   101 Fed. Cl. 511 (2011) .................................................................8

*NKF Eng'g, Inc. v. United States,*
   805 F.2d 372 (Fed. Cir. 1986) ....................................................9

*PGBA, LLC v. United States,*
   389 F.3d 1219 (Fed. Cir. 2004) ...................................................3

*PGBA, LLC v. United States,*
   57 Fed. Cl. 655 (2003) ....................................................19, 20, 21

*QualMED, Inc. v. Office of Civilian Health & Med. Program of the
   Uniformed Servs.,*
   934 F. Supp. 1227 (D. Colo. 1996).............................................9

*Shields & Dean Concessions, Inc.--Reconsideration,*
   B-292901.4, Mar. 19, 2014, 2004 U.S. Comp. Gen. LEXIS 60.......................18

*Software Testing Solutions, Inc. v. United States,*
   58 Fed. Cl. 533 (2003) ...............................................................19

*Turner Constr. Co., Inc., v. United States,*
   94 Fed. Cl. 561 (2010) ....................................................8, 9, 11, 17

*Unionbancal Corp. & Subsidiaries v. United States,*
   *93 Fed. Cl. 166 (*2010)...............................................................20

*United Int'l Investigative Servs., Inc. v. United States,*
   41 Fed. Cl. 312 (1998) ...............................................................20

## Regulations

48 C.F.R. 2.101 ..........................................................................13

48 C.F.R. 3.101-1 ........................................................................7

48 C.F.R. 9.504(a)......................................................................12

48 C.F.R. 9.505-3 ...............................................................*passim*

48 C.F.R. 9.505-4......................................................................12

**Rules**

RCFC 7.1(A) ................................................................................5, 6

Fed. Cir. Rule 8 ................................................................................1

**Other Authorities**

http://www.cbre.us/o/washingtondc/people/henry-
    chapman/Pages/overview.aspx ...............................................6

http://www.cbre.us/o/washingtondc/people/henry-
    chapman/Pages/overview.aspx; ...........................................15

http://www.gsa.gov/graphics/pbs/CBRE_GS00P10BQD0001_VOL-
    I_REDACTED-signed_21June2010-508c.pdf ..................................4, 5

http://www.sec.gov/Archives/edgar/data/1138118/-
    000119312516484680/0001193125-16-484680-index.htm ................................5

http://www.trammellcrow.com/EN/aboutus/Pages/corporateinformatio
    n.aspx ................................................................................6

Pursuant to Fed. Cir. R. 27(m)(2)(B), Parcel 49C Limited Partnership has redacted certain information from this non-confidential version of Plaintiff-Appellant's Motion for an Injunction Pending Appeal.  The redacted information includes proprietary pricing, information relating to proprietary methodologies set forth in the parties' proposals, as well as material redacted in the prior U.S. Court of Claims action from which this Appeal arises.

Pursuant to the Rule 8 of the Rules of the U.S. Court of Appeals for the Federal Circuit, Appellant Parcel 49C Limited Partnership ("Parcel 49C") hereby respectfully requests that, during the pendency of this Appeal, this Court enjoin the Defendant, acting through the U.S. General Services Administration ("GSA") from signing, awarding and/or permitting or requiring performance of, a lease contract pursuant to Request for Lease Proposals ("RLP") No. 3DC0421.[1]  Injunctive relief is appropriate here since Parcel 49C demonstrates that: (1) all four factors required for the issuance of permanent injunctive and declaratory relief are met; (2) injunctive relief is necessary to ensure that Parcel 49C retains a meaningful remedy if it prevails here; and (3) injunctive relief pending appeal presents *zero risk* that any of the parties will suffer delay or prejudice.

The above-captioned matter is an Appeal by Parcel 49C (un unsuccessful offeror in the procurement) of an Order issued by the U.S. Court of Federal Claims ("COFC") denying a pre-award bid protest that challenges the failure of GSA to identify, evaluate, mitigate and neutralize an actual and apparent self-evaluation conflict of interest.  Through RLP No. 3DC0421, GSA seeks to procure office space in the DC area to house the headquarters of the Federal Communications

---

[1] On December 6, 2016, Parcel 49C filed a Motion for Injunction Pending Appeal in the U.S. Court of Federal Claims, which that court denied on December 14, 2016.  *See* DI 83; DI 86.

Commission ("FCC").  AR Tab 31 and 459-60.  GSA seeks to sign a fifteen year

lease pursuant to the RLP with the Trammell Crow Company ("Trammell Crow").

*Id*.; DI 84.  As demonstrated below, GSA's broker for this procurement, CBRE

Inc., evaluated and selected for award the proposal of Trammell Crow - which is

CBRE's wholly owned subsidiary.  CBRE-Trammell Crow never disclosed this

self-evaluation conflict to the Government as required.  GSA never identified

evaluated, mitigated, or neutralized this conflict as required by FAR § 9.505-3 and

a host of other governing authority.  The COFC committed a clear error of

judgment and abused its discretion by holding that CBRE disclosed this conflict,

and that GSA properly identified and mitigated the conflict.

## LEGAL ARGUMENT

A party seeking preliminary injunctive relief must establish that: (1) it is

likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the

absence of preliminary relief; (3) the balance of hardships tips in its favor; and (4)

an injunction is in the public interest.  *FMC Corp. v. United States*, 3 F.3d 424, 427

(Fed. Cir. 1993).  The weakness of the showing regarding one factor may be

overborne by the strength of the others."  *Id*.  Parcel 49C satisfies all of these

elements, and the COFC committed a clear error of judgment in holding

otherwise.[2]

## I.   PARCEL 49C WILL SUCCEED ON THE MERITS SINCE GSA HAS VIOLATED 48 C.F.R. 9.505-3 AND A WEALTH OF OTHER AUTHORITY BY FAILING TO  IDENTIFY AND MITIGATE AN ACTUAL AND APPARENT SELF-EVALUATION CONFLICT OF INTEREST

Parcel 49C will succeed on the merits since: (1) CBRE-Trammell Crow

never disclosed to GSA or the other offerors that it was evaluating, and selecting

for award, its own proposal; and (2) GSA failed to properly evaluate, identify, and

neutralize this actual and apparent, impaired objectivity conflict of interest,

interest, and the Court below improperly ruled that FAR 9.505-3 does not apply to

the FCC Lease award.

### A.   FAR 9.505-3 And Controlling Authority Prohibit Award To Trammell Crow Due To Its Unmitigated Self-Evaluation Conflict

CBRE acted as GSA's broker for this procurement.  AR Tab 31 at 462.

CBRE's brokerage contract with GSA required CBRE to provide a host of core,

substantive, procurement services including: (1) developing the RLP requirements;

---

[2] This Court gives deference to the Court of Federal Claims' decision to grant or deny injunctive relief, only disturbing the court's decision if it abused its discretion. *PGBA, LLC v. United States*, 389 F.3d 1219, 1223 (Fed. Cir. 2004).  An abuse of discretion may be established under Federal Circuit law by showing that the court made a clear error of judgment in weighing the relevant factors or exercised its discretion based on an error of law or clearly erroneous fact finding.  *Int'l Rectifier Corp. v. Samsung Elecs. Co.*, 361 F.3d 1355, 1359 (Fed. Cir. 2004).

(2) reviewing and evaluating offers; (3) compiling lists of needed clarifications for each offer; (4) negotiating offers; and (5) creating the price negotiation memorandum and source selection document, if necessary.[3]  CBRE and its most senior member of the GSA procurement team, Mr. Henry Chapman,[4] drove the procurement process by: (1) helping to develop the RLP requirements;[5]; (2) serving as the "Primary Point of Contact" for the solicitation, AR Tab 29 at 450; (3) influencing the content of the estimates used to evaluate proposals;[6] and (4) fielding all offerors' questions, AR Tab 30 at 455; AR Tabs 109-114.  CBRE and Mr. Chapman also played a significant part in evaluating proposals by: (1) alerting

---

[3] *See* http://www.gsa.gov/graphics/pbs/CBRE_GS00P10BQD0001_VOL-I_REDACTED-signed_21June2010-508c.pdf at 29, 36.

[4] *See, e.g.*, AR Tab 17 at 306 (listing Mr. Chapman, Richard Downey and Sara Dunstan of CBRE as three of the eight acquisition team members); AR Tab 31 at 472 (listing Henry Chapman as the "Alternate Government Contact").

[5] AR Tab 15 at 294 (showing that CBRE personnel participated in, and led, the December 9, 2014 FCC requirements meeting); AR Tab 15 at 294 ("CBRE reiterated that the two main objectives of the meeting is to establish a move and replication cost estimate and to review the Program of Requirements (POR) containing the special areas").

[6] AR Tab 23 at 331 (advising the GSA Project Engineer who created the cost estimates that "there appears to be little gain by remaining in the existing building," that "I believe it clear that there is no portion of the IT that can be salvaged, but there might be some security elements that can be retained"); AR Tab 23 at 329 (demonstrating that CBRE revised the details of the cost estimates used to evaluate proposals as CBRE discussed with GSA, and that CBRE suggested reducing the size of the desired floor plan).

GSA to missing items in offeror's proposals;[7] (2) running GSA's November 2015

negotiations meetings;[8] (3) identifying deficiencies in proposals.[9]

In addition to running the procurement for GSA, CBRE participated in the

procurement as an offeror.  CBRE owns 100% of Trammel Crow - the offeror

selected for award.[10]  This means that CBRE *is* Trammell Crow.[11]  CBRE-

Trammel Crow constitutes a single entity that files consolidated financial

statements and boasts that it uses CBRE and Trammel Crow personnel

---

[7] AR Tab 73 at 1046 (stating that four of the five offerors submitted NEPA checklists and requesting feedback for the discussions meetings with offerors).

[8] AR Tab 42 at 785-87; *id*. at 785 ("CBRE began the meeting").

[9] AR Tab 42 at 787 ("CBRE outlined several other deficiencies in the offer"); AR Tab 116 (wherein the meeting minutes reflect that GSA made only introductions, and that CBRE held all substantive discussions with the offerors).

[10] *See* Rule 7.1(A) Disclosure Statement of Trammell Crow (stating that "Trammell Crow is a subsidiary of CBRE Group, Inc."); *see* http://www.sec.gov/Archives/edgar/data/1138118/-000119312516484680/0001193125-16-484680-index.htm (describing Trammell Crow as CBRE's "wholly opened subsidiary").

[11] Trammell Crow's proposal offers to lease office space to GSA "at the building known as Sentinel Square III to be constructed at 45 L Street, NE, Washington, DC."  AR Tab 118 at 2014.  Trammell Crow owns the Sentinel Square III lot/site. *See* AR Tab 118 at 2020 ("The land for Sentinel Square Ill is currently owned by 90 K Holding LLC and 45 L Holding LLC, each of which is a joint venture of affiliates of Trammell Crow Company, Crow Holdings, and Cottonwood Partners"); AR Tab 118 at 2018 (identifying 90 K Holding LLC and 45 L Holding LLC as affiliates of Trammell Crow).

interchangeably.[12]  The single identity of CBRE-Trammell Crow means that CBRE

evaluated, and selected for award, its own proposal.[13]  This type of self-evaluation

created a prohibited, actual and apparent, impaired objectivity conflict of interest

that is directly prohibited by 48 C.F.R. 9.505-3 and governing case law.

48 C.F.R. 9.505-3 states explicitly that "[c]ontracts for the evaluation of

offers for products or services shall not be awarded to a contractor that will

evaluate its own offer for products or services, or those of a competitor, without

proper safeguards to ensure objectivity to protect the Government's interests."  48

C.F.R. 9.505-3.  The clear language of this provision prohibits a contractor from

evaluating its own offer without proper safeguards to ensure objectivity.  This is

precisely what CBRE did here.

---

[12] *See* Rule 7.1(A) Disclosure Statement of Trammell Crow (stating that "Trammell Crow is a subsidiary of CBRE Group, Inc. through CB Richard Ellis Real Estate Services, LLC"); *see* http://www.trammellcrow.com/EN/aboutus/Pages/corporateinformation.aspx (wherein Trammell Crow's website advertises that its status as a wholly owned subsidiary of CBRE gives Trammell Crow "[a]ccess to talent" from CBRE in the form of the 70,000 CBRE real estate professionals").

[13] CBRE *knew* that it was evaluating and selecting for award its own proposal. Henry Chapman was a principal at Trammell Crow before he left to become Vice Chairman of CBRE); AR Tab 133 at 2922; *see* http://www.cbre.us/o/washingtondc/people/henry-chapman/Pages/overview.aspx (stating that Henry Chapman was a principal at Trammell Crow before he became Vice Chairman of CBRE); AR Tab 133 at 2922.

CBRE's evaluation and selection for award of its own proposal, and (as demonstrated below), GSA's failure to identify and mitigate this conflict, constitute a *per se* violation of the OCI regulations. *See* 48 C.F.R. 9.505-3; *Helix Elec., Inc. v. United States*, 68 Fed. Cl. 571, 585 (2005) (citing *Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 10 (2003) ("an OCI exists 'when the contractor's objectivity may be impaired due to the nature of the work to be performed' and includes situations in which a government contract could entail a firm evaluating itself without proper safeguards"); *id*. (citing *Filtration Dev. Co. v. United States*, 60 Fed. Cl. 371, 379 (2004) ("[b]ecause Westar was improperly in a position to make decisions favoring its own product capabilities, it occupied an impermissible dual role, and an actual OCI arose"); *MacAulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 594 n.1 (2016) (an "OCI exists when work performed by a contractor may . . . impair the contractor's objectivity in performing government work if ***for example it is called upon to evaluate proposals submitted by affiliates***") (emphasis added); 48 C.F.R. 3.101-1 ("[t]he general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government-contractor relationships"); *Mori Assocs., v. United States*, 102 Fed. Cl. 503, 525 (2011 (FAR 3.101 "is clearly mandatory").

The overwhelming weight of relevant and controlling case law instructs that the conduct of CBRE and GSA constitute all of the "hard facts" necessary to

establish an *actual* self-evaluation conflict - the existence of which, by itself, warrants the disqualification of Trammell Crow, since prejudice is presumed once the core OCI facts are established. *See, e.g., Turner Constr. Co., Inc., v. United States*, 94 Fed. Cl. 561, 573 (2010) ("[a]n OCI must be established by 'hard facts' that indicate the existence or potential existence of a conflict," [but] [t]hese 'hard facts' do not need to show either an actual conflict or a negative impact from a conflict"); *id.* ("[i]f 'hard facts' establish the appearance of impropriety, it is not irrational for a reviewing body to overturn an award"); *Filtration Development Co., LLC v. United States*, 60 Fed. Cl. 371, 380 n.29 (2004) ("[c]onsistent with the court's holding concerning the presumption of prejudice, "hard facts" are only required to "establish the existence of the [OCI], but not the specific impact of that conflict"); *Netstar-1 Gov't Consulting, Inc., v. United States*, 101 Fed. Cl. 511, 529 (2011) ("[a] long line of cases holds that when a potential significant OCI is identified, prejudice stemming from that OCI is presumed, unless the evidence shows compelling evidence to the contrary"); *id.* (citing *ARINC Eng'g Svs, LLC v. United States*, 77 Fed. Cl. 196, 203 (2007) ("[n]or must 'a protestor . . . show that the information possessed by its competitor specifically benefited the latter's proposal' [since] [t]hat too is presumed")).

The CBRE-Trammell Crow self-evaluation conflict also creates a prohibited *appearance* of impropriety that precludes award to CBRE-Trammel Crow. *See*

*NKF Eng'g, Inc. v. United States*, 805 F.2d 372, 376 (Fed. Cir. 1986) ("[w]hether or not inside information was actually passed from Mr. Park to NKF, the appearance of impropriety was certainly enough for the CO to make a rational decision to disqualify NKF"); *Turner Constr.*, 94 Fed. Cl. 561, 573 ("[a]n OCI must be established by 'hard facts' that indicate the existence or ***potential existence*** of a conflict," [but] [t]hese 'hard facts' do not need to show either an actual conflict or a negative impact from a conflict"); *id.* ("[i]f 'hard facts' establish the appearance of impropriety, it is not irrational for a reviewing body to overturn an award"); *Filtration Development Co., LLC v. United States*, 60 Fed. Cl. 371, 380 n.29 (2004); *Command Management Services, Inc. v. United States*, 111 Fed. Cl. 279, 288 (2013) ("FAR 1.102-2(c)(1) and FAR 3.101-1 require disqualification of a procurement offeror where impropriety or ***the possibility*** of an unfair competitive advantage in the acquisition process is present") (emphasis added); *QualMED, Inc. v. Office of Civilian Health & Med. Program of the Uniformed Servs.*, 934 F. Supp. 1227 (D. Colo. 1996) ("[c]ases considering this issue have concluded, contrary to QualMED's contention, that an appearance of impropriety is a sufficient basis on which to find an OCI, and that actual bias and/or prejudice need not be shown").

The COFC erred in holding that no conflict exits since the COFC said 48 C.F.R  9.505-3 applies only to CBRE's brokerage contract with GSA, and does not

apply to this procurement. *See* DI 79 at 22 n.5 ("Section 9.505-3 has no application to the FCC lease at issue here"). CBRE became GSA's broker for this procurement on September 23, 2014. AR Tab 133 at 2924. GSA did not seek offers in this procurement until it issued the RLP almost a year later, on September 22, 2015. AR Tab 31 at 459. Trammell Crow did not submit its initial offer in this procurement until October 20, 2015 - thirteen months after CBRE assumed the role of evaluator of proposals for this procurement. AR Tab 118 at 2014. Thus, at the time CBRE became GSA's broker and evaluator of proposals for this procurement, CBRE was not *also* an offeror. AR Tab 133 at 2924; AR Tab 118 at 2014. At the time CBRE received award of its brokerage contract – September 23, 2014 – 48 C.F.R 9.505-3 did not prevent CBRE from accepting the award of the September 2014 brokerage contract since: (1) in 2014, CBRE was only an evaluator of proposals, and not also a submitter of a proposal; (2) CBRE was not engaged in self-evaluation or self-dealing in 2014; (3) CBRE never disclosed to GSA or anyone else in 2014 that CBRE owned Trammell Crow, or that CBRE-Trammell Crow would be submitting an offer. *See* 48 C.F.R. 9.505-3; AR Tab 133 at 2922-2923.

However, once Trammell Crow submitted its initial offer in this procurement on October 20, 2015, 48 C.F.R 9.505-3 prohibited CBRE from acting as *both* evaluator and offeror. *See* 48 C.F.R. 9.505-3. FAR 9.505-3 required GSA,

10

at that point, to either terminate CBRE as its broker, disqualify Trammell Crow as an offeror, or attempt to neutralize the self-evaluation conflict. *Id*.; FAR 9.04; FAR 9.505; FAR 301-1. GSA did none of these things. GSA permitted CBRE-Trammell Crow to evaluate and select for award its own proposal in direct violation of the self-dealing prohibition of FAR 9.505-3. FAR 9.505-3 by its terms applies directly to this procurement. A wealth of case law cited above by Parcel 49C holds that the self-evaluation prohibition articulated by FAR 9.505-3 prohibits CBRE from evaluating and selecting for award its own proposal, creates an impaired objectivity conflict of interest, and prohibits GSA from selecting CBRE-Trammell Crow for award.

The COFC's holding that FAR 9.505-3 does not apply to this FCC Lease procurement is erroneous. The COFC fails to recognize (and distinguish between) the two separate and dramatically different conflicts that CBRE-Trammell Crow created in this procurement: (1) CBRE's "unequal access to information" dual agency conflict (FAR 9.505-4); and (2) CBRE's impaired objectivity, self-evaluation conflict (FAR 9.505-3). OCI regulations and interpreting courts recognize that these comprise two separate and distinct types of conflicts. *See, e.g.*, *L-3 Commc'ns Corp. v. United States,* 99 Fed. Cl. 283, 298 (2011) ("Generally, there are three types of OCIs - resulting from unequal access to information, biased ground rules, and impaired objectivity"); *Turner Constr.*, 94

11

Fed. Cl. 561, 568, (stating that the COFC has "interpreted FAR Subpart 9.5 to identify three distinct types of OCIs;" unequal access to information, biased ground rules, and impaired objectivity).

48 C.F.R. 9.505-4 recognizes and describes CBRE-Trammell Crow's dual agency conflict as an "unequal access to information" conflict, stating that "[w]hen a contractor requires proprietary information to perform a Government contract and can use the leverage of the contract to obtain it, the contractor may gain a competitive advantage unless restrictions are imposed." 48 C.F.R. 9.504(a); *see Ala. Aircraft Indus., Inc. - Birmingham v. United States*, 83 Fed. Cl. 666, 688 (2008) *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009. A separate FAR provision, 48 C.F.R. 9.505-3, recognizes CBRE-Trammell Crow's second, distinct self-evaluation conflict as an "impaired objectivity" conflict. *See* 48 C.F.R. 9.505-3. Such an impaired objectivity conflict exists where, as here, a contractor engages in evaluating and selecting for award its own proposal or even that of an affiliate. *See L-3 Commc'ns Corp.,* 99 Fed. Cl. 283, 297 (2011) (citing *Ala. Aircraft Indus.,* 83 Fed. Cl. 666, 687-88 ("The impaired objectivity OCI occurs 'where a firm's work under one contract might require it to evaluate itself under another contract'")); *MacAulay-Brown, Inc. v. United States*, 125 Fed. Cl. 591, 594 n.1 (2016) (stating that an "OCI exists when work performed by a contractor may . .

. impair the contractor's objectivity in performing government work if *for example it is called upon to evaluate proposals submitted by affiliates*) (emphasis added).

The FAR recognizes these conflicts as separate and distinct because they present different risks and different opportunities for impropriety.  CBRE-Trammel Crow's dual agency, unequal access to information conflict poses a risk that CBRE-Trammel Crow will be able to use its position as GSA's broker to gain access to source selection information, unavailable to other offerors, that will confer a competitive advantage upon CBRE-Trammel Crow.  *See L-3 Communications,* 99 Fed. Cl. 283, 297.  CBRE-Trammell Crow's self-evaluation, impaired objectivity conflict poses a separate and distinct legal risk (unrelated to potential transfer of protected information) that CBRE-Trammell Crow will use its position as an evaluator of proposals to advance its self-interest by favorably evaluating its own proposal.  *See Ala. Aircraft,* 83 Fed. Cl. at 688.

The self-evaluation conflict creates a massive incentive for wrongdoing.  By selecting Trammell Crow for award, CBRE has made the proposed CBRE-Trammell Crow building incredibly valuable.  Trammell Crow previously sold a building with federal tenants for $196 million.  *See Cottonwood Partners buys out Trammel Crow stake in Sentinel Square for $196M*, Washington Business Journal, Mar. 12, 2014.  Thus, the self-evaluation conflict poses a significant danger of improperly favorable self-evaluation.  Conversely, the incentive for CBRE to

13

abuse its dual agency and pass data to another client is comparatively miniscule – a

brokerage fee.  It was prejudicial error for the COFC not to recognize that a

separate and distinct self-evaluation conflict existed in this case, in addition to the

dual agency conflict.[14]

### B.    CBRE Never Disclosed Its Self-Evaluation Conflict And The Appearance Of Impropriety Has Never Been Addressed Or Mitigated

The COFC held that no appearance of impropriety resulted from CBRE-

Trammell Crow's evaluation, and selection for award, of its own proposal, since

"CBRE appropriately disclosed its *dual agency relationship* with Trammell Crow

to the GSA *and* to all interested parties in this lease procurement."  DI 79 at 21-22

(emphasis added).  This is incorrect.  *CBRE-Trammell Crow never disclosed the*

*self-evaluation conflict to GSA, and the self-evaluation conflict was never*

*disclosed to the other offerors and never mitigated.*

CBRE submitted two dual agency conflict disclosure forms in this

procurement – one on September 29, 2014, and one on April 12, 2016.  AR Tab

---

[14] The conduct of GSA and CBRE-Trammell Crow violates additional authority that was not addressed by the COFC.  GSA was required to investigate, identify and mitigate the CBRE-Trammel Crow conflict "*as early in the acquisition process as possible*." 48 C.F.R. § 9.504(a) (emphasis added); *Filtration Development Co., LLC v. United States*, 60 Fed. Cl. 371, 377 (2004 ("[t]he CO is instructed to 'identify and evaluate potential organizational conflict of interest *as early in the acquisition process as possible* . . . .").  Early identification and remediation is critical, as a host of other FAR provisions depend on it.  *See* FAR 9.504, 9.505, 9.506(b), 9.506(d)(3); 48 C.F.R. §§ 2.101, 3.101-1.

133 at 2922-23 (September 29, 2014 disclosure form); AR Tab 133 at 2928-31 (April 12, 2016 disclosure form).  All CBRE disclosed to GSA, and all GSA considered, was that CBRE would be simultaneously representing both GSA and other offerors *as a broker*, and thus a dual agency existed.  *Id*.  ***But, CBRE's review of its own proposal is not a dual agency conflict— it is a direct conflict of a company evaluating its own offer, specifically prohibited by FAR § 9.505-3 and the other authority cited above***.  This conflict was *NEVER* disclosed to GSA and *NEVER* evaluated by GSA.  Neither of CBRE's disclosure forms mentions the fact that CBRE will be evaluating - or has already evaluated – its own proposal.  *See* AR Tab 133 at 2922-23; *id*. at 2928-31.

CBRE-Trammell Crow remained silent about this self-evaluation conflict even though it ***knew*** of the conflict the moment Trammell Crow submitted its first offer, since: (1) the senior CBRE official acting for GSA in this procurement, Henry Chapman, was a principal of Trammell Crow who became Vice Chairman of CBRE after CBRE acquired Trammell Crow; and (3) he ***had to know*** that CBRE owned Trammell Crow; and (2) that CBRE was evaluating its own proposal.  *See* http://www.cbre.us/o/washingtondc/people/henry-chapman/Pages/overview.aspx; AR Tab 133 at 2922.  ***No offerors ever received notification of the self-evaluation conflict.***

Since the COFC predicated its holding that no apparent conflict exists on its erroneous finding that CBRE disclosed its self-evaluation conflict, the COFC's holding is erroneous.

### C. The COFC Erred In Holding That GSA Reasonably Determined That The CBRE-Trammell Crow Conflict Was Mitigated

The COFC held that GSA "reasonably determined that the OCI involving CBRE and Trammell Crow could be, and had been, mitigated" due to the existence of the safeguards that CBRE-Trammell Crow describes in its 2014 Dual Agency Disclosure Form. *See* DI 79 at 21. The COFC's holding is error since none of the alleged CBRE safeguards are designed to, or are able to, mitigate or alter the self-evaluation conflict.

CBRE's September 29, 2014 OCI disclosure lists certain safeguards that CBRE asserts it has emplaced to mitigate *dual agency* conflicts. AR Tab 133 at 2922-23. These safeguards include a firewall, and physical and electronic safeguarding of documents "created in connection with this task order" - *i.e.*, CBRE's 2014 brokerage agreement with GSA. AR Tab 133 at 2922. None of these alleged safeguards were designed to, or can, mitigate the self-evaluation conflict. AR Tab 133 at 2922-23. These measures were created in 2014 - a year before CBRE-Trammell Crow became an offeror - and are aimed at preventing the transfer of source selection information between CBRE and third parties. *Id*. Since CBRE-Trammell Crow did not become an offeror until October 2015 – and,

16

according to Trammell Crow itself, CBRE could not know that it would become an offeror when it became GSA's broker and created firewalls in 2014[15] - these firewalls could not have been established to mitigate the conflict whereby CBRE evaluated and selected for award its own proposal.

Not only were CBRE's firewalls and electronic safeguards not designed to mitigate its self-evaluation conflict, these measures are totally incapable of doing so. Dual agency conflicts are a type of unequal access to information conflict, which arise due to the actual or potential transfer of non-public, competitively advantageous, information to an offeror. *See* § A, above; *Ala. Aircraft Indus., supra*, 83 Fed. Cl. at 688; *Turner Construction Co.*, 94 Fed. Cl. at 569 (2010). The firewalls and electronic safeguards that CBRE allegedly implemented were implemented to preclude a dual agency conflict, and are aimed solely at precluding CBRE from transferring advantageous source selection information to its offeror-clients. Firewalls and electronic safeguards designed to prevent disclosure of information do nothing to ensure the objectivity of CBRE-Trammell Crow when it is evaluating its own proposal. Firewalls and electronic safeguards cannot alter the fact that Mr. Henry Chapman of CBRE knew that CBRE was evaluating its own

---

[15] *See* DI 70 at 5 ("CBRE did not list Trammell [in its 2014 OCI Disclosure Form] just as it did not list any of its multiple other subsidiaries that may or may not have ultimately participated in a fledgling procurement [since] CBRE listed only the existing buildings with which it had a conflict . . . ; *it could not be expected to include imaginary or future ones*") (emphasis added).

proposal, and that CBRE was selecting its own proposal for award.  To hold, like the COFC, that firewalls and electronic safeguards designed to mitigate leaks of non-public information in a dual agency context effectively mitigate a self-evaluation conflict, is tantamount to arguing that there never can be an unmitigated conflict when reviewing one's own proposal - which is untenable.

## II.    PARCEL 49C WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF THE REQUESTED RELIEF

A protester suffers irreparable harm where, in the absence of the requested injunctive relief, the protester will lose the opportunity to fairly compete in a procurement and will lose profits as a result of this lost opportunity.[16]  Here, Parcel 49C will suffer irreparable harm since it will be precluded from fairly competing in, and profiting from, this procurement, due to GSA's failure to perform its mandatory duties of evaluating and identifying the CBRE-Trammell Crow self-evaluation conflict, and mitigating or neutralizing this conflict.

Parcel 49C will also suffer irreparable harm in the absence of injunctive relief since, if Parcel 49C prevails on appeal, the Government is sure to argue that

---

[16] *See, e.g., Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 355 (2012) ("Recoupment of bid preparation costs or other legal remedy would not serve to remedy plaintiff's loss of . . .  the opportunity to participate in a fair procurement process"); *id*. ("***the court finds that plaintiff has demonstrated irreparable harm in the form of lost profits and a lost opportunity fairly to compete***") (emphasis added).

it need not terminate the lease, or that doing so would be financially prohibitive, as the lease contains no termination for convenience clause.[17] This will deprive Parcel 49C of any meaningful remedy.

## III.    THE BALANCE OF THE HARDSHIPS FAVORS PARCEL 49C

The balance of the hardships favors Parcel 49C.  If the Court does not issue injunctive relief, and GSA is permitted to sign a lease while Parcel 49C pursues its Appeal, it is highly likely that, if Parcel 49C prevails, GSA will assert that it will suffer substantial economic harm if it is forced to terminate the lease it has signed with CBRE-Trammell Crow.  Thus, the denial of injunctive relief will deprive Parcel 49C of the possibility of obtaining any real remedy.

Conversely, GSA cannot demonstrate that it will suffer ***any*** hardship if the Court issues an injunction.  The only possible hardship that GSA can identify as resulting from the issuance of an injunction is that its procurement of new office

---

[17] *See*, *e.g.*, *Federal Builders, LLC-The James R. Belk Trust - Costs*, B-409952.3, May 6, 2016, 2016 U.S. Comp. Gen. LEXIS 108 at *1, *11 ("because the awarded lease contains no termination clause, there is no relief available to the protester except reimbursement of its costs"); *Shields & Dean Concessions, Inc.-- Reconsideration*, B-292901.4, Mar. 19, 2014, 2004 U.S. Comp. Gen. LEXIS 60 at *1, *9 ("in the absence of a clause that would permit the government to unilaterally terminate a contract for convenience a successful protester's only remedy is reimbursement of proposal preparation and protest costs"); *see also*, *Doty Bros. Equipment Company*, B-274634, Dec. 19, 1996, 1996 U.S. Comp. Gen. LEXIS 619 at *1, *8 (holding it "impractical to recommend termination" of a successfully protested contract award where "the agency reports that approximately 40 percent of the project is complete . . . .").

space, and the FCC's ability to consolidate its footprint, will be delayed – and

delay does not constitute irreparable harm.[18]   Moreover, GSA will not even suffer

delay from the grant of an injunction, since GSA  - for reasons unrelated to this

Parcel 49C's Protest - has already asked Parcel 49C to extend the current FCC

lease by one year beyond the October 2017 expiration date of the current FCC

lease, and Parcel 49C's Appeal will be resolved in less than one year.  *See, e.g.*,

*Unionbancal Corp. & Subsidiaries v. United States*, *93 Fed. Cl. 166, 168 (*2010)

("On average . . . [a Federal Circuit appeal] should be decided shortly after oral

argument," [and] [h]ence, the present case should be ready to proceed to trial in

less than a year from now").

## IV.    GRANTING INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST

The public interest is served by ensuring fair and open competition in the

procurement process.  *United Int'l Investigative Servs., Inc. v. United States*, 41

Fed. Cl. 312, 323 (1998).  GSA's failure to identify, mitigate, or neutralize a self-

evaluation conflict that will render the execution of a lease arbitrary and

capricious, an abuse of discretion, contrary to procurement regulations and law,

---

[18] *See, e.g.*, *Software Testing Solutions, Inc. v. United States*, 58 Fed. Cl. 533, 538 (2003) ("the mere delay of a contract is insufficient, standing alone, to avoid preliminary relief"); *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003) ("only in an exceptional case would [the delayed implementation of a contract] alone warrant a denial of injunctive relief, or the courts would never grant injunctive relief in bid protests").

and devoid of any rational basis.  The granting of injunctive relief will serve the public interest by preserving the integrity of the procurement system by ensuring honest, open, and fair competition.[19]

## CONCLUSION

For the foregoing reasons, Parcel 49C respectfully requests that, during the pendency of Parcel 49C's Appeal, this Court enjoin GSA from awarding, signing, or requiring or permitting performance of, any Lease, pursuant to RLP No. 3DC0421.  The other parties to this Appeal oppose this Motion and will file a response.

December 15, 2016                                   Respectfully submitted,

                                                   /s/ Richard J. Conway
                                                   Richard J. Conway

---

[19] *PGBA, LLC v. United States*, 57 Fed. Cl. 655, 663 (2003); *Magellan Corp. v. United States*, 27 Fed. Cl. 446, 448 (1993) ) ("the public interest in honest, open, and fair competition in the procurement process is compromised whenever an agency abuses its discretion in evaluating a contractor's bid"); *id.* ("the public's interest likewise lies in preserving the integrity of the competitive process").

*Parcel 49C Limited Partnership v. United States*, Case No. 17-1315 (Fed. Cir. 2017)

### Non-Confidential Exhibit List

| Exhibit Number | Administrative Record Entry |
| --- | --- |
| Non-Confidential Exhibit 1 | AR Tab 015 at 294 |
| Non-Confidential Exhibit 2 | AR Tab 017 at 306 |
| Non-Confidential Exhibit 3 | AR Tab 023 at 329, 331 |
| Non-Confidential Exhibit 4 | AR Tab 029 at 450 |
| Non-Confidential Exhibit 5 | AR Tab 030 at 455 |
| Non-Confidential Exhibit 6 | AR Tab 031 and 459-60, 462, 472 |
| Non-Confidential Exhibit 7 | AR Tab 042 at 785-87 |
| Non-Confidential Exhibit 8 | AR Tab 073 at 1046 |
| Non-Confidential Exhibit 9 | AR Tab 109-114 |
| Non-Confidential Exhibit 10 | AR Tab 116 |
| Non-Confidential Exhibit 11 | AR Tab 117 at 715 |
| Non-Confidential Exhibit 12 | AR Tab 118 at 2014, 2018, 2020 |
| Non-Confidential Exhibit 13 | AR Tab 133 at 2918-21, 2922-23, 2924-26, 2928-31 |
| Non-Confidential Exhibit 14 | Opinion and Order Being Appealed - *Parcel 49C Limited Partnership v. United States,* COFC No. 16-427C, |

| | |
|---|---|
| | Fed. Cl. __, Docket Entry No. 79, Nov. 30, 2016 Order and Opinion of the U.S. Court of Federal Claims Denying Plaintiff's Motion for Judgment on the Administrative Record |
| Non-Confidential Exhibit 15 | Notice of Appeal - *Parcel 49C Limited Partnership v. United States,* COFC No. 16-427C, __ Fed. Cl. __, Docket Entry No. 80, Nov. 30, 2016 Notice of Appeal |
| Non-Confidential Exhibit 16 | Order Denying Motion for Injunction - *Parcel 49C Limited Partnership v. United States,* COFC No. 16-427C, __ Fed. Cl. __, Docket Entry No. 86, Dec. 14, 2016 Order Denying Plaintiff's Motions for Injunctive Relief |
| Non-Confidential Exhibit 17 | Parcel 49C Certificate of Interest |

# EXHIBIT 1



*December 9, 2014*

**Requirements Review Meeting Minutes**
**Portals II – 445 12th Street, SW – December 9, 2014**
*GS-P-11-14-YL-0041, Federal Communications Commission*
*Contract Number: GS00P10BQD0001*

**In Attendance**:

| | | |
|---|---|---|
| Henry Chapman | Sandi Munari - FCC | John Skudlarek – FCC (IT) |
| Sara Dunstan | Maureen Duignan - FCC | Fred Bücwer – FCC (Security) |
| Richard Downey | Paul Laurenzano – FCC | Toni McGowan – FCC |
| Kevin Terry – GSA | Scott Paden – OLBN | |
| Bradi Henderson - GSA | John Li - OLBN | |
| Suzanne Perrin - FCC | Carolyn Conyers – OMD/FCC | |

**Review of Discussion Topics:**

- GSA began the meeting by introducing everyone. GSA explained the purpose of the session is to determine what special spaces would remain in a renovation of the incumbent location and to make sure all cost elements are covered in order to prevent a protest.
- GSA gave an update on the Prospectus status and stated the Prospectus should go to the Hill at the latest March 2015.
- CBRE reiterated that the two main objectives of the meeting is to establish a move and replication cost estimate and to review the Program of Requirements (POR) containing the special areas. CBRE suggested that the POR be sent to all of the potential Offerors in the RLP package.
- FCC stated that from a security standpoint there will be no cost savings to have if they were to remain in the current building. Since the agency is consolidating from 692,029 RSF / 596,576 USF to 525,840 RSF / 438,200 USF, security will have to compartmentalize, which ultimately could end up being additional costs rather than savings.
- CBRE explained as long as there is reasonable justification for the move and replication estimates then there should not be a problem.
- GSA pointed to the POR and reviewed their methodology behind the special and unique spaces. Tier I represents the areas that will remain, Tier II contains the areas that will reduce by 10-15% and Tier III contains the areas that are grossly outsized.
- CBRE asked if there are any rooms in Portals II that would stay as is.
- FCC asked everyone to turn to section 6.3 of the POR and highlighted the following special and unique spaces:
  - Commission Meeting Room: Technology outdated needs to be updated
  - Command Center: Could remain as is; expensive to move
  - 7th Floor: Major SCIF which would have to be constructed around.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**AR 294**

# **EXHIBIT 2**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

---

## PROJECT MANAGEMENT AND ACQUISITION PLAN
### (ACQUISITION OF LEASEHOLD INTERESTS IN REAL PROPERTY)

---

**PROJECT NO.:** 3DC0421

**A. PROJECT DEFINITION/STATEMENT OF NEED:**

1. Requiring Agency(ies):                    Federal Communications Commission
2. Location of pending action:               Washington, DC
3. Project background/trigger event:    The Federal Communications Commission (FCC) currently occupies 659,030 rentable square feet (RSF), yielding 596,576 ANSI/BOMA Office Area Square Feet (ABOA SF) of office space in Washington, DC under the following leases: Lease Number GS-11B-40155 at 445 12th Street, SW and Lease Number GS-11B-40114 at 1250 Maryland Avenue, SW.  The leases expire on October 16, 2017, and October 31, 2017, respectively.  These leases comprise the space contemplated for FCC's Prospectus consolidation under Prospectus Number PDC-06-WA16.  The prospectus authorizes a total of 473,000 RSF in Washington, DC and seeks to consolidate FCC's leased space currently housed at the above locations.  FCC will improve their overall utilization rate from 272 usable square feet to 180 usable square feet.  The total space reduction of 186,030 RSF. The space reduction will yield approximately $11 million in total rent savings on an annual basis.  The prospectus authorizes up to a 15 year lease term and allows the Government to issue a single or multiple award(s) however FCC has a requirement to remain in a contiguous location(s) which likely will result in a single award.  The Government intends to conduct a full and open, lowest price technically acceptable procurement.

4. REXUS Action Type:
   - ☐ New
   - ☒ New Replacing
   - ☐ Succeeding
   - ☐ Superseding
   - ☐ Expansion
     Within Scope?    ☐ Yes.  Describe _____
                      ☐ No.  Will prepare an OTFO justification

   - ☐ Extension (GSAM 570.405)
        Select the purpose of the extension:
        - ☐ Construction Delay
        - ☐ Customer DID Prep. Delay
        - ☐ Lack of Agency Funding
        - ☐ Lack of Agency POR
        - ☐ Lessor Delay
        - ☐ Market Conditions
        - ☐ Strategic Portfolio Scheduling
        - ☐ Tactical Considerations
        - ☐ Other (workload, agency leaving PBS inventory, forced move, FEMA emergency, etc.)
        Describe:_____
        Describe follow-on action for long-term housing solution, if applicable.  _____

   - ☐ Renewal (GSAM 570.401)
        ☐ Evaluated    ☐ Unevaluated

5. Estimated Square Footage to be Acquired:  473,000 RSF;  393,633 ABOA SF

   If Requirement Action Type is not a "New Requirement", provide the following:

   a) Current lease number  LDC40155, LDC40114
   b) Building name and address  445 12th Street, SW, 1250 Maryland Avenue, SW
   c) Current square footage  659,030  RSF;  596,576  ABOA.
   d) Current annual rent rate $ 52.63/RSF (LDC40155), $52.72/RSF (LDC40114)
   e) Lease expirations are  October 16, 2017, October 31, 2017
   f) If applicable, describe existing renewal option(s) _____

6. Lease Acquisition Model:
   ☒ Standard Model

---

**AR 303**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

## PROJECT MANAGEMENT AND ACQUISITION PLAN
### (ACQUISITION OF LEASEHOLD INTERESTS IN REAL PROPERTY)

| Kevin Paul<br>kevin.paul@gsa.gov | Lease Contracting Specialist | 202.205.5721 |
|---|---|---|
| Jason Hilton<br>jason.hilton@gsa.gov | Asset Manager / Reg. CPP | 202.708.7012 |
| Henry Chapman<br>henry.chapman@cbre.com | NBC Contractor | 202.585.5665 |
| Sara Dunstan<br>sara.dunstan@cbre.com | NBC Contractor | 202.585.5663 |
| Richard Downey<br>richard.downey@cbre.com | NBC Contractor | 202.585.5664 |
| Wanda Sims<br>wanda.sims@fcc.gov | FCC | 202.418.2990 |
| MaryKay Mitchell<br>marykay.mitchell@fcc.gov | FCC | 202.418.2173 |

2. Stakeholder communication preferences.

| Audience | Approach | Timing |
|---|---|---|
| Client | Phone Call & In person | As needed |
| LCO supervisor | In Person | As needed |
| Property manager | Email & In Person | Monthly, and at key project intervals such as market survey and award |

### C. ACQUISITION STRATEGY/PLAN OF ACTION

1. Risk and Opportunity Management

| Risk/Opportunity Name and Description | Likelihood (H/M/L) | Impact (H/M/L) | Classification (H/M/L) | Mitigation Plan |
|---|---|---|---|---|
| Pre-Award (ex. lack of competition) | L | L | L | |
| Award (ex. risk of protest) | M | H | H | Only if new construction projects would likely not meet the required delivery date. |
| Post-Award (ex. build-out time/costs, funding issues) | M | H | H | The Agency has submitted their FY16 request for a portion of their buildout and FF&E to congress. However, they have yet to receive approval and we won't know whether those funds are approved until the FY 16 President's budget is approved by congress. |

**AR 306**

# EXHIBIT 3



Mikhail Petersen - LDW <mikhail.petersen@gsa.gov>

## Fwd: FCC Move and Replication
1 message

Kevin Terry - WPRA <kevin.terry@gsa.gov>                    Wed, Jan 6, 2016 at 3:23 PM
To: Edith Toms <edith.toms@gsa.gov>, Mikhail Petersen - LDW <mikhail.petersen@gsa.gov>

Move & Rep
--------- Forwarded message ---------
From: **Cirilo Paulo - WPRB-D-C** <cirilo.paulo@gsa.gov>
Date: Mon, Jul 27, 2015 at 3:50 PM
Subject: Re: FCC Move and Replication
To: "Chapman, Henry @ Washington DC" <Henry.Chapman@cbre.com>
Cc: "Dunstan, Sara @ Washington DC" <Sara.Dunstan@cbre.com>, "Kevin Terry (WPRA)"
<kevin.terry@gsa.gov>


Henry,

Find attached the revisions done to the Rep Cost Analysis per our conversation.

The changes were as following: 1) Design cost percentage was changed to ▉ (from ▉)
                              2) Lessor's fee was changed to ▉ (from ▉),
                              3) TI allowance was changed to $46.74 (from $35.00)
                              4) BSAC allowance of $35 was added.

In addition, the move cost was made equal in value on both scenarios, and the security cost was reduced on the stay in place scenario.

My only concern is adding the BSAC as part of this analysis, because it alters the total personal property cost, yet the BSAC as I have been informed can only apply to security related costs. Unless the security cost is higher than the BSAC ($35 x 393,633 = $13,777,155) which is $13,777,155 in this scenario, it can provide a false total of personal property funds an Agency would need to procure (any money above the security cost amount can't be used for other personal property costs). Not sure where the best place to indicate this BSAC would be.

Respectfully,

Cirilo Paulo
Contractor Project Engineer
Lease Project Management Division
Real Estate Acquisition Group - WPRB
Public Buildings Service
National Capital Region
U.S. General Services Administration
301 7th Street, SW, Suite 2720
Washington, DC 20407

(202) 708-8298 - Office
(202) 205-4716 - Fax
(202) 309-6439 - Cell

On Mon, Jul 20, 2015 at 10:18 AM, Chapman, Henry @ Washington DC <Henry.Chapman@cbre.com> wrote:

> Cirilio,

Kevin and Cirilo,

As you know, we need to wrap up an estimate of the move and replication costs in the coming weeks – preferably before we run the ad for expressions of interest. Attached are excerpts from the Final POR, as well as an earlier draft that discussed the potential reuse of special spaces in the Portals building. I believe these documents are good starting points for our analysis. I have highlighted those areas that discuss the new requirements for special spaces and any possibility for their reuse. Combined with our discussions with FCC, there appears to be little gain by remaining in the existing building.

We need to look at this closely and allocate any dollar figure for all or partial reuse of these spaces. I believe it clear that there is no portion of the IT that can be salvaged, but there might be some security elements that can be retained.

Cirilo, Doug was in several meetings with FCC where this was discussed, so he may be able to help. Will you be able to prepare this cost analysis? I know this is becoming a larger issue for GSA in light of some recent protests attacking Move and Rep Cost Analysis.

Thanks for your help,

Henry

Henry O. Chapman | Vice Chairman
CBRE, Inc. | Global Corporate Services
750 9th Street, NW, Suite 900  Washington, DC  20001
T 202 585 5665 | F 202 783 1723 | C 703 220 1833
henry.chapman@cbre.com | www.cbre.com

--
Kevin Terry
Senior Realty Contracting Officer
US General Services Administration
301 7th Street, SW
Washington, DC 20407
Desk: 202-708-4600
Cell:   202-420-1854

**2 attachments**

**FCC Move and Replication Cost Estimate 15-07-24 - Relocate.pdf**
360K

**FCC Move and Replication Cost Estimate 15-07-24 - Stay in Place.pdf**
360K

**AR 331**

# EXHIBIT 4

U.S. Government Seeks to Lease Office and Related Space in Washington, DC - Federal ...    Page 1 of 4

## U.S. Government Seeks to Lease Office and Related Space in Washington, DC

SOLICITATION NUMBER: 3DC0421

NOTICE DETAILS

**Solicitation #:**
3DC0421

**Procurement Type:**
Presolicitation

**Date Posted:**
July 20, 2015

**Title:**
U.S. Government Seeks to Lease Office and Related Space in Washington, DC

**Classification Code:**
X -- Lease or rental of facilities

**NAICS Code:**
531190 -- Lessors of Other Real Estate Property

**Is this a Recovery and Reinvestment Act Action?:**
No

**Response Date:**
Aug 03, 2015 3:00 pm  Eastern

Phone: 202-585-5665
Fax: 202-783-1723

**Primary Point of Contact.:**
Henry O. Chapman
henry.chapman@cbre.com

**Secondary Point of Contact:**
Sara Dunstan,
Senior Associate
sara.dunstan@cbre.com
Phone: 202-585-5663
Fax: 202-783-1723

**Description:**
    The General Services Administration (GSA) seeks to lease the following space:

| | |
|---|---|
| City/State: | Washington, DC |
| Delineated Area: | Washington, DC Central Employment Area |
| Minimum Sq. Ft. (ABOA): | 394,000 |
| Maximum Sq. Ft. (RSF): | 473,000 |
| Space Type: | Office and related space |

**AR 450**

# EXHIBIT 5



GSA National Capital Region

## VIA ELECTRONIC MAIL

September 22, 2015

Mr. Timothy Hutchens
CBRE, Inc.
750 9th Street, NW
Suite 900
Washington, DC 20001

    Re:   General Services Administration (RLP No. 3DC0421)
           Portals II – 445 12th Street, SW

Dear Mr. Hutchens:

Enclosed is a copy of Request for Lease Proposals (RLP) No. 3DC0421 for your use in submitting an initial offer for the General Services Administration's requirement for space in Portals II, 445 12th Street, SW, Washington, DC 20024.

Due to the nature of the Agency's mission requirements, the Government has determined this procurement to be a critical action. The Water Resources Council's Floodplain Management Guidelines for Implementing Executive Order 11988 defines a critical action as any activity for which even a slight chance of flooding would be too great a risk, and therefore should be located outside the 500-year floodplain. Since it appears your offered building is located in the 500-year floodplain, your offer is subject to mitigation.

Please carefully review the RLP and attachments and initial all pages where indicated. The following forms must be completed and returned with your offer:

- RLP No. 3DC0421
- Lease No. GS-XXP-LXXXXXXX (Form L201C)
- Agency Specific Requirements
- Security Requirements for Level IV
- GSA Form 3516 (Solicitation Provisions)
- GSA Form 3517B (General Clauses)
- GSA Form 1364C (Proposal to Lease Space)
- GSA Form 1217 (Lessor's Annual Cost Statement and Instructions)
- GSA Form 3518-SAM (Addendum to System for Award Management and Representations and Certifications)
- GSA Form 12000 (Prelease Fire Protection and Life Safety Evaluation)
- Program of Requirements
- Commission Agreement
- Rider No. 1 (Additional Renewal Option and Purchase Option)

U.S. General Services Administration
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

**AR 454**

Page 2 / 2

- Documentation required to comply with NEPA
- 500-year floodplain mitigation plan

Any exceptions you may have to the Solicitation must be outlined separately in your offer, so that we can address those items during negotiations. If you plan to have your legal counsel review the language in the RLP, Form L201C, Form 3517B and 3518, please submit those documents to your legal counsel now, so as to allow adequate time to discuss any language issues that may arise. Changes to the language in these documents cannot be made after you submit your final proposal revisions.

**Please submit your initial offer by 3:00 PM on October 20, 2015, to the following address:**

> CBRE, Inc.
> ATTN: Henry Chapman, Sara Dunstan, Richard Downey
> 750 9th Street, NW
> Suite 900
> Washington, DC 20001

After receipt of your initial offer, the Government will contact you for negotiations.

If you have any questions please contact Henry Chapman, Sara Dunstan or Richard Downey at (202) 783-8200.

Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer

**U.S. General Services Administration**
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

**AR 455**

# **EXHIBIT 6**

# GSA REQUEST FOR LEASE PROPOSALS NO. 3DC0421 Washington, DC

# Offers due by 10/20/2015

In order to be considered for award, offers conforming to the requirements of the RLP shall be received no later than 3:00 pm Eastern Daylight Time (EDT) on the date above.  See "Receipt Of Lease Proposals" herein for additional information.

This Request for Lease Proposals ("RLP") sets forth instructions and requirements for proposals for a Lease described in the RLP documents.  Proposals conforming to the RLP requirements will be evaluated in accordance with the Method of Award set forth herein to select an Offeror for award.  The Government will award the Lease to the selected Offeror, subject to the conditions herein.

*The information collection requirements contained in this Solicitation/Contract, that are not required by the regulation, have been approved by the Office of Management and Budget pursuant to the Paperwork Reduction Act and assigned the OMB Control No. 3090-0163.*

**STANDARD RLP
GSA FORM R101C (05/15)**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# REQUEST FOR LEASE
# PROPOSALS NO. 3DC0421

September 21, 2015
STANDARD RLP GSA FORM R101C (May 2015)

## SECTION 1  STATEMENT OF REQUIREMENTS

### 1.01    GENERAL INFORMATION (JUN 2012)

A.    This Request for Lease Proposals (RLP) sets forth instructions and requirements for proposals for a Lease described in the RLP documents. The Government will evaluate proposals conforming to the RLP requirements in accordance with the Method of Award set forth below to select an Offeror for award.  The Government will award the Lease to the selected Offeror, subject to the conditions below.

B.    Included in the RLP documents is a lease form (GSA Form L201C) setting forth the lease term and other terms and conditions of the Lease contemplated by this RLP and a GSA Proposal to Lease Space (GSA Form 1364C-STANDARD) on which Offeror shall submit its offered rent and other price data, together with required information and submissions.  The Lease paragraph titled "Definitions and General Terms" shall apply to the terms of this RLP.

C.    Do not attempt to complete the lease form (GSA Form L201C).  Upon selection for award, GSA will transcribe the successful Offeror's final offered rent and other price data included on the GSA Form 1364C into the lease form, and transmit the completed Lease, including any appropriate attachments, to the successful Offeror for execution.  Neither the RLP nor any other part of an Offeror's proposal shall be part of the Lease except to the extent expressly incorporated therein.  The Offeror should review the completed Lease for accuracy and consistency with his or her proposal, sign and date the first page, initial each subsequent page of the Lease, and return it to the Lease Contracting Officer (LCO).

D.    The Offeror's executed Lease shall constitute a firm offer.  No Lease shall be formed until the LCO executes the Lease and delivers a signed copy to the Offeror.

### 1.02    AMOUNT AND TYPE OF SPACE, LEASE TERM, AND OCCUPANCY DATE (SEP 2013)

A.    The Government is seeking a minimum of **393,633** of American National Standards Institute/Building Owners and Managers Association (ANSI/BOMA) Office Area (ABOA) square feet (SF), yielding no more than 473,000 rentable square feet (RSF), of contiguous space within the Area of Consideration set forth below.  Of this space, the Government requires approximately 28,495 ABOA SF to be located on the first (1st) or ground floor of the offered building, which does not have to be contiguous to the remaining leased premises.  If the approximately 28,495 ABOA SF is not available entirely on the ground/first floor, approximately 4,320 ABOA SF may be located on the floor one (1) level below the ground level/first floor.  See Section 2 of the Lease for applicable ANSI/BOMA standards.

B.    The Space shall be located in a modern quality Building of sound and substantial construction with a facade of stone, marble, brick, stainless steel, aluminum or other permanent materials in good condition and acceptable to the LCO.  If not a new Building, the Space offered shall be in a Building that has undergone, or will complete by occupancy, modernization or adaptive reuse for the Space with modern conveniences.

C.    Offered space must be contiguous (with the exception of the ground level/first floor space referenced in paragraph 1.02.A. above) and accommodated in no more than one (1) building, as determined by the LCO.  To qualify as one (1) building, offered space must be owned by a single Offeror and the structures, if more than one, must be connected internally on at least 70% of the Government-occupied floors.

D.    The lowest point of the top floor of the offered space shall be no more than 25 lineal feet from the exterior surface of the roof, but generally not exceeding two floors.  For example, in a ten story building, the upper-most floor of the offered space would need to be on floors nine or ten.

E.    The Government requires **12** structured/inside non-stacked parking spaces (each of which shall meet all requirements for parking spaces under applicable laws) reserved for the exclusive use of the Government.  These spaces must be grouped together and located proximate to a main employee entrance, as designated by the Government, and shall be marked by signage designating them as official Government spaces.  These spaces must also be secured and lit in accordance with the Security Requirements set forth in the Lease.  Offeror shall include the cost of this parking as part of the rental consideration.

F.    As part of the rental consideration and at no additional cost to the Government, the Government requires use of part of the Building roof for the installation of antennas.  Specifications regarding the type of antennas and mounting requirements are included in the agency requirements information provided with this RLP.  As outlined in Section 1.02 of the Lease, the Government requires, at no additional cost to the Government, the exclusive right to 1) control access to the roof; and 2) restrict use by other parties if such use would interfere with the effectiveness of Government's telecommunications equipment, as determined by the LCO.

G.    Approximately **600** ABOA SF will be used for the operation of a vending facility under the provisions of the Randolph-Sheppard

**AR 459**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Act (20 USC 107 et. seq.).  The Government will control the number, kind, and locations of vending facilities and will control and receive income from all automatic vending machines.  Offeror shall provide necessary utilities and make related alterations.  The cost of the improvements is part of Tenant Improvement (TI) costs.  The Government will not compete with other facilities having exclusive rights in the Building.  The Offeror shall advise the Government if such rights exist.

H.    The lease term shall be **15** Years Firm.  The Government shall have an option to renew the Lease for a term of up to five (5) years (see Lease paragraph 1.06, Option to Renew), effective after year 15, by providing not less than three hundred sixty (360) days' prior written notice.  This shall be an evaluated option.

I.    Occupancy is required in accordance with the schedule outlined in the Schedule for Completion of Space paragraph under the Lease, but must occur between October 18, 2017, and December 31, 2019.

J.    Purchase Option – Offerors must provide an option to purchase the Building at the end of the lease term and any renewal options thereof, as outlined in Exhibit L (Rider No. 1) to this RLP.  This purchase option will not comprise a part of the price evaluation for the leasehold interest of this solicitation as described in Paragraph 4.05 of this RLP.

### 1.03    AREA OF CONSIDERATION (JUN 2012)

The Government requests Space in the Central Employment Area (CEA) of Washington, D.C. within 2,640 walkable linear feet of a Metrorail station.

Buildings that have frontage on the boundary streets are deemed to be within the delineated Area of Consideration.

### 1.04    NEIGHBORHOOD, PARKING, LOCATION AMENITIES, AND PUBLIC TRANSPORTATION (SEP 2013)

A.    INSIDE CITY CENTER:  Space shall be located in a prime commercial office district with attractive, prestigious, and professional surroundings with a prevalence of modern design and/or tasteful rehabilitation in modern use.  Streets and public sidewalks shall be well maintained.  The parking-to-square-foot ratio available on-site shall at least meet current local code requirements, or in the absence of a local code requirement, on-site parking shall be available at a ratio of one (1) space for every **1,500** RSF of Space.  Throughout the term of the Lease and any extension thereof, the Government shall have a continuous first (1st) right to its pro-rata share of on-site parking at prevailing market rates.  A variety of inexpensive or moderately priced fast-food and/or eat-in restaurants shall be located within the immediate vicinity of the Building, but generally not exceeding **a walkable 2,640 feet** of the employee entrance of the offered Building, as determined by the LCO.  Other employee services, such as retail shops, cleaners, and banks, shall also be located within the immediate vicinity of the Building, but generally not exceeding **a walkable 2,640 feet** of the employee entrance of the offered Building, as determined by the LCO.  A commuter rail, light rail, or subway station shall be located within the immediate vicinity of the Building, but generally not exceeding **a walkable 2,640 feet**, as determined by the LCO.  Amenities must be existing or the Offeror must demonstrate to the Government's reasonable satisfaction that such amenities will exist by the Government's required occupancy date.

B.    INTENTIONALLY DELETED

### 1.05    LIST OF RLP DOCUMENTS (APR 2015)

The following documents are attached to and included as part of this RLP package:

| DOCUMENT NAME | NO. OF PAGES | EXHIBIT |
|---|---|---|
| Lease No. GS-XXP-LXXXXXXX (Form L201C) | 43 | A |
| Agency's Special Requirements, Dated **September 21, 2015** | 3 | B |
| Security Requirements for Level **IV** | 13 | C |
| GSA Form 3516, Solicitation Provisions | 5 | D |
| GSA Form 3517B, General Clauses | 47 | E |
| Proposal to Lease Space (GSA Form 1364C) | 3 | F |
| GSA Form 1217, Lessor's Annual Cost Statement | 2 | G |
| GSA Form 3518 -SAM, Addendum to System for Award Management (SAM) Representations and Certifications (Acquisitions of Leasehold Interests in Real Property) | 2 | H |
| GSA Form 12000 for Prelease Fire Protection and Life Safety Evaluation for an Office Building (Part A or Part B) (See Section 3 for applicable requirements) | 6 | I |
| Program of Requirements | 107 | J |
| Commission Agreement | 3 | K |
| Rider No. 1 | 2 | L |

**AR 460**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

documents. After completing the construction documents, the Lessor shall submit a list of the itemized costs. Such costs shall be subject to negotiation.

C.    There shall be no charge to the Government for any items that already exist in the offered Building or facility.

**1.10    SECURITY LEVEL DETERMINATION FOR FACILITY HOUSING OTHER FEDERAL TENANTS (APR 2011)**

If an Offeror is offering Space in a facility currently housing a Federal agency, the security requirements of the facility may be increased and the Offeror may be required to adhere to a higher security standard than other Offerors competing for the same space requirement. If two or more Federal space requirements are being competed at the same time, an Offeror submitting on both or more space requirements may be subject to a higher security standard if the Offeror is determined to be the successful Offeror on more than one space requirement. It is incumbent upon the Offeror to prepare the Offeror's proposal accordingly.

**1.11    INSPECTION—RIGHT OF ENTRY (JUN 2012)**

A.    At any time and from time to time after receipt of an offer (until the same has been duly withdrawn or rejected), the agents, employees and contractors of the Government may, upon reasonable prior notice to Offeror, enter upon the offered Space or the Premises, and all other areas of the Building access to which is necessary to accomplish the purposes of entry, to determine the potential or actual compliance by the Offeror with the requirements of the RLP and its attachments, which purposes shall include, but not be limited to:

　　　　1.    Inspecting, sampling, and analyzing of suspected asbestos-containing materials and air monitoring for asbestos fibers.

　　　　2.    Inspecting the heating, ventilation and air conditioning system, maintenance records, and mechanical rooms for the offered Space or the Premises.

　　　　3.    Inspecting for any leaks, spills, or other potentially hazardous conditions which may involve tenant exposure to hazardous or toxic substances.

　　　　4.    Inspecting for any current or past hazardous waste operations, to ensure that appropriate actions were taken to alleviate any environmentally unsound activities in accordance with Federal, state, and local law.

B.    Nothing in this paragraph shall be construed to create a Government duty to inspect for toxic materials or to impose a higher standard of care on the Government than on other lessees. The purpose of this paragraph is to promote the ease with which the Government may inspect the Building. Nothing in this paragraph shall act to relieve the Offeror of any duty to inspect or liability which might arise because of Offeror's failure to inspect for or correct a hazardous condition.

**1.12    AUTHORIZED REPRESENTATIVES (JUN 2012)**

With respect to all matters relating to this RLP, only the Government's LCO designated below shall have the authority to amend the RLP and award a Lease. The Government shall have the right to substitute its LCO by notice, without an express delegation by the prior LCO.

　　**Lease LCO:**

　　Kevin M. Terry
　　General Services Administration
　　301 7th Street, SW
　　Washington, DC 20407
　　202.708.4600
　　kevin.terry@gsa.gov

As to all other matters, Offerors may contact the Alternate Government Contact designated below.

　　**Alternate Government Contact:**

　　Henry O. Chapman / Sara B. Dunstan / Richard T. Downey
　　CBRE, Inc.
　　750 9th Street, NW, Suite 900
　　Washington, DC 20001
　　202.585.5665 / 202.585.5663 / 202.585.5664
　　henry.chapman@cbre.com / sara.dunstan@cbre.com / richard.downey@cbre.com

**1.13    BROKER COMMISSION AND COMMISSION CREDIT (SEP 2013)**

A.    For the purposes of this RLP, CBRE, INC. (the Broker) is the authorized contractor real estate broker representing GSA. Offerors are advised that there is a potential for a dual agency situation to arise under this procurement, whereby the Broker may represent both GSA and another Offeror under this lease action. By submitting an offer, the Offeror acknowledges the potential for

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

    c.    A copy of the previous year's automatic fire sprinkler system maintenance record showing compliance with the requirements in NFPA 25 (if a system is installed in the Building).

    d.    A valid Building Certificate of Occupancy (C of O) issued by the local jurisdiction. If the Building C of O is not available or the local jurisdiction does not issue a Building C of O, a report prepared by a licensed fire protection engineer with their assessment of the offered Space regarding compliance with all applicable local Fire Protection and Life Safety-related codes and ordinances must be provided.

2.    If the Space offered is 10,000 RSF or less in area and is located on the 1st floor of the Building, Offeror is not required to submit to GSA the Fire Protection and Life Safety (FPLS) Submittal Information listed in I.1.a through I.1.d above.

3.    If the Offeror provides a Building C of O obtained under any edition of the International Building Code (IBC), and the offered Space meets or will meet all the requirements of the Lease with regard to Means of Egress, Automatic Fire Sprinkler System, and Fire Alarm System prior to occupancy, then the Offeror is not required to submit to GSA the FPLS Submittal Information listed in I.1 above.

K.    The legal description of the Property and tax ID number associated with the Property, copies of prior year tax notices and prior year tax bills, as well as any other information (such as a fact sheet, 5" wide x 3" high or larger color photograph, site plan, location map, and tax parcel map) in case of multiple tax parcels for an offered Building, and any other information that may affect the assessed value, in order for the Government to perform a complete and adequate analysis of the offered Property. The Offeror is to provide a detailed overview and documentation of any Tax Abatements on the Property as outlined in the "Real Estate Tax Adjustment" paragraph of the Lease.

L.    A plan and short narrative as necessary to explain how the Offeror will meet the parking requirements.

M.    The architectural plans for modernization, if the offered Building is not a modern office Building.

N.    An asbestos management plan, if the offered Building contains asbestos-containing materials.

O.    First generation plans scaled at a minimum of 1/8" = 1'-0" (preferred) shall be submitted for review and consideration and meet N.1 through N.5 noted below.

1.    All plans submitted for consideration shall include floor plan(s) for which Space is being offered and floor plan(s) of the floor(s) of exit discharge (e.g., street level(s)). Each plan submitted shall include the locations of all exit stairs, elevators, and the Space(s) being offered to the Government. In addition, where Building exit stairs are interrupted or discontinued before the level of exit discharge, additional floor plans for the level(s) where exit stairs are interrupted or discontinued must also be provided.

2.    All plans submitted for consideration shall have been generated by a Computer Aided Design (CAD) program which is compatible with the latest release of AutoCAD. The required file extension is .DWG. Clean and purged files shall be submitted on CD-ROM. Plans shall include a proposed corridor pattern for typical floors and/or partial floors. The CAD file showing the offered Space should show the Poly-Line utilized to determine the square footage on a separate and unique layer. All submissions shall be accompanied with a written matrix indicating the layering standard to verify that all information is recoverable. All architectural features of the Space shall be accurately shown.

3.    Photostatic copies are not acceptable. All architectural features of the Space shall be accurately shown. If conversion or renovation of the Building is planned, alterations to meet this RLP shall be indicated.

4.    Plans shall reflect corridors in place or the proposed corridor pattern for both a typical full (single-tenant) floor and/or partial (multi-tenant) floor. The corridors in place or proposed corridors shall meet local code requirements for issuance of occupancy permits.

5.    GSA will review all plans submitted to determine if an acceptable level of safety is provided. In addition, GSA will review the common corridors in place and/or proposed corridor pattern to determine whether these achieve an acceptable level of safety as well as to verify that the corridors provide public access to all essential Building elements. The Offeror will be advised of any adjustments that are required to the corridors for determining the ABOA Space. The required corridors may or may not be defined by ceiling-high partitions. Actual corridors in the approved layout for the successful Offeror's Space may differ from the corridors used in determining the ABOA square footage for the lease award. Additional egress corridors required by the tenant agency's design intent drawings will not be deducted from the ABOA square footage that the most efficient corridor pattern would have yielded.

P.    As provided in the "Amount and Type of Space, Lease Term, and Occupancy Date" paragraph in the RLP, advise whether there are existing vending facilities in the offered Building which have exclusive rights in the Building.

Q.    Provide evidence demonstrating amenities do or will exist by the Government's required occupancy date. Such evidence shall include copies of signed leases, construction contracts, or other documentation as deemed acceptable by the LCO.

R.    No later than the due date for final proposal revisions, the Offeror must submit to the LCO:

1.    Evidence of an Energy Star® label obtained within the 12 months prior to the due date of final proposal revisions,

# EXHIBIT 7

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

                                                      CBRE

*November 16, 2015*

## Negotiation Meeting Minutes
## The Portals II – November 5, 2015
*GS-P-11-14-YL-0041, Federal Communications Commission*
*Contract Number: GS-00-P-10-BQ-D-0001*

**In Attendance:**

| | |
|---|---|
| Kevin Terry – GSA/ Lease Contracting Officer | Paul Hood – CBRE FLAG (Offeror Rep) |
| Michael Klein – GSA/General Counsel | Stephanie Hamlett – GSA/WPDBA |
| Henry Chapman - CBRE | Dawud Abdur-Rahman - GSA/WPDBA |
| Richard Downey – CBRE | Frank Harry – FC Harry Co. |
| Sarah Maxwell – CBRE | Steven Grigg – Republic Properties |
| Robert DiGiovonni – DFS Construction | George Cantrell – Republic Properties |
| Marcy Owens Test – CBRE FLAG (Offeror Rep) | Keith Worley – WDG Architecture |
| Tim Hutchens – CBRE FLAG (Offeror Rep) | Amy Edwards – Holland & Knight |

**Review of Discussion Topics:**

- CBRE began the meeting by having the parties introduce themselves. CBRE explained that the purpose of the negotiation session was to make sure the offer is fully compliant and to discuss the financial components and deficiencies of the offer. CBRE discussed the timeframe for the procurement and explained that the next step would likely be a letter calling for Final Proposal Revisions; however, timing was contingent upon the internal review of the NEPA documentation.

- CBRE suggested discussing the two outstanding NEPA items before reviewing the Initial Offer.

- Tim Hutchens acknowledged that the offered location was located in a 500-year floodplain and that ownership was in the process of mitigation. Michael Klein explained that the Government had identified this procurement as a critical action and therefore, the offered site cannot be considered for award if the Government had alternative locations that are not in the 500-year floodplain, even if mitigation took place. Mitigation would be required if no alternative locations outside of the 500-year floodplain were offered. Michael Klein explained that to be considered for award, the FEMA flood map would need to be changed to exclude the offered site prior to the due date for Final Proposal Revisions which was highly unlikely, considering the timeframe. The Offeror responded that they would move forward with the mitigation plan and have the FEMA maps changed.

- CBRE stated that the Offeror was required to complete a Phase I Environmental Assessment in accordance with NEPA and the RLP. Stephanie Hamlett, GSA's NEPA advisor, confirmed that the Offeror was required to follow the NEPA guidelines in RLP Paragraphs 2.11 and 5.03. The Offeror expressed concern that existing buildings were being held to an unfair standard in comparison to new construction projects but agreed to follow the requested format. Offeror asked if a specific NEPA requirement does not apply

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

                                                              **CBRE**

to the offered site how should it be addressed. Stephanie responded the Offeror must provide justification on why the NEPA requirement is not applicable.
- CBRE asked if there were any questions, and the Offeror questioned if the move and replication costs for the Government had been calculated and if those costs were going to be included in the evaluation.
- GSA responded that the move and replication costs for the Government will not be disclosed but would be factored into the analysis, if applicable.
- CBRE outlined a few deficiencies that must be corrected in order to make the offer fully compliant.
- CBRE discussed GSA Form 1364:
- Section II: 13 – Offeror did not provide amortized BSAC. CBRE stated Offeror must include the required ▊ for BSAC and if there are existing security items that are in good condition and can be utilized, credit will go towards lessor.
- CBRE discussed the clarifications from the Initial Offer:
    - Paragraph 5, Lease Commencement: Offeror suggested that Lease Commencement start upon completion of final lease swing plan. GSA stated the Lease Term will begin based on a composite occupancy date.
    - Paragraph 10, Uppermost Floor: CBRE asked how the uppermost floor must be within 25 feet from the roof requirement is accommodated in an 11 story building when the bottom 6 floors are offered. The Offeror stated space on a higher floor will be offered.
    - Paragraph 15, Parking: Lessor proposes ▊ space/year (▊) with market escalation NTE ▊ CBRE stated this seems on the ▊ and asked what Government was currently paying. Offeror explained the Government is currently paying under a separate lease and will check the rate.
    - Paragraph 18, Overtime Utilities: Offer included ▊ which CBRE pointed out is costly and suggested the Offeror revisit or provide justification for such a high rate.
- CBRE discussed GSA Form 3518-SAM:
    - Offeror only submitted Entity Overview and must include full FAR Report showing representations and certifications.
    - CBRE asked if the Offeror is a small business.
    - Offeror stated might be a small business with new annual average gross revenue threshold but will confirm. If not a small business, then Offeror will provide small business plan.
- CBRE discussed the Swing Plan:
    - Offeror proposed 4 phase plan that moves staff on floors 1 and 2 for the duration of the renovation. According to Offeror, each phase should take approximately ▊ days to complete with the Commissioner's Room completed last.
    - CBRE noted the primary issue with the swing plan is the aggressive timeframe for each phase to be complete.
    - Offeror stated allotted ▊ days to comply with the 200 day construction requirement in the RLP.
    - GSA stated 200 days only applies to new construction and existing buildings is required to complete construction by occupancy date but will need to confirm.
- CBRE discussed the Capital Improvement Plan:

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

GSA                                                                    CBRE

- Offeror performed a property Condition Assessment; however, an updated assessment plan is forthcoming and will be submitted with FPR.
- CBRE discussed the Commitment of Funds:
  - Offeror stated project is ████████ Need to provide proof of funds.
- CBRE discussed the Pre-Lease Fire Protection and Safety Evaluation:
  - Section II – Offer needs to only provide space offered to the Government.
  - Section IV (b) – Fire sprinkler system must be maintained by applicable local code or NFPA 25.
- CBRE outlined several other deficiencies in the offer:
  - Evidence of Signatory Authority
  - All documents must be signed by authorized signatory authority
  - Energy Star Compliance
  - Phase I Environmental Assessment
  - Offeror is a large business and must provide a small business subcontracting plan
  - RLP Paragraph 3.06.I – Offeror must provide SAM registration
  - RLP Paragraph 3.06.J – Offeror must provide current C of O
- CBRE discussed the overall price offered and noted that the rental rate is in the competitive range however, given this is a competitive procurement, we do except the range to be lowered with subsequent offers. A/E fees are high and Adjustment for vacant premises are low. The Offeror agreed to revisit all costs noted by CBRE.
- CBRE reiterated some of the major deficiencies of the Offeror that could potentially cause the Offeror to be noncompliant, including: 500-year flood plain, NEPA approval ████ BSAC allowance and first floor ceiling height.

**Summary and Proposed Next Steps:**
- The Offeror will correct all deficiencies outlined above.
- GSA and CBRE will clarify the POR items brought into question during the negotiation sessions with the agency.
- CBRE and GSA will likely issue a letter requesting Final Proposal Revisions and outlining the above deficiencies once NEPA documentation has been reviewed internally.

*Minutes Submitted By: Henry O. Chapman – CBRE, November 16, 2015.*


Signature:_____        Date:
            Kevin M. Terry
            Lease Contracting Officer


Signature:_____        Date:
            Kevin Paul
            Leasing Specialist

# EXHIBIT 8

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

 **GSA**

Michael Klein - LDW <michaelp.klein@gsa.gov>

---

## Fwd: FCC (3DC0421) - NEPA Documentation
1 message

---

**Stephanie Hamlett - WPDBA** <stephanie.hamlett@gsa.gov>    Tue, Dec 29, 2015 at 4:52 PM
To: Michael Klein - LDW <michaelp.klein@gsa.gov>
Cc: Kevin Terry - WPRA <kevin.terry@gsa.gov>

28th email
Stephanie R. Hamlett, AICP
Chief, Planning Branch
Office of Planning and Design Quality
U.S. General Services Administration
National Capital Region
301 7th Street, SW
Suite 4004
Washington, DC 20407
Office: (202) 401-9764
Cell:   (202) 316-2114

———— Forwarded message ————
From: **Downey, Richard @ Washington DC** <Richard.Downey@cbre.com>
Date: Wed, Oct 21, 2015 at 2:46 PM
Subject: FCC (3DC0421) - NEPA Documentation
To: "stephanie.hamlett@gsa.gov" <stephanie.hamlett@gsa.gov>
Cc: "Kevin Terry (kevin.terry@gsa.gov)" <kevin.terry@gsa.gov>, "Eric Albrecht - WPIAA
(eric.albrecht@gsa.gov)" <eric.albrecht@gsa.gov>, "Chapman, Henry @ Washington DC"
<Henry.Chapman@cbre.com>


Stephanie,

We received five offers for the FCC procurement in DC. Below is a link to download the NEPA submittal for one
of the offers.


https://cbftp.cbre.com/download.aspx?fileId=1014685&vaultToken=70719345-8eee-4854-8c77-
e4a309a42268&link=yes&fileName=Washington+Gateway+-+NEPA+Information.zip


I will bring hard copies of three others to your desk tomorrow. The fifth offeror (the incumbent location) only
submitted the attached NEPA checklist. They also maintain that they are located outside of the 100 or 500-year
floodplains.


Please note – all offerors, excluding the incumbent location, submitted NEPA documentation for a recent
procurement that received a CATEX.


We would like to have feedback on the documents prior to our negotiation meetings which will take place in the
next two weeks. Will that be enough time to review and provide feedback?

# **EXHIBIT 9**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order



GSA National Capital Region

## VIA ELECTRONIC MAIL

September 22, 2015

Mr. Timothy Hutchens
CBRE, Inc.
750 9th Street, NW
Suite 900
Washington, DC 20001

     Re:   General Services Administration (RLP No. 3DC0421)
            Portals II – 445 12th Street, SW

Dear Mr. Hutchens:

Enclosed is a copy of Request for Lease Proposals (RLP) No. 3DC0421 for your use in submitting an initial offer for the General Services Administration's requirement for space in Portals II, 445 12th Street, SW, Washington, DC 20024.

Due to the nature of the Agency's mission requirements, the Government has determined this procurement to be a critical action. The Water Resources Council's Floodplain Management Guidelines for Implementing Executive Order 11988 defines a critical action as any activity for which even a slight chance of flooding would be too great a risk, and therefore should be located outside the 500-year floodplain. Since it appears your offered building is located in the 500-year floodplain, your offer is subject to mitigation.

Please carefully review the RLP and attachments and initial all pages where indicated. The following forms must be completed and returned with your offer:

- RLP No. 3DC0421
- Lease No. GS-XXP-LXXXXXXX (Form L201C)
- Agency Specific Requirements
- Security Requirements for Level IV
- GSA Form 3516 (Solicitation Provisions)
- GSA Form 3517B (General Clauses)
- GSA Form 1364C (Proposal to Lease Space)
- GSA Form 1217 (Lessor's Annual Cost Statement and Instructions)
- GSA Form 3518-SAM (Addendum to System for Award Management and Representations and Certifications)
- GSA Form 12000 (Prelease Fire Protection and Life Safety Evaluation)
- Program of Requirements
- Commission Agreement
- Rider No. 1 (Additional Renewal Option and Purchase Option)

- Documentation required to comply with NEPA
- 500-year floodplain mitigation plan

Any exceptions you may have to the Solicitation must be outlined separately in your offer, so that we can address those items during negotiations. If you plan to have your legal counsel review the language in the RLP, Form L201C, Form 3517B and 3518, please submit those documents to your legal counsel now, so as to allow adequate time to discuss any language issues that may arise.  Changes to the language in these documents cannot be made after you submit your final proposal revisions.

**Please submit your initial offer by 3:00 PM on October 20, 2015, to the following address:**

> CBRE, Inc.
> ATTN: Henry Chapman, Sara Dunstan, Richard Downey
> 750 9th Street, NW
> Suite 900
> Washington, DC 20001

After receipt of your initial offer, the Government will contact you for negotiations.

If you have any questions please contact Henry Chapman, Sara Dunstan or Richard Downey at (202) 783-8200.

Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Material Deleted From This Page Pursuant to U.S. Court of Federal Claims Protective Order



**GSA National Capital Region**

## VIA ELECTRONIC MAIL

September 22, 2015

Mr. Tom Finan
Trammell Crow Company
1055 Thomas Jefferson Street
Suite 600
Washington, DC 20007

     Re:    General Services Administration (RLP No. 3DC0421)
             Sentinel Square III

Dear Mr. Finan:

Enclosed is a copy of Request for Lease Proposals (RLP) No. 3DC0421 for your use in submitting an initial offer for the General Services Administration's requirement for space in Sentinel Square, 45 L Street, NE, Washington, DC 20002.

Please carefully review the RLP and attachments and initial all pages where indicated. The following forms must be completed and returned with your offer:

- RLP No. 3DC0421
- Lease No. GS-XXP-LXXXXXXX (Form L201C)
- Agency Specific Requirements
- Security Requirements for Level IV
- GSA Form 3516 (Solicitation Provisions)
- GSA Form 3517B (General Clauses)
- GSA Form 1364C (Proposal to Lease Space)
- GSA Form 1217 (Lessor's Annual Cost Statement and Instructions)
- GSA Form 3518-SAM (Addendum to System for Award Management and Representations and Certifications)
- GSA Form 12000 (Prelease Fire Protection and Life Safety Evaluation)
- Program of Requirements
- Commission Agreement
- Rider No. 1 (Additional Renewal Option and Purchase Option)
- Documentation required to comply with NEPA

Any exceptions you may have to the Solicitation must be outlined separately in your offer, so that we can address those items during negotiations. If you plan to have your legal counsel review the language in the RLP, Form L201C, Form 3517B and 3518, please submit those documents to your legal counsel now, so as to allow adequate time to discuss any language issues that may arise.  Changes to the language in these documents cannot be made after you submit your final proposal revisions.

**U.S. General Services Administration**
301 7th Street, SW
Washington, DC 20407-0001
**www.gsa.gov**

**AR 1700**

**Please submit your initial offer by 3:00 PM on October 20, 2015, to the following address:**

CBRE, Inc.
ATTN: Henry Chapman, Sara Dunstan, Richard Downey
750 9th Street, NW
Suite 900
Washington, DC 20001

After receipt of your initial offer, the Government will contact you for negotiations.

If you have any questions please contact Henry Chapman, Sara Dunstan or Richard Downey at (202) 783-8200.

Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**U.S. General Services Administration**
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

**AR 1701**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order



GSA National Capital Region

VIA ELECTRONIC MAIL

December 1, 2015

Mr. Timothy Hutchens
CBRE
750 9th Street, NW,
Suite 900
Washington, DC 20001

> Re: RLP Number 3DC0421
> Portals II – 445 12th Street, SW, Washington, DC

Dear Mr. Hutchens:

Thank you for your initial offer dated October 20, 2015, on behalf of Parcel 49C Limited Partnership ("Offeror") for the above referenced procurement. The Government appreciates your efforts to submit a comprehensive and fully compliant offer. The Government has the following clarifications they would like you to address along with a Final Proposal Revision (FPR). These clarifications, along with the attached Amendment Number Two, outline all of the additional items that should be included or taken into consideration with your FPR.

As we discussed in our negotiation meeting on November 5, 2015, you will need to clarify or correct the following items in order to make your offer fully compliant:

**1. GSA Form 1364**
    a.    Section II: 13 – Please provide BSAC amortization amount. Your offer will be considered non-responsive without this full allowance.
    b.    Section III: 27 – Tenant Improvement Fees are the high end of the competitive range. Please revisit.
    c.    If you are going to offer a cash allowance concession, please indicate when the funds would be made available.

**2. Additional Remarks or Conditions to the 1364:**
    a.    <u>3. Renewal Option:</u> The Government does not accept the proposed language at this time. The Government will select term at time of exercising option; tax base not to reset.
    b.    <u>5. Lease Commencement:</u> The Government does not accept the proposed language. The Lease shall commence on the composite Occupancy Date.
    c.    <u>10. Uppermost Floor:</u> "Offeror confirms uppermost floor (6th) is within the 25 feet from the roof". Please confirm and expand on how this is

    accomplished in an 11 story building. If not, please modify offered space so your offer will be compliant.

d.    <u>15. Parking:</u> Parking rates are at the high end of the competitive range and annual cap is excessive.

e.    <u>18. Overtime Utilities</u>: HVAC overtime rate is at the high end of the competitive range. Please revisit and submit a detailed explanation of the actual costs.

## 3. GSA Form 3518-SAM

a.    Need to provide full FAR Report showing representations and certifications.

b.    Clarify whether or not a small business. If not, please provide a small business subcontracting plan.

## 4. Swing Plan

a.    Provide Letter of Intent for lease of swing space. Please note that the Lease Commencement Date shall be no later than December 31, 2019, and the schedule should be modified to be more realistic.

## 5. Capital Improvement Plan

a.    Please submit updated building condition assessment plan.

## 6. Commitment of Funds

a.    Please provide verification of funds and capability to perform.

## 7. FPLS Evaluation

a.    Section II – Only provide space offered to the Government.

b.    Section IV (b) – Fire sprinkler system must be maintained by applicable local codes or NFPA 25.

## 8. NEPA Documentations

a.    Please provide NEPA documentation in accordance with RLP Paragraphs 2.11 and 5.03. The documentation must be in the requested format, fully responsive and must be for the offered property. If any of the requested documents are not applicable to your property, please state this along with an explanation in your response. Failure to timely and comprehensively submit this information prior to receipt of FPR, will cause your offer to be deemed non-responsive and you will no longer be considered for award.

b.    You have confirmed the FEMA map showing that the property is within the 500-year floodplain. Because this procurement has been identified as a critical action by the Government, The Portals II cannot be considered for award if the Government has alternatives that are not in the 500-year floodplain. At this time, several other building alternatives exist and it is anticipated they will submit Final Proposal Revisions. If

Case: 17-1315     Document: 48     Page: 61     Filed: 03/10/2017
Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Page 3 of 3

this occurs, the Government will have practicable alternatives, and your site will not be eligible for consideration for award.

**9. Missing Items**
    a.    Energy Star compliance
    b.    Phase I Environmental Assessment
    c.    LEED-CI Narrative
    d.    Evidence of signatory authority
    e.    All documents must be signed by authorized signatory
    f.    RLP Paragraph 3.06.I – Please provide SAM registration
    g.    RLP Paragraph 3.06.J – Please provide current C of O

Along with the above corrections, you are hereby requested to sign Amendment Number Two and submit an FPR for Portals II for RLP No. 3DC0421. Two (2) originals of your best and final offer will be due in the offices of CBRE, Inc., located at 750 9th Street, NW, Suite 900, Washington, DC 20001 no later than 3:00 p.m. on December 15, 2015. The offer should include a correction of the clarifications and deficiencies as noted above.

The Government would also like you to look at your costs outlined on the GSA Forms 1217 and 1364 to make certain there is consistency among the documents and revise as appropriate to ensure that you are offering the most competitive economic terms to the Government.

If you have any questions, please contact Henry Chapman or Richard Downey at (202) 783-8200. Thank you for your continued interest in the Government's tenancy.

Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer



**GSA National Capital Region**

## VIA ELECTRONIC MAIL

December 1, 2015

Mr. Tom Finan
Trammell Crow Compnay
1055 Thomas Jefferson Street, NW
Suite 600
Washington, DC 20007

     Re:  RLP Number 3DC0421
          Sentinel Square III - 45 L Street, NE, Washington DC

Dear Mr. Finan:

Thank you for your initial offer dated October 20, 2015, on behalf of Trammell Crow Company ("Offeror") for the above referenced procurement. The Government appreciates your efforts to submit a comprehensive and fully compliant offer. The Government has the following clarifications they would like you to address, which should be incorporated in a Final Proposal Revision (FPR). These clarifications, along with the attached Amendment Number Two, outline all of the additional items that should be included or taken into consideration with your FPR.

As we discussed in our negotiation meeting on November 5, 2015, you will need to clarify or correct the following items in order to make your offer fully compliant:

1. **GSA Form 1364**
   a. Section I: Adjustment for vacant premises applies to full floor increments. Please consider providing zonal increments.
   b. Section I: 3.a. – State full building RSF.
   c. Note 13: confirm the 5,930 ABOA SF requiring 24/7 HVAC is included in the offered rental rate.
   d. If you are going to offer a cash concession, please indicate when the funds would be made available.

2. **GSA Form 3518**
   a. Please use Form 3518-SAM provided with the RLP package. Also include active SAM registration.

3. **Commitment of Funds**
   a. Letter provided from financial institution, but pertains to a different procurement. Provide updated letter pertaining to this procurement.

4. **Evidence of Ownership**

    a.    Please describe process that will need to be completed to create single ownership entity.

**5. Commission Agreement**
    a.    Modifications to the commission agreement are currently being reviewed.

**6. Missing Items/Deviations**
    a.    Provide proof of signatory authority. We will also need articles of incorporation.
    b.    RLP Paragraph 3.06.I –SAM registration will be needed for final single ownership entity.
    c.    RLP Paragraph 3.06.J – Pre-lease FPLS evaluation.
    d.    Please reconsider providing additional renewal option and purchase option.
    e.    Please ensure all offered items and documents are for RLP No. 3DC0421.

Along with the above corrections, you are hereby requested to sign Amendment Number Two and submit an FPR for Sentinel Square III for RLP No. 3DC0421. Two (2) originals of your best and final offer will be due in the offices of CBRE, Inc., located at 750 9th Street, NW, Suite 900, Washington, DC 20001 no later than 3:00 p.m. on December 15, 2015. The offer should include a correction of the clarifications and deficiencies as noted above.

The Government would also like you to look at your costs outlined on the GSA Forms 1217 and 1364 to make certain there is consistency among the documents and revise as appropriate to ensure that you are offering the most competitive economic terms to the Government.

If you have any questions, please contact Henry Chapman or Richard Downey at (202) 783-8200. Thank you for your continued interest in the Government's tenancy.


Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer

**U.S. General Services Administration**
301 7th Street, SW
Washington, DC 20407-0001
www.gsa.gov

**AR 1706**

Material Deleted on This Page Pursuant to U.S. Code of Federal Regulations Protective Order



VIA ELECTRONIC MAIL

April 1, 2016

Mr. Timothy Hutchens
CBRE
750 9th Street, NW,
Suite 900
Washington, DC 20001

  Re: RLP Number 3DC0421 – Lease Amendment Number Three
     Request for Clarifications and Revised Final Proposal Revision

Dear Mr. Hutchens:

Attached, please find Amendment Number Three to RLP Number 3DC0421, clarifying language regarding the additional ten year option to renew and option to purchase. In addition, to be considered for award, you must provide the following information with your Revised Final Proposal Revision (FPR):

 **1. Floodplain**
   a. Please provide any Letter of Map Revision (LOMR) you have received from FEMA that indicates the offered space is no longer within the 500-year floodplain.

 **2. Statement of Review**
   a. In your Statement of Review, please confirm that offered space can meet the ceiling height of the FCC Operations Center outlined on page 83 of the Program of Requirements (POR).

 **3. GSA Form 1364**
   a. Please confirm the shell rate for the five year option to renew in Box 23(a) of GSA Form 1364. FPR number may conflict with item Number 7 of the "Additional Remarks and Conditions".

Along with the above clarifications, you are hereby requested to sign a copy of Amendment Number Three and any modifications to Rider Number One for Portals II for RLP No. 3DC0421, due in the offices of CBRE, Inc., located at 750 9th Street, NW, Suite 900, Washington, DC 20001 no later than 3:00 p.m. on April 11, 2016.  You are also invited to revise any portion of GSA Form 1364 as a part of your Revised Final Proposal Revision.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Page 2 of 2

The Government intends to award without further discussions. Thank you for your continued interest in the Government's tenancy.

Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer

Material Deleted From This Page Pursuant to U.S. Court of Federal Claims Protective Order



GSA National Capital Region

## VIA ELECTRONIC MAIL

April 1, 2016

Mr. Tom Finan
Trammell Crow Compnay
1055 Thomas Jefferson Street, NW
Suite 600
Washington, DC 20007

      Re:  RLP Number 3DC0421 – Lease Amendment Number Three
            Request for Revised Final Proposal Revision

Dear Mr. Finan:

Attached, please find Amendment Number Three to RLP Number 3DC0421, clarifying language regarding the additional ten year option to renew and option to purchase.  In accordance with revised RLP Section 1.02.J., you must provide the required purchase option.  Please provide a signed copy of Amendment Number Three and any modifications to Rider Number One for Sentinel Square III for RLP No. 3DC0421, due in the offices of CBRE, Inc., located at 750 9th Street, NW, Suite 900, Washington, DC 20001 no later than 3:00 p.m. on April 11, 2016.  You are also invited to revise any portion of GSA Form 1364 as a part of your Revised Final Proposal Revision.

The Government intends to award without further discussions. Thank you for your continued interest in the Government's tenancy.

Sincerely,

*Kevin M. Terry / HOC*

Kevin M. Terry
Lease Contracting Officer

# EXHIBIT 10

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order





*November 16, 2015*

### Negotiation Meeting Minutes
### Sentinel Square III – November 5, 2015
*GS-P-11-14-YL-0041, Federal Communications Commission*
*Contract Number: GS-00-P-10-BQ-D-0001*

**In Attendance**:

| Kevin Terry – GSA/ Lease Contracting Officer | Sarah Maxwell – CBRE |
|---|---|
| Henry Chapman – CBRE | Tom Finan – Trammell Crow Company |
| Richard Downey – CBRE | |

**Review of Discussion Topics:**

- CBRE began the meeting by having the parties introduce themselves. CBRE explained that the purpose of the negotiation session is to make sure the offer is fully compliant and to discuss the financial components and deficiencies of the offer.  CBRE discussed the timeframe for the procurement, and explained that the next step would likely be a letter calling for Final Proposal Revisions; however, timing was contingent upon the internal review of the NEPA documentation.
- CBRE thanked the Offeror for providing a mostly compliant offer and outlined a few deficiencies that must be corrected in order to make the offer fully compliant.
- CBRE discussed GSA Form 1364:
  - Section I: 3.a. – Offeror needs to provide full building SF.
  - Section III: 28 – Adjustment for vacant premises only applied to full floor increments. CBRE suggested providing zonal increments as well.  Offeror agreed to revisit.
- CBRE discussed GSA Form 3518
  - Offeror did not use the most recent GSA Form 3518-SAM provided with the RLP package.
  - CBRE pointed out the offered site is comprised of two parcels of land under two separate ownership entities and asked how the Offeror planned to create one common entity, as this is needed by FPR.
  - Offeror explained that both parcels are in the same tax lot and confirmed the two entities would be under one partnership and registered in SAM by FPR.
- CBRE discussed the Commitment of Funds:
  - Offeror included a letter from its financial institution but it referenced a different procurement. CBRE asked the Offeror to provide an updated letter pertaining to this procurement.
- CBRE acknowledged the modifications to the commission agreement made by the Offeror and stated that they would be reviewed.
- CBRE outlined several other deficiencies and missing documentation in the offer:
  - Need Evidence of Signatory Authority
  - RLP Paragraph 3.06.I – Offeror must provide SAM registration for ultimate entity.

**AR 1713**





- o RLP Paragraph 3.06.J – Offeror must provide FPLS evaluation or statement confirming compliance with FPLS standards and commitment to make recommended changes.
- o Offeror asked to ensure all offered items and documents are for RLP No. 3DC0421.
- o Offeror was asked to consider providing the requested Additional Renewal Option and Purchase Option.
- CBRE discussed the overall price offered and noted that the rental rate was in competitive range, but that given this is a competitive procurement, the range was expected to be lowered with subsequent offers.
- CBRE commented that Offerors had questions regarding the Program of Requirements and clarifications would be provided after consultation with the agency.

**Summary and Proposed Next Steps:**
- The Offeror will correct all deficiencies outlined above.
- GSA and CBRE will provide clarification regarding the POR items brought into question during the negotiation sessions.
- CBRE and GSA will likely issue a letter requesting Final Proposal Revisions outlining the above deficiencies once NEPA documentation has been reviewed internally.

*Minutes Submitted By: Henry O. Chapman – CBRE, November 16, 2015.*

Signature:_____     Date:

      Kevin M. Terry
      Lease Contracting Officer

Signature:_____     Date:

      Kevin Paul
      Leasing Specialist

AR 1714

# EXHIBIT 11

*GSA RLP No. 3DC0421 – FCC*
*Initial Offer – October 20, 2015*

# Portals II
## 445 12th Street, SW, Washington DC

## Initial Offer

TAB

1. GSA Form 1364 – Proposal to Lease Space with Attachment

2. GSA Form 1217 – Lessor's Annual Cost Statement

3. Statement of Review

4. Floor Plans of the Offered Space

5. Parking Plan and Narrative

6. GSA Form 3518-SAM with SAM Registration Confirmation

7. Amenity and Transportation Map

8. EnergyStar Documentation

9. LEED Documents

10. Capital Improvement Plan

11. NEPA Response – CATEX Checklist and Flood Plain Map

12. Swing Space Plan and Schedule

13. Fire Protection and Life Safety Evaluation

14. Fire Alarm and Sprinkler Maintenance Records

15. Real Estate Tax Bills and Legal Description

16. Ownership Evidence

17. Zoning Evidence

18. Commitment of Funds Evidence

19. Landlord Representation Letter

20. Government Broker Commission Agreement

21. Dual Agency Agreement



# EXHIBIT 12

**Trammell Crow Company**

October 20, 2015

RLP No. 3DC0421
CBRE, Inc.
ATTN: Henry Chapman, Sara Dunstan, Richard Downey
750 9th Street, NW
Suite 900
Washington, DC 20001

Re:    Initial Offer for Request for Lease Proposals ("RLP") No. 3DC0421 for 45 L Street, NE
       Washington, DC.

Dear Mr. Chapman, Ms. Dunstan and Mr. Downey:

On behalf of Trammell Crow Company (The "Offeror"), I am pleased to submit this initial
offer in response to the above referenced RLP. The enclosed submission offers to lease office
space in accordance with the requirements of the RLP at the building known as Sentinel
Square III to be constructed at 45 L Street, NE, Washington, DC (the "Building.")

In accordance with the RLP, please find the following submission items enclosed:

1.    Lessor's Statements
2.    GSA RLP No. 3DC0421
3.    Lease No. GS-XXX-XXXXX (Form L201C)
4.    Agency's Special Requirements
5.    Security Requirements for Level IV
6.    GSA Form 3516 Solicitation Provisions
7.    GSA Form 3517B General Clauses
8.    GSA From 1364C Proposal to Lease Space
9.    GSA Form 1217 Lessor's Annual Cost Statement
10.   GSA Form 3518 Representations and Certifications, SAM Addendum
11.   GSA Form 12000 Prelease Fire Protection and Life Safety Evaluation
12.   Small Business Subcontracting Plan
13.   Commission Agreement
14.   Rider No. 1
15.   12 Reserved Parking Spaces
16.   Schedule
17.   Overtime HVAC Rates
18.   Plans for Offered Space, AutoCAD for Offered Space
19.   BOMA Table
20.   Evidence that the Offered Space is Not Located in a Floodplain
21.   EISA Compliance/ ENERGY STAR®/LEED®/Green Lease Submittals
22.   Access to Transportation and Amenities
23.   Quality and Appearance of Building
24.   Evidence of Site Ownership/Land Deed
25.   Zoning Compliance
26.   Tax Information
27.   Permission to Represent

**AR 2014**



## Offeror's/Lessor's Statements

The following "statements" are a material component of our Initial Offer in response to GSA RLP #3DC0421 ("RLP") and are hereby incorporated therein and made a component thereof:

1.  <u>Project Offered:</u> Sentinel Square is a multi-phase project which will ultimately contain nearly 1.3 million square feet of highly secure, environmentally friendly, efficient and affordable Class-A Office space in the thriving NoMa submarket of Washington, DC, as follows:.

    Sentinel Square I,  located at 90 K Street NE ("Sentinel Square I"), is an existing 12-story office building containing 412,661 rentable square feet of space that set the anchor for this overall development at northwest corner of First and K Streets, NE.  The building is 90 % leased and currently occupied by several agencies of the US Government through GSA and operates as a Level IV facility (*see Statement 7 for further detail on this tenancy*).    While Sentinel Square I is not a part of the offered space (a) it is referred to in various statements below as evidence of Lessor's abilities with GSA leases and/or requirements [*i.e., LEED, Energy STAR, security, financial capabilities, etc.*]; and (b) over the long term may supply the Citizenship & Immigration Services' with additional growth opportunities, should the need arise during the long term lease.

    Sentinel Square II, located at 1050 First Street NE ("Sentinel Square II" or Offered Space Component A"), is a recently constructed 12 story office building containing 280,363 rentable square feet of space that fronts the main thoroughfare serving NoMa and includes the corner of First and L Streets, NE.

    Sentinel Square III, to be located at 45 L Street NE ("Sentinel Square III" or "Offered Space Component B"), is a proposed 12-story office building which will contain approximately 539,903 rentable square feet of space that includes the majority of the L Street frontage spanning from North Capitol Street to First Street, NE.

    Brochures, photos, renderings, etc. for both Sentinel Square II and Sentinel Square III are included in this Initial Offer package and more detail on all of the

Request for Lease Proposal No. 3DC0421
US Federal Communications Commission
Presented by:

Trammell Crow Company

**AR 2018**

GSA





---

- *Floodplain:* Sentinel Square III does not sit in either the 100-year or 500-year floodplain. Appropriate evidence is provided in this submission package.

3. **Space Offered:** The space offered herein is comprised of (i) a portion of the first (1ˢᵗ) and third (3ʳᵈ), and the entire fourth (4ᵗʰ) through twelfth (12ᵗʰ) floors of the building[1]. The offered space contains a total of 473,000 contiguous rentable square feet (excluding first floor element) and 402,079 contiguous ABOA square feet.

   Due to the buildings' efficient design, the offered space has an overall core-factor of approximately 17.6% on a GSA/multi-tenant basis.

   Tenant's proportionate share of the building is 87.61 %.

4. **One-Building:** The entire premises is contained in one-building.

5. **Lessor Entities:** The land for Sentinel Square III is currently owned by 90 K Holding LLC and 45 L Holding LLC, each of which is a joint venture of affiliates of Trammell Crow Company, Crow Holdings, and Cottonwood Partners.

6. **Method of Measurement:** Sentinel Square III will be measured in accordance with the American National Standards Institute/Building Owners and Managers Association (ANSI/BOMA) international standard Z65.1 issued June 1996 and certified by the project architect (SmithGroup/JJR) upon completion of final plans. For now, we have included preliminary BOMA calculations as part of this submission.

7. **Finished Ceiling Heights:** The finished ceiling heights on the typical floors of Sentinel Square II and Sentinel Square III are/will be 8' 6" with no coordination of plenum. First floor will be 11' 6".

8. **Overtime HVAC Rates:** Overtime Utility Rates per RLP:

   - The base rate for overtime HVAC for additional hours beyond the Normal Hour Schedule[2] is ▮▮▮▮/hour/floor thereafter;

   - The base rate for overtime HVAC for Saturdays, Sundays or holidays is ▮▮▮▮▮ per hour per floor.

---

[1] The offered space may be subject to change prior to award of this contract based on the receipt of other GSA lease awards.

[2] Normal Hours are 7:00 am – 6:00 pm, Monday-Friday, exclusive of Federal Holidays.



# Exhibit 13

GENERAL SERVICES ADMINISTRATION
NATIONAL CAPITAL REGION

FINDINGS AND DETERMINATIONS
IN REGARD TO ADEQUACY OF SAFEGUARDS AGAINST
ORGANIZATIONAL CONFLICTS OF INTEREST

### FINDINGS

I hereby find that:

In June of 2010, the U.S. General Services Administration (GSA) entered into a professional services contract for real estate consulting and related services (Broker Contract) with several suppliers, including CBRE.  The Broker Contract was in effect as of September 29, 2014, on which date GSA engaged CBRE as the consultant to aid in the procurement of leased space to house the headquarters for the Federal Communications Commission (FCC).  This engagement was accomplished by issuing Task Order GS-P-11-14-YL-0041 to CBRE.

The Broker Contract includes the provision numbered H.5. and titled "Organizational Conflicts of Interest".  This provision cites Subpart 9.5 of the Federal Acquisition Regulation (FAR), 48 C.F.R. 9.5 which "prescribes responsibilities, general rules, and procedures for identifying, evaluating, and resolving organizational conflicts of interest." The Broker Contract thus clearly reflects an awareness of the possibility of organizational conflicts of interest in the brokerage firms that are parties to the Broker Contract, and adopts the FAR standards and procedures  to identify whether such conflicts exist and, if so, how any such conflict may be mitigated.

The FAR standards applicable to the provision of professional consulting services require the Contracting Officer to "[a]void, neutralize, or mitigate significant potential conflicts before contract award." FAR 9.504(a)(2).  In keeping with its standard practice, GSA required CBRE to conduct a preliminary survey of building locations that were eligible to submit bids in the contemplated procurement.  Of the 44 identified buildings, CBRE identified three in which it had a potential conflict of interest. On September 29, 2014, CBRE submitted the "Organizational Conflict of Interest" disclosure document specified for this purpose in the Broker Contract. See *Exhibit 1* attached hereto.  The submission noted that CBRE represents the  lessor for the incumbent location of the FCC headquarters at 445 12th Street, SW, Washington DC (Parcel 49C)(Plaintiff in the  Court of Federal Claims case.)  CBRE also noted that it "might represent other potential offerors for new construction projects in the future; however a preliminary survey uncovered no such conflicts at this time."  The GSA Contracting Officer administering the Broker Contract in the National Capital Region (NCR) prepared a Findings and Determination document, in which she found that adequate measures had been taken to mitigate the potential

Page 1 of 4

**AR 2918**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

conflict, and to provide adequate protection to the government. As the Contracting Officer's Technical Representative for the Broker Contract in NCR, I joined in these Findings and Determinations as well. See *Exhibit 2* attached hereto.

When initial offers were submitted, one of the offerors was Sentinel Square, which is an entity controlled by the Trammel Crow Company. Trammel Crow Company proposes to build a new building to satisfy the FCC's needs. Trammel Crow Company is an entity that is well known to me as an active developer and broker of commercial real estate in many locations in the United States, including Washington, DC. The offer was not submitted by or on behalf of CBRE.

At a subsequent point in time during the procurement, an allegation was made that CBRE has a potential undisclosed conflict of interest. This allegation is premised on the fact that CBRE has an ownership interest in Trammel Crow Company. In response to this allegation, I have taken certain actions to ensure the integrity of the procurement and the protection of the government's interests.

I approached CBRE for information about the alleged conflict. CBRE indicated that all procurement information was properly contained within a firewall at CBRE. No procurement information had been shared between CBRE and Trammel Crow Company, just as no such information had been shared internally at CBRE between the brokers representing Parcel 49C, and those representing the GSA. CBRE made a formal filing with this representation, attached hereto as *Exhibit 3*.

CBRE also informed me that the business relationship between CBRE and Trammel Crow Company likely does not rise to the threshold that would make a conflict of interest (as contemplated in the FAR) possible. CBRE describes itself at its own website (http://www.cbre.com/about/corporate-information) in the following terms:

> CBRE Group, Inc. is the world's largest commercial real estate services and investment firm, with 2015 revenues of $10.9 billion and more than 70,000 employees (excluding affiliate offices). CBRE has been included in the Fortune 500 since 2008, ranking #259 in 2016. It also has been voted the industry's top brand by the Lipsey Company for 15 consecutive years, and has been named one of Fortune's "Most Admired Companies" in the real estate sector for four years in a row. Its shares trade on the New York Stock Exchange under the symbol "CBG."

> The Company serves real estate owners, investors and occupiers worldwide. CBRE offers strategic advice and execution for property sales and leasing; corporate services; property, facilities and project management; mortgage banking; appraisal and valuation; development services; investment management; and research and consulting.

**Page 2 of 4**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

As a large real estate conglomerate, CBRE has a great many ownership and partnership relationships with other business entities all over the world.  The fact that CBRE and Trammel Crow Company have such a relationship does not necessarily create a conflict of interest as described in FAR 9.500, because the entities function as independent businesses and the connection between the entities is remote.  The business world is full of interlocking corporate and ownership interests.  In the case of Trammel Crow Company, it represents itself as a independently operated business entity, not as an alter ego of CBRE. A connection at this remote level is a lesser cause for concern than arises when the same brokerage firm represents both sides in a transaction, since the opportunity for improper sharing of information between rival separate brokerage firms with a common corporate ownership is less than the opportunities that might arise when two separate broker teams within the same brokerage firm are on opposite sides in a competitive procurement action.

Applying this standard, it is apparent that where, as in this procurement, the incumbent ownership is represented by a broker working directly for CBRE, the same brokerage firm as is working for GSA, the possible scenarios in which information might improperly pass between the two sides are far more numerous and plausible than is the case between two rival firms, regardless of common ownership interests.  Therefore, the firewall procedures and safeguards in place that are adequate to mitigate the possibility of an internal organizational conflict of interest within CBRE itself, are certainly adequate to mitigate the possibile organizational conflict of interest that might exist between rival firms in common ownership.

FAR 9.504(d) instructs contracting officers to "avoid creating unnecessary delays, burdensome information requirements, and excessive documentation.  The contracting officer's judgment need be formally documented only when a substantive issue concerning potential organizational conflict of interest exists."

FAR 9.504(e) states: "The contracting officer shall award the contract to the apparent successful offeror unless a conflict of interest is determined to exist that cannot be avoided or mitigated. Before determining to withhold award based on conflict of interest considerations, the contracting officer shall notify the contractor, provide the reasons therefor, and allow the contractor a reasonable opportunity to respond. If the contracting officer finds that it is in the best interest of the United States to award the contract notwithstanding a conflict of interest, a request for waiver shall be submitted in accordance with 9.503. The waiver request and decision shall be included in the contract file."

Despite the apparent lack of any substantive issue concerning potential organizational conflict of interest (pursuant to FAR 9.504(d)), I want to ensure that any theoretical conflict of interest has been mitigated (pursuant to FAR 9.504(e), and thereby resolve, using applicable regulatory

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

procedures, even the possibility of the appearance of an unmitigated potential conflict of interest. Therefore, in addition to reviewing the OCI submission by CBRE regarding Trammel Crow Company attached hereto as *Exhibit 3*.

Based upon the representations made by CBRE, both in its Organizational Conflict of Interest submissions, and in respone to my further inquiries, it is apparent to me that the common ownership interest between CBRE and Trammel Crow Company likely does not create a conflict of interest as such is defined in the FAR, and that even if such a potential conflict arises from the fact of common ownership, it is properly mitigated by the firewall protections in place at CBRE as described in the Organizational Conflict of Interest submissions attached hereto as *Exhibits 1 and 3*.

### DETERMINATIONS

Therefore, I find and determine that there is no unmitigated conflict of interest arising from the business relationship between CBRE and Trammel Crow Company. I also find and determine that, to the extent there is an ongoing allegation of the existence of an unmitigated conflict of interest arising from the business relationship between CBRE and Trammel Crow Company, it is in the interest of the United States to award the lease contract to the apparent successful offeror notwithstanding the ongoing allegation of an unmitigated conflict of interest.

Dated: *July 22, 2016*

*Kevin M. Terry*    KEVIN TERRY

_____

Kevin Terry
Contracting Officer
US General Services Administration
National Capital Region

ORGANIZATIONAL CONFLICT OF INTEREST

*This form shall be completed for each task order by an officer of the contractor's firm.*

Contractor:          CBRE
Contract Number:     GS00P10BQD0001
Task Order Number:   GS-P-11-14-YL-0041

**This firm does <u>X</u> or does not _____ have a potential organizational conflict of interest, as described in Section H.5 of the above referenced contract, for task order number GS-P-11-14-YL-0041**

A preliminary survey of buildings that could potentially accommodate the requirement consists of forty four (44) properties. Of these options there are two (2) potential conflicts of interest:

> 1025 F Street, NW, Washington, DC (The Woodies Building)
> 455 12th Street, NW, Washington, DC (Incumbent location)

In addition to an organizational conflict of interest as described above, this firm does __<u>X</u>__ or does not ___ provide Property Management for any properties that would be a potential offeror for this task. Of the forty four (44) total options there is one (1) potential conflict of interest:

> 601 D Street, NW, Washington, DC (Patrick Henry Building)

As required by Section H.5 of the contract, the contractor certifies the following measures are in place:

- A "conflict wall" is in place and contractor personnel have been advised of the restrictions in 1 through 13 of the clause.
- Electronic safeguards are in place to prevent unauthorized access to documents prepared in connection with this task order.
- Documents related to the contract will be safeguarded and secured while in the contractor's possession.

_____          ___**9/29/2014**___
Name: Henry Chapman                       Date
Title: Vice Chairman

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

ORGANIZATIONAL CONFLICT OF INTEREST

**TASK ORDER NUMBER GS-P-11-14-YL-0041**
**FEDERAL COMMUNICATIONS COMMISSION**

A preliminary survey for the required square footage revealed forty four (44) properties in the delineated area that could potentially meet the Government's requirements. Of these 44 properties, there are three (3) potential conflicts of interest:

| | |
|---|---|
| 1025 F Street, NW, Washington, DC (The Woodies Building) | Landlord Representation |
| 445 12th Street, SW, Washington, DC (Incumbent location) | Landlord Representation |
| 601 D Street, NW, Washington, DC (Patrick Henry Building) | Property Management |

CBRE represents the incumbent lessor. Based on their unsolicited offer, it is unlikely they will be the successful offeror, as they require that the Government leases 75,000 RSF more than is expected to be in the prospectus. CBRE may represent other potential offerors for new construction projects in the future; however a preliminary survey uncovered no such conflicts at this time.

The above conflicts are not expected to result in a dual agency for several reasons. Due to the number of potential properties in the delineated area, it is unlikely that the above buildings would express interest or furthermore submit an Initial Offer. Moreover, if the buildings do indeed submit Initial Offers, it is unlikely with the field of competition that one of the above buildings would ultimately become the successful Offeror.

As a result, CBRE should be allowed to continue working on this project pursuant to the updated policy which allows NBC contractors to go to the next step and advertise to determine if a potential conflict of interest emerges. Even if the buildings do express interest, or even submit an offer, the potential dual agency should be allowed. As stated, it is unlikely that one of these buildings would prevail or ultimately meet the Government's requirements. In the unlikely event that one of these properties is the successful Offeror, all of the conflict walls and mitigation requirements required by the contract have been and will continue to be met.

As described above, all elements of the conflict wall required under the NBC are fully employed and the Government should exercise their option to keep this task with CBRE, as it is in the Government's best interests. CBRE would like to continue on this project and does not believe there are any reasons to prohibit them from doing so.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# NATIONAL BROKER CONTRACT
## CONTRACTING OFFICER FINDING AND DETERMINATION
## DUAL AGENCY REQUEST
## TASK ORDER NUMBER GS-P-11-14-YL-0041
## 3DC0421

## FINDINGS

On September 23, 2014, task order number GS-P-11-14-YL-0041 was issued by GSA Regional Contracting Officer, Aliza Brown to CBRE, Inc. to provide lease acquisition services for competitive lease acquisition requirement for approximately 526,000 USF. On September 29, 2014, CBRE indicated that their firm did have a potential organizational conflict of interest, as described in Section H.5 of their contract. CBRE indicated that after a survey of buildings that could potentially accommodate the requirement, 44 properties were found. Of the 44, two buildings were considered potential conflicts of interests. CBRE further indicated that their firm provided property management for one of the 44 buildings.

CBRE indicated the following buildings as having potential conflicts of interest:

      1025 F Street, NW, Washington, DC (The Woodies Building)
      444 12th Street, NW, Washington, DC (Incumbent Location)

CBRE certified they provided Property Management (PM) services at the following location in the delineated area:

      601 D Street, NW, Washington, DC (Patrick Henry Building)

On April 18, 2016, CBRE notified the COTR, Kevin Terry and the ZCO that there was a dual agency situation. CBRE indicated that they had received an offer from Sentinel Square III – 45 L Street, NW, Washington, DC. Sentinel Square III is represented by Trammel Crow, Inc., a wholly owned subsidiary of CBRE. CBRE and Trammel Crow Company are two separate brokerage firms however, their relationship to CBRE constitutes a dual agency.

At the request of the ZCO, updated Conflict of Interest forms were requested and submitted by CBRE on April 19, 2016, that described the introduction of the Sentinel Square III building to the procurement. It was found that initial offers were received on 10/20/2015. There were five initial offers of which two represented potential conflicts of interest; the incumbent location 445 12th Street and 45 L Street, Sentinel Square III.

The arrangement mentioned above between CBRE and Trammel Crow Company constitutes an organizational conflict of interest because of the dual agency situation.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Contract Section/Paragraph H.5 (d)10 provides what actions both the contractor and GSA must take upon a potential conflict of interest identification.  Paragraph H.5 (d) 10 states that the Contractor agrees:

> To immediately notify the Contracting Officer of any conflict of interest discovered during Contractor's performance of work pursuant to a government issued task order; provided that the Contracting officer shall have the right to impose such restrictions as he/she deems appropriate on Contractor's performance based on the existence of such a conflict or, if the contracting Officer determines that such restrictions would not adequately address the conflict of interest at issue, to terminate the Contractor's performance of work under the task order at no cost to the Government.

## DETERMINATION

In accordance with the Federal Acquisition Regulation (FAR) Part 3.101-1 and the provision contained in Section H of the broker contract, NCR's Contracting Officers have made a determination, that it is in the Government's best interest to retain CBRE's project team under this procurement.  This decision is based on the following:

GSA lacks sufficient in house resources to perform the procurement in house and the only other alternative would be to re-task this project to another broker.  The current project schedule indicates a lease award of October 1, 2017 and sufficient time to task another broker does not exist.

This is a large, complex procurement. To bring on another broker at this time will cause delay, stall the momentum and negatively impact our relationship with one of our most important customer agencies.  It would take a new broker unnecessary time to "ramp up" on the procurement.

CBRE asserts that they have established a conflict wall in accordance with contract requirements to appropriately safeguard procurement sensitive data, thereby preserving procurement integrity.

CBRE has also provided the required dual agency notifications to all interested parties in the lease procurement.

Consequently, the identified organizational conflict of interest has been satisfactorily mitigated per requirements of the FAR.

Therefore, it is determined to be in the best interest of the Government to permit CBRE to operate in a dual agency capacity under Task Order Number GS-P-11-14-YL-0041.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**ALIZA BROWN**    Digitally signed by ALIZA BROWN
DN: c=US, o=U.S. Government, ou=General
Services Administration, cn=ALIZA BROWN,
0.9.2342.19200300.100.1.1=47001000013499
Date: 2016.04.26 09:35:15 -04'00'

_____    _____
Aliza Y. Brown                                              Date
NCR Regional Contracting Officer

_Kevin M. Terry_  **KEVIN TERRY**    Digitally signed by KEVIN TERRY
DN: c=US, o=U.S. Government, ou=General Services Administration,
cn=KEVIN TERRY, 0.9.2342.19200300.100.1.1=47001000337374
Date: 2016.06.09 11:09:44 -04'00'

_____    _____
Kevin Terry                                              Date
Contracting Officer Technical Representative

_____    _____
Brad Harrison                                            5/23/16
NCR Regional Program Manager                Date


**Approved**


_____    _____
Danny Killian                                            Date
National Contracting Officer


_____    _____
Heather Cameron                                       Date
General Counsel
Real Property Division (LR)


Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**DUAL AGENCY DISCLOSURE**
**Acknowledgement (August 2010)**

GSA Regional CO: _____    Offeror(s): Trammell Crow Company

Offeror's Property: Sentinel Square III, 45 L Street NE

**Dual Agency:** Dual Agency is a commission based tenant representation and an owner commission/fee relationship. The General Services Administration's allows a brokerage firm under this GSA contract to represent both the Government, as tenant, and another offeror in this real estate transaction as long as this is disclosed to all parties. Similarly, the contract allows the broker to represent the Government, as tenant and provide property management, consulting, or similar services to an offeror in the procurement as long as this is disclosed to all parties. This is known as dual agency. Under this GSA Contract, a brokerage firm may represent or have another form of business relationship with two clients whose interest are, or at times could be, different or adverse. Dual Agency under this GSA contract does not allow the same individual agent of the brokerage firm to represent both parties, and no individual with a personal financial interest may represent the Government. The Government brokers have conflict walls in place, are compliant with Federal Information Security Management Act and have other protections to safeguard the Government and Offeror information.

This statement discloses that CBRE, Inc. will be (or has been) acting as the GSA broker and Dual Agent in this procurement.

It is understood as a Dual Agent, the broker and the brokerage firm shall:
- Treat both clients honestly;
- Disclose latent, material defects to the Government, if known by the broker;
- Provide information regarding lenders, inspectors and other professionals, if requested;
- Provide market information available from a property listing service or public records, if requested;
- Prepare and present all offers and counteroffers at the direction of the parties;
- Assist both clients in completing the steps necessary to fulfill the terms of any contract, if requested.

It is also understood as Dual Agent, the broker and brokerage firm agrees to:
- Protect Offeror's proprietary information from unauthorized use and disclosure for as long as it remains proprietary and refrain from using the information for any other purpose than that for which it was furnished;
- Not disclose confidential information, or information having an adverse effect on one party's position in the transaction;
- Not suggest or recommend specific terms, including price, or disclose the terms or price the Government is willing to accept or any offeror is willing to offer;
- Not engage in conduct contrary to the instructions of any offeror and may NOT act in biased manner on behalf of any one party.

**Responsibilities of the Parties:** The duties of the brokerage firm in a real estate transaction do not relieve the Government and Offeror from the responsibility to protect their own interests. The Government and the Offeror are advised to carefully read all agreements to assure the terms adequately express their understanding of the lease transaction. The brokerage firm is qualified to provide advice on real estate matters. IF LEGAL OR TAX ADVICE IS DESIRED, YOU SHOULD CONSULT THE APPROPRIATE PROFESSIONAL.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

AR 2928

**Exhibit 4C**

**Government Non Disclosure Requirements:** The Government requires complete confidentiality in all lease acquisition offers including non disclosure of the names of potential offerors. The Dual Agent brokerage firm, under a dual agency agreement, will be soliciting other competitive offers for the lease acquisition. By presenting this Dual Agency Disclosure, all interested offerors will be aware of the dual agency relationship; however, the Dual Agent brokerage firm cannot disclose the number, identity or rank of other offerors, or the content or evaluation of the other offerors proposals to the offeror in the Dual Agency relationship.

**Acknowledgement and Duration of Dual Agency and Confidentiality:** The Dual Agency shall automatically terminate upon (a) receipt of Unsuccessful Offeror notification or (b) in the event of a Successful Offeror notification; this agreement will terminate upon occupancy of the Government tenant. As agreed to above, the Dual Agency broker and brokerage firm will protect your information from unauthorized use or disclosure for as long as it remains proprietary and refrain from using the information for any purpose other than that for which it was furnished.

By signing the below, you acknowledge you have read and understand this form.

---

**Notice of dual agency to potential offerors for Solicitation**

By signing this Dual Agency Disclosure Statement you acknowledge that:

<u>CBRE, Inc.</u> Brokerage Firm will act as Dual Agent under this transaction.

April 11, 2016

| **Offeror's Signature** | **Date** |

**Government's Signature**      **Date**

**Broker's Signature**      **Date**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

AR 2929

**DUAL AGENCY DISCLOSURE**
**Acknowledgement (August 2010)**

GSA Regional CO: _____    Offeror(s): Trammell Crow Company

Offeror's Property: Sentinel Square III, 45 L Street NE

**Dual Agency:** Dual Agency is a commission based tenant representation and an owner commission/fee relationship. The General Services Administration's allows a brokerage firm under this GSA contract to represent both the Government, as tenant, and another offeror in this real estate transaction as long as this is disclosed to all parties. Similarly, the contract allows the broker to represent the Government, as tenant and provide property management, consulting, or similar services to an offeror in the procurement as long as this is disclosed to all parties. This is known as dual agency. Under this GSA Contract, a brokerage firm may represent or have another form of business relationship with two clients whose interest are, or at times could be, different or adverse. Dual Agency under this GSA contract does not allow the same individual agent of the brokerage firm to represent both parties, and no individual with a personal financial interest may represent the Government. The Government brokers have conflict walls in place, are compliant with Federal Information Security Management Act and have other protections to safeguard the Government and Offeror information.

This statement discloses that CBRE, Inc. will be (or has been) acting as the GSA broker and Dual Agent in this procurement.

It is understood as a Dual Agent, the broker and the brokerage firm shall:
- Treat both clients honestly;
- Disclose latent, material defects to the Government, if known by the broker;
- Provide information regarding lenders, inspectors and other professionals, if requested;
- Provide market information available from a property listing service or public records, if requested;
- Prepare and present all offers and counteroffers at the direction of the parties;
- Assist both clients in completing the steps necessary to fulfill the terms of any contract, if requested.

It is also understood as Dual Agent, the broker and brokerage firm agrees to:
- Protect Offeror's proprietary information from unauthorized use and disclosure for as long as it remains proprietary and refrain from using the information for any other purpose than that for which it was furnished;
- Not disclose confidential information, or information having an adverse effect on one party's position in the transaction;
- Not suggest or recommend specific terms, including price, or disclose the terms or price the Government is willing to accept or any offeror is willing to offer;
- Not engage in conduct contrary to the instructions of any offeror and may NOT act in biased manner on behalf of any one party.

**Responsibilities of the Parties:** The duties of the brokerage firm in a real estate transaction do not relieve the Government and Offeror from the responsibility to protect their own interests. The Government and the Offeror are advised to carefully read all agreements to assure the terms adequately express their understanding of the lease transaction. The brokerage firm is qualified to provide advice on real estate matters. IF LEGAL OR TAX ADVICE IS DESIRED, YOU SHOULD CONSULT THE APPROPRIATE PROFESSIONAL.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Exhibit 4C

**Government Non Disclosure Requirements:** The Government requires complete confidentiality in all lease acquisition offers including non disclosure of the names of potential offerors. The Dual Agent brokerage firm, under a dual agency agreement, will be soliciting other competitive offers for the lease acquisition. By presenting this Dual Agency Disclosure, all interested offerors will be aware of the dual agency relationship; however, the Dual Agent brokerage firm cannot disclose the number, identity or rank of other offerors, or the content or evaluation of the other offerors proposals to the offeror in the Dual Agency relationship.

**Acknowledgement and Duration of Dual Agency and Confidentiality:** The Dual Agency shall automatically terminate upon (a) receipt of Unsuccessful Offeror notification or (b) in the event of a Successful Offeror notification; this agreement will terminate upon occupancy of the Government tenant. As agreed to above, the Dual Agency broker and brokerage firm will protect your information from unauthorized use or disclosure for as long as it remains proprietary and refrain from using the information for any purpose other than that for which it was furnished.

By signing the below, you acknowledge you have read and understand this form.

---

**Notice of dual agency to potential offerors for Solicitation**

By signing this Dual Agency Disclosure Statement you acknowledge that:

CBRE, Inc. Brokerage Firm will act as Dual Agent under this transaction.

| | April 11, 2016 |
|---|---|
| **Offeror's Signature** | **Date** |

| Kevin M. Terry  KEVIN TERRY | Rec'd April 12, 2016 |
|---|---|
| **Government's Signature** | **Date** |

| | 4/12/16 |
|---|---|
| **Broker's Signature** | **Date** |

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**AR 2931**

# Exhibit 14

# In the United States Court of Federal Claims

BID PROTEST−NOT FOR PUBLICATION

No. 16-427C

Filed Under Seal: November 30, 2016

|  |  |  |
|---|---|---|
| PARCEL 49C LIMITED PARTNERSHIP,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant,<br><br>v.<br><br>TRAMMELL CROW COMPANY,<br><br>Defendant-Intervenor. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Pre-Award Bid Protest; Judgment upon the Administrative Record, RCFC 52.1; Organizational Conflict of Interest; Supplementing the Administrative Record. |

*Richard J. Conway*, Counsel of Record, *Daniel A. Broderick*, Of Counsel, Blank Rome LLP, Washington, DC, *Michael J. Slattery*, Of Counsel, Blank Rome, LLP, New York, NY, *Larry D. Blust*, Of Counsel, Hughes Socol Piers Resnick & DYM, LTD., Chicago, IL, for plaintiff.

*William J. Grimaldi*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, *Michael P. Klein*, Assistant Regional Counsel, United States General Services Administration, Washington, DC, for defendant.

*Stuart W. Turner*, Attorney of Record, *Ronald A. Schechter*, Of Counsel, *Amanda Johnson*, Of Counsel, Arnold & Porter LLP, Washington, DC, for defendant-intervenor.

## MEMORANDUM OPINION AND ORDER

GRIGGSBY, Judge

## I.   INTRODUCTION

Plaintiff, Parcel 49C Limited Partnership ("Parcel 49C"), brought this pre-award bid

protest matter challenging several actions taken by the United States General Services

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Administration ("GSA") in connection with the GSA's evaluation of proposals in response to a request for lease proposals to procure office space for the headquarters of the Federal Communications Commission ("FCC").  The government has moved to partially dismiss this matter for lack of subject-matter jurisdiction, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC").  The government, Parcel 49C, and the defendant-intervenor in this matter, Trammell Crow Company ("Trammell Crow"), have also filed cross-motions for judgment upon the administrative record, pursuant to RCFC 52.1.  In addition, Parcel 49C has filed a motion to supplement the administrative record, a motion for leave to file a sur-reply and a motion to file certain documents under seal, pursuant to RCFC 7(b).

For the reasons set forth below, the Court: (1) **GRANTS** the government's motion for judgment upon the administrative record and Trammell Crow's motion for judgment upon the administrative record; (2) **DENIES** Parcel 49C's motion for judgment upon the administrative record; (3) **DENIES** Parcel 49C's motion to supplement the administrative record; (4) **GRANTS** Parcel 49C's motion to file certain documents under seal and motion for leave to file a sur-reply; and (5) **DENIES**, as moot, the government's partial motion to dismiss.

## II.    FACTUAL AND PROCEDURAL BACKGROUND[1]

### A.  Factual Background

In this pre-award bid protest matter, Parcel 49C alleges that the GSA committed several errors in connection with the agency's evaluation of proposals submitted in response to a request for lease proposals (the "RLP") to procure office space for the headquarters of the FCC ("the FCC Lease").  Pl. 2d. Am. Compl. ¶¶ 1-9.  Specifically, Parcel 49C alleges that the GSA's evaluation of responsive proposals was unreasonable and not in accordance with the terms of the RLP or applicable law.

In this regard, Parcel 49C challenges the GSA's evaluation upon five grounds.  First, Parcel 49C alleges that the GSA should have determined that Trammell Crow is ineligible for

---

[1]The facts recited in this Memorandum Opinion and Order are taken from the administrative record ("AR"); the supplemental administrative record ("SAR"); plaintiff's second amended complaint ("Pl. 2d. Am. Compl."); and plaintiff's memorandum in support of its motion for judgment upon the amended administrative record ("Pl. 2d. Mem.").

award of the FCC Lease due to an organizational conflict of interest ("OCI") that cannot be mitigated and because Trammell Crow was not a single owner of the property that it proposes for the FCC Lease at the time that Trammell Crow submitted its proposal.  *Id*. at ¶¶ 160-79.  Second, Parcel 49C alleges that certain requirements in the RLP unduly restrict competition and prejudice Parcel 49C.  *Id*. at ¶¶ 96-108.  Third, Parcel 49C alleges that the GSA improperly required Parcel 49C to provide certain National Environmental Policy Act ("NEPA") documentation in connection with Parcel 49C's offer, in violation of the RLP's terms and applicable law.  *Id*. at ¶¶ 143-51.  Fourth, Parcel 49C alleges that the GSA's evaluation of responsive proposals was improper, because the agency did not consider certain relocation and move-related costs in connection with its evaluation of the price for the FCC Lease and because the GSA's Independent Government Estimate ("IGE") has not been properly documented by the agency.  *Id*. at 109-42; Pl. 2d. Mem. at ¶¶ 24-46.  Lastly, Parcel 49C alleges that the GSA failed to conduct meaningful discussions with Parcel 49C regarding its proposed price.  Pl. 2d. Am. Compl. at ¶¶ 152-159.

As relief, Parcel 49C requests that the Court order the GSA to reject Trammell Crow's proposal or, alternatively, enjoin the GSA from awarding the FCC Lease.  *Id*. at ¶¶ 43-44.

## 1.  The Request For Lease Proposals

Parcel 49C is the current lessor of a building located at The Portals II, 445 12th Street, SW, Washington, DC, which currently houses the headquarters of the FCC under a previous lease.  AR at 1450.  This lease will expire on October 16, 2017.  *Id*. at 26.

On September 21, 2015, the GSA issued the RLP to procure office space to house the headquarters of the FCC in Washington, DC after the current lease expires.  *Id.* at 1427-1697.  The RLP provides that the subject lease is expected to be for a 15-year term and that the occupancy date under the lease is expected to be between October 18, 2017 and December 31, 2019.  *Id*. at 1431.  In addition, the RLP also provides that "[t]he Lease will be awarded to the responsible Offeror whose offer . . . is the lowest priced technically acceptable offer submitted."  *Id*. at 1446.

Prior to issuing the RLP, the GSA retained the services of CBRE, Inc. ("CBRE") to provide broker services related to the RLP, pursuant to a professional services contract for real estate consulting and other services.  *Id*. at 2918.  Consistent with its standard practice, the GSA

required CBRE to conduct a preliminary survey of building locations that were eligible to submit bids in connection with the RLP. *Id.* This survey revealed that CBRE had three potential conflicts of interest, including a potential conflict with respect to the FCC's incumbent lessor, Parcel 49C. *Id.* at 2923.

There are several provisions in the RLP that are relevant to Parcel 49C's claims in this matter.

First, the RLP contains certain requirements regarding the minimum ceiling height for the space offered for the FCC Lease, as well as a requirement for power redundancy through dual power feeds. *Id.* at 1497. Specifically, the RLP provides that "[t]he first (1st) floor of the offered building must have a minimum finished ceiling height of 11'6." *Id.* The RLP also contains a requirement regarding dual power feeds, which provides that:

> The Government requires power and communication circuits that have more than one point of entry coming into the Building (multiple independent conduits coming from the street to the facility, with at least 25 feet of physical separation). The Government requires redundancy for communications and power. Communications requires dual redundant 10-gigabit circuit, with more than one cable infrastructure. . .

*Id.* (Exhibit B, paragraph 11).

Second, the RLP contains a requirement that the space to be leased must be owned by a single owner. *Id.* at 1687. In this regard, paragraph 1.02, subparagraph C of the RLP provides that:

> Offered space must be contiguous (with the exception of the ground level/first floor space referenced in paragraph 1.02.A. above) and accommodated in no more than one (1) building, as determined by the LCO [Lease Contracting Officer]. To qualify as one (1) building, offered space must be owned by a single Offeror and the structures, if more than one, must be connected internally on at least 60% of the offered floors as determined by and at the discretion of the LCO.

*Id.* at 1687.

Third, the RLP contains several provisions to address potential conflicts of interest involving the broker for the RLP, CBRE. Specifically, paragraph 1.13, subparagraph A of the RLP provides that:

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

For the purposes of this RLP, CBRE, INC. (the Broker) is the authorized contractor real estate broker representing GSA. Offerors are advised that there is a potential for a dual agency situation to arise under this procurement, whereby the Broker may represent both GSA and another Offeror under this lease action. By submitting an offer, the Offeror acknowledges the potential for a dual agency situation. Should there be an actual dual agency, the Broker will notify all Offerors of the actual dual agency and request written acknowledgement statements from all Offerors.

*Id*. at 1433-34.  In addition, paragraph 3.06, subparagraph H of the RLP also provides that:

If there is a potential for conflict of interest because of a single agent representing multiple owners, present evidence that the agent disclosed the multiple representation to each entity and has authorization from each ownership entity offering in response to this RLP package. Owners and agents in conflicting interest situations are advised to exercise due diligence with regard to ethics, independent pricing, and Government procurement integrity requirements. In such cases, the Government reserves the right to negotiate with the owner directly.

*Id*. at 1442.

In addition, the RLP includes a requirement that offerors provide documentation related to compliance with NEPA.  In this regard, paragraph 2.11, subparagraph B of the RLP provides, in relevant part, that:

The Government reserves the right to reject any offer where (i) the NEPA-related documentation provided by the Offeror for the offered Property is inadequate, (ii) the offer entails unacceptably adverse impacts on the human environment, (iii) the identified adverse impacts cannot be readily mitigated, or (iv) the level of NEPA analysis is more extensive than is acceptable to the Government (*e.g.*, offers must be of a nature that would allow NEPA to be satisfied by preparation of a Categorical Exclusion (CATEX) NEPA study or an Environmental Assessment (EA) with or without mandatory mitigation).

*Id*. at 1438.  Section 5.03 of the RLP also provides, in relevant part, that:

Any offer must provide a basis for GSA to determine that award of a lease involving the offered building(s) will, under the National Environmental Policy Act (NEPA – 42 U.S.C. Sec. 4321, *et seq*.), as implemented in the GSA NEPA Desk Guide (October 1999), either result in: 1) a Categorical Exclusion (CATEX) from the requirement to prepare an Environmental Assessment (EA) or an Environmental Impact Statement (EIS), or 2) Finding of No Significant Impact (FONSI) as the result of performing an EA. Any offer that, in GSA's opinion, would require preparation of an EIS shall be considered technically unacceptable and ineligible for award.

*Id*. at 1450.

The RLP also contains a provision to address the fact that the current location of the FCC's headquarters could be renovated to meet the agency's future needs. In this regard, the RLP provides in paragraph 5.04, subparagraph A that:

> A renovation of The Portals II may be a potential solution for this procurement. A renovation of The Portals II will be required to: I) meet all the requirements of the current GSA Request for Lease Proposals (RLP) and Lease Form L201C; II) bring the existing structure and tenant areas up to a LEED-CI, Silver, rating in accordance with the U.S. Green Building Council requirements; and III) reconstruct the majority of the tenant's space to meet the occupancy density required in the approved Prospectus.

*Id*. at 1450.

Lastly, the RLP contains several significant provisions regarding the evaluation of the price proposed by each offeror for the FCC Lease. Specifically, the RLP describes the factors that the GSA will consider in its evaluation of each offerors' price, including move-related and relocation costs, and provides, in relevant part, that:

> Evaluation of offered prices will be based on the annual price per [American National Standards Institute/Building Owners and Managers Office Area Square Feet ("ABOA SF")], including all required option periods. The Government will perform present value price evaluation by reducing the price per ABOA SF to a composite annual ABOA SF price, as follows . . .
> 7. To the gross PVC [present value cost] will be added: . . .
> d.       The cost of relocation of furniture, telecommunications, replications costs, and other move-related costs, if applicable.

*Id*. at 1447.

To develop an IGE for the FCC Lease, the GSA engaged an architectural firm, OLBN, to study the FCC's space needs. *Id*. at 336- 442; SAR at 2. To that end, on April 21, 2015, OLBN provided the agency with a program of requirements ("POR") to help the GSA estimate the costs associated with the FCC Lease. SAR at 6-355.

On July 26, 2016, the government submitted the Declaration of the GSA's Project Manager for the RLP, Cirilo Paulo, which explains the development of the IGE for the FCC Lease based on the POR. *Id*. at 1-5. In the declaration, Mr. Paulo states that OLBN "prepared an extensive POR based upon an in-depth examination of FCC needs, including extensive employee interviews to gain first-hand input from FCC staff." *Id*. at 2. Mr. Paulo also states that, "[a]fter compiling a summary of improvements required by the FCC, OBLN priced its estimate of the

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

costs to accomplish the work, based upon its professional knowledge of the costs prevailing in the Washington DC market for the work described." *Id.*

Mr. Paulo further states in the declaration that, after OBLN arrived at its "estimate of the costs to accomplish the work," he reviewed OLBN's estimated costs and "used these estimates as the starting point in formulating the final IGE for the FCC project." *Id.* With respect to the development of the IGE, Mr. Paulo also states in his declaration that he relied upon his "knowledge of current construction costs," due to his experience managing the new build-out of incumbent leased space for the NASA headquarters. *Id.* at 2. In this regard, Mr. Paulo states that he compared the costs in OLBN's estimates with his own experience with the NASA project and that he found the prices in OLBN's POR to be "realistic, and broadly consistent with [his] own experience." *Id.* at 3.

Mr. Paulo also states that he made certain adjustments to the cost estimates contained in the POR based upon his experience. *Id.* In this regard, Paulo describes several adjustments that he made to OLBN's cost estimates:

> In response to these concerns, and in recognition that an IGE is intended to provide a basis for the tenant agency to budget adequate funds for the anticipated build-out, I made adjustments to certain cost estimates in the POR. These changes included both increasing assumed unit costs, as well decreasing assumed administrative charges. I also corrected certain assumptions as to what Tenant Improvement Allowance (TIA) and Building Specific Amortized Capital (BSAC) funds would be available to defray out-of-pocket build-out costs.
>
> a. I increased the per square foot construction cost estimates for the general office space and both the Low Cost Special Space and High Cost Special Space build-outs.
>
> b. I increased the TIA from $35.00 to $46.74 to reflect the correct allowance available for this lease procurement.
>
> c. I deleted the costs of a swing move from the "stay in place" scenario to reflect that the Government would only pay for one move. Move costs were thus $5.00 per usable square foot for both scenarios.
>
> d. I subtracted the BSAC, which is an allowance available to FCC to fund security costs, from both scenarios. The BSAC is an additional allowance available for the new lease, which would decrease the FCC's out-of-pocket build-out costs.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

e. I decreased both scenario's [sic] design cost percentage from █ percent to █ percent. This was done to reflect the fact that architectural firms are willing to take on large dollar projects such as this one for a lesser overall percentage charge than is the case for smaller dollar projects.

f. I decreased both scenario's [sic] lessor's fee from █ percent to █ percent. Once again, this is to reflect the market's acceptance of a lower percentage commission on large dollar projects.

*Id.* at 3-4 (internal citations omitted).

### 2. Evaluation Of Proposals Submitted By Parcel 49C And Trammell Crow

Parcel 49C and Trammell Crow both timely submitted proposals in response to the RLP on October 20, 2015. AR at 1715-2426. After receiving these proposals, the GSA held discussions with the offerors and subsequently requested that Parcel 49C and Trammell Crow provide their Final Proposal Revisions ("FPR") by December 15, 2015. *Id.* at 785-87, 1703-04.

The GSA's correspondence with both offerors during the evaluation of their initial proposals shows that the GSA identified some deficiencies in both proposals. *Id.* at 1702-14. Specifically, with respect to Parcel 49C's proposal, the GSA requested that Parcel 49C provide the ████████████ required by the RLP. *Id.* at 1703-04. The GSA also expressed a concern about how Parcel 49C's final proposal addressed the RLP's ██████████ requirement. *Id.* at 1707, 1712.

With respect to Trammell Crow's proposal, the GSA expressed concern that the initial proposal did not include certain registration information that would "be needed for [a] final single ownership entity" and the agency requested that Trammell Crow "describe [the] process that will need to be completed to create [a] single ownership entity. *Id.* at 1706; *see also id.* at 1713-14.

Parcel 49C and Trammell Crow both timely submitted their FPRs to the GSA on December 15, 2015, and both offerors further revised their respective proposal at the GSA's request on April 11, 2016. *Id.* at 1707-09, 2427-879. Specifically relevant to this dispute, Trammell Crow described how it could create a single ownership entity to satisfy the RLP's single owner requirement in its FPR. *Id.* at 2782, 2807-08. In this regard, Trammell Crow provided the GSA with an opinion letter from its special counsel describing the process through

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

which Trammell Crow could form a new entity to qualify as a single owner under the RLP upon condition of a lease award. *Id.* at 2807-08.

Following the evaluation of the proposals submitted by Parcel 49C, Trammell Crow, and three other offerors, the GSA determined that Trammell Crow offered the lowest-priced, technically-acceptable offer. *Id.* at 30, Pl. 2d. Mem. at 23-26. And so, the GSA intends to award the FCC Lease to Trammell Crow. *Id.*

### 3. Alleged Organizational Conflicts Of Interest

The GSA also conducted two investigations into alleged organizational conflicts of interest arising from CBRE's business relationship with Trammell Crow. In April 2016, CBRE and Trammell Crow executed a "Dual Agency Disclosure" form, which identified a dual agency relationship between the two companies. *Id.* at 2928-31. On April 18, 2016, CBRE notified the GSA's Contracting Officer's Technical Representative ("COTR"), Kevin Terry, and other GSA contracting personnel, that a dual agency situation existed with respect to the RLP, because the GSA received "an offer from Sentinel Square III," which is "represented by Trammel[l] Crow, Inc., a wholly owned subsidiary of CBRE." *Id.* at 2924. Thereafter, the GSA investigated potential organizational conflicts of interest involving CBRE and Trammell Crow in light of this dual agency disclosure.[2] AR at 2924-26.

On April 26, 2016, the GSA National Capital Region Regional Contracting Officer, Aliza Brown, issued a "National Broker Contract Contracting Officer Finding and Determination" with regard to the disclosed dual agency relationship between CBRE and Trammell Crow. *Id.* at 2924-31. In her findings, Ms. Brown determined that, although an organizational conflict of interest exists, it was "in the Government's best interest to retain CBRE's project team under [the FCC] procurement," because of the size and complexity of that procurement. *Id.* at 2925. With regard to mitigating this OCI, Mr. Brown also found that CBRE had "established a conflict wall in accordance with the contract requirements to appropriately safeguard procurement sensitive data, thereby preserving procurement integrity." *Id.* In addition, she also determined that CBRE

---

[2] On September 29, 2014, CBRE also disclosed a potential organizational conflict of interest related to the fact that CBRE represented Parcel 49C, which is the lessor for the incumbent location of the FCC headquarters. AR at 2918, 2922-23. CBRE also disclosed at that time that it might represent other potential offerors for new construction projects in the future. *Id.* at 2918.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

"provided the required dual agency notifications to all interested parties in the lease procurement" and, as a result, "the identified organizational conflict of interest had been satisfactorily mitigated per requirements of the" Federal Acquisition Regulation ("FAR"). *Id.*

The GSA conducted a second OCI investigation related to CBRE's business relationship with Trammell Crow after Parcel 49C commenced this litigation. In this regard, on July 22, 2016, the GSA's COTR, Kevin Terry, issued "Findings and Determinations in Regard to Adequacy of Safeguards Against Organizational Conflicts of Interest." *Id.* at 2918-21. In his findings, Mr. Terry detailed the actions that he undertook to investigate and directly address Parcel 49C's allegation that Trammell Crow had a potential undisclosed conflict of interest with respect to CBRE and "to ensure the integrity of the procurement and the protection of the government's interests." *Id.* at 2919.

First, Mr. Terry states that he "approached CBRE for information about the alleged conflict." *Id.* Mr. Terry also states that he found that "[t]he fact that CBRE and Trammell Crow Company have [a common ownership] relationship does not necessarily create a conflict of interest as described in FAR 9.500, because the entities function as independent businesses and the connection between the entities is remote." *Id.* at 2920. In this regard, Mr. Terry determined that "Trammel[l] Crow Company . . . represents itself as a[n] independently operated business entity, not as an alter ego of CBRE." *Id.* And so, Mr. Terry concluded that:

> A connection at this remote level is a lesser cause for concern than arises when the same brokerage firm represents both sides in a transaction, since the opportunity for improper sharing of information between rival separate brokerage firms with a common corporate ownership is less than the opportunities that might arise when two separate broker teams within the same brokerage firm are on opposite sides in a competitive procurement action.

*Id.*

In his findings and determinations, Mr. Terry also states that "the ▮▮▮▮▮▮▮▮ and safeguards [that CBRE has] in place that are adequate to mitigate the possibility of an internal organizational conflict of interest within CBRE itself, are certainly adequate to mitigate the possibile [sic] organizational conflict of interest that might exist between rival firms in common ownership." *Id.* Mr. Terry also "made further inquiries of CBRE pursuant to FAR 9.504(e)." *Id.* at 2921. From those inquiries Mr. Terry states that he learned "that Trammel[l] Crow Company ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

██████████████████████████████████████████████████

████████████████████████████████████████████ *Id.* at

2921. Mr. Terry also found that "CBRE and Trammel[l] Crow Company [did] not ███

████████████, and the economic interests of the two firms, and the brokers employed by

each, are not aligned even to the same extent as is the case for CBRE, which has brokers

representing both Parcel 49C and GSA within the same brokerage firm." *Id.* And so, Mr. Terry

found a "lack of any substantive issue concerning [a] potential organizational conflict of interest"

pursuant to the FAR. *Id.*

After completing his investigation, Mr. Terry states that he determined that "the common

ownership interest between CBRE and Trammel[l] Crow Company likely does not create a

conflict of interest as such is defined in the FAR, and that even if such a potential conflict arises

from the fact of common ownership, it is properly mitigated by the ████ protections in place

at CBRE as described in" CBRE's organizational conflict of interest submissions. *Id.* at 2921.

And so, Mr. Terry concluded that there was "no unmitigated conflict of interest arising from the

business relationship between CBRE and Trammell Crow Company" and that, in any event, it

was "in the interest of the United States" to award the FCC Lease to Trammell Crow,

notwithstanding Parcel 49C's allegation of an unmitigated conflict of interest. *Id.* at 2921.

### 4. Parcel 49C's GSA And GAO Protests

Prior to commencing this litigation, Parcel 49C filed several protests before the GSA and

the Government Accountability Office ("GAO") related to the RLP. *Id.* at 51-221, 248-266,

287-93, 1103-1250. On October 20, 2015, Parcel 49C filed an agency-level protest with the

GSA challenging the RLP's ceiling height and dual power feed requirements. *Id.* at 287-93. The

GSA denied Parcel 49C's protest on December 2, 2015. *Id.* at 224-32. On November 16, 2015,

Parcel 49C filed a second agency-level protest challenging, among other things, the RLP's

requirement that offerors comply with the RLP's NEPA-related requirements. *Id.* at 248-66.

The GSA dismissed Parcel 49C's second agency-level protest on December 15, 2015. *Id.* at 222-

23.

In December 2015, Parcel 49C filed a protest with the GAO, challenging, among other

things, the RLP's first floor ceiling height and dual power feed requirements, the GSA's

interpretation of the RLP's NEPA-related requirements, and the GSA's consideration of

relocation and move-related costs.  *Id.* at 51-221, 1103-1250.  The GAO dismissed-in-part and denied-in-part this protest on March 23, 2016.  *Id.* at 1414-26.

### B.    Relevant Procedural History

On April 4, 2016, Parcel 49C filed the complaint in this bid protest matter.  *See generally* Compl.  Parcel 49C subsequently amended the complaint on May 19, 2016 and on June 9, 2016. *See generally* Pl. 1st Am. Compl.; Pl. 2d. Am. Compl.

On April 14, 2016, the government filed the administrative record in this matter.  *See generally* 1st AR.  The government subsequently amended the administrative record on May 20, 2016, and later supplemented the administrative record on July 26, 2016, with the Declaration of Cirilo Paulo.  *See generally* AR; SAR.  On May 5, 2016, plaintiff filed a motion to supplement the administrative record with certain expert reports that were commissioned by Parcel 49C pertaining to the RLP's ceiling height and dual power feed requirements.  *See generally* Pl. Mot. to Supp.  The government filed a response and opposition to Parcel 49C's motion to supplement on June 24, 2016.  *See generally* Def. Opp. to Mot. to Supp.

On May 5, 2016, Parcel 49C also filed its first motion for judgment upon the administrative record.  *See generally* Pl. 1st Mot.  Subsequently, on June 10, 2016, Parcel 49C filed a second motion for judgment upon the amended administrative record.[3]  *See generally* Pl. 2d. Mot.

On June 3, 2016, Trammell Crow filed a motion to intervene in this matter, which the Court granted on June 9, 2016.  *See generally* Int. Mot. to Intervene.  Thereafter, on June 24, 2016, the government filed a partial motion to dismiss this matter and motion for judgment upon the administrative record, and Trammell Crow filed a motion for judgment upon the administrative record.  *See generally* Def. Mot.; Int. Mot.

On August 12, 2016, Parcel 49C filed a reply in support of its motion for judgment upon the administrative record and a response to the government's partial motion to dismiss and motion for judgment upon the administrative record and to Trammell Crow's motion for

---

[3] On May 24, 2016, Parcel 49C filed a notice withdrawing Counts I-V and Count XII of its first amended complaint.  *See generally* Pl. Notice.  On May 25, 2016, plaintiff also filed a motion to seal this notice. *See generally* Pl. Mot to Seal.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

judgment upon the administrative record. *See generally* Pl. Reply. On September 2, 2016, the
government and Trammell Crow filed their respective replies in support of their motions for
judgment upon the administrative record. *See generally* Def. Reply; Int. Reply.

Lastly, on October 18, 2016, Parcel 49C filed a motion for leave to file a sur-reply in
response to the government's reply. *See generally* Pl. Mot. for Sur-Reply. On October 20, 2016,
and October 21, 2016, respectively, the government and Trammell Crow filed their responses
and opposition to Parcel 49C's motion for leave to file a sur-reply. *See generally* Def. Opp. to
Sur-Reply; Int. Opp. to Sur-Reply.

These matters having been fully briefed, the Court addresses the pending motions.

## III.   LEGAL STANDARDS

### A.   Jurisdiction And Bid Protests

The Tucker Act grants the United States Court of Federal Claims jurisdiction over bid
protests brought by "an interested party objecting to a solicitation by a Federal agency for bids or
proposals for a proposed contract or to a proposed award or the award of a contract or any
alleged violation of statute or regulation in connection with a procurement or a proposed
procurement." 28 U.S.C. § 1491(b)(1). In bid protest cases, this Court reviews agency actions
under the "arbitrary and capricious" standard. *See* 28 U.S.C. § 1491(b)(4) (adopting the standard
of review set forth in the Administrative Procedure Act). And so, under the Administrative
Procedure Act standard, an award may be set aside if "(1) the procurement official's decision
lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or
procedure." *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1351 (Fed. Cir. 2004)
(quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332
(Fed. Cir. 2001)). The United States Court of Appeals for the Federal Circuit has explained that:

> When a challenge is brought on the first ground, the test is whether the
> contracting agency provided a coherent and reasonable explanation of its exercise
> of discretion, and the disappointed bidder bears a "heavy burden" of showing that
> the award decision had no rational basis. When a challenge is brought on the
> second ground, the disappointed bidder must show a clear and prejudicial
> violation of applicable statutes or regulations.

*Id.* at 1351 (citations omitted).

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

In reviewing an agency's procurement decision, the Court should recognize that the agency's decision is entitled to a "presumption of regularity." *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977) (citations omitted). And so, the Court should not substitute its judgment for that of the agency. *Cincom Sys., Inc. v. United States*, 37 Fed. Cl. 663, 672 (1997). "The protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law" or procedure. *Info. Tech. & Applications Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003) ("*ITAC*"); *see also Bannum, Inc. v. United States*, 60 Fed. Cl. 718, 723 (2004); *Gentex Corp. v. United States*, 58 Fed. Cl. 634, 648 (2003). This standard "is highly deferential" and "requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing *Bowman Transp., Inc. v. Ark.–Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

In addition, as long as there is "a reasonable basis for the agency's action, the Court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (citations omitted). But, if "the agency 'entirely fail[s] to consider an important aspect of the problem [or] offer[s] an explanation for its decision that runs counter to the evidence before the agency,'" then the resulting action lacks a rational basis and, therefore, is defined as arbitrary and capricious. *Ala. Aircraft Indus., Inc.–Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

## B.     Judgment Upon The Administrative Record And Injunctive Relief

Generally, Rule 52.1 limits this Court's review of an agency's procurement decision to the administrative record. RCFC 52.1; *see Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) ("[T]he focal point for judicial review should be the administrative record already in existence."). And so, unlike a summary judgment motion brought pursuant to Rule 56, the existence of genuine issues of material fact does not preclude judgment upon the administrative record under Rule 52.1. *Tech. Sys., Inc. v. United States*, 98 Fed. Cl. 228, 242 (2011); RCFC 56. Rather, the Court's inquiry is whether, "given all the disputed and undisputed

14

facts, a party has met its burden of proof based on the evidence in the record." *A&D Fire Prot., Inc. v. United States*, 72 Fed. Cl. 126, 131 (2006).

In addition, under its bid protest jurisdiction, the Court "may award any relief [it] considers proper, including declaratory and injunctive relief . . . ." 28 U.S.C. § 1491(b)(2); *see also Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009). In deciding whether to issue a permanent injunction, the Court considers: (1) whether the plaintiff has succeeded upon the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004); s*ee also Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success."); *Centech Grp., Inc.*, 554 F.3d at 1037. These four factors are to be considered collectively, rather than individually, such that "[n]o one factor, taken individually, is necessarily dispositive. . . . [T]he weakness of the showing regarding one factor may be overborne by the strength of the others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). Conversely, "the absence of an adequate showing with regard to any one factor may be sufficient" to deny injunctive relief. *Id*.

A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon its motion for permanent injunctive relief. *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd*., 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon its motion for permanent injunctive relief), *reh'g* and *reh'g en banc* denied. This Court has also found success upon the merits to be "the most important factor for a court to consider when deciding whether to issue injunctive relief." *Dellew Corp. v. United States*, 108 Fed. Cl. 357, 369 (2012) (citing *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 312 (Fed. Cir. 2007)). However, while success upon the merits is necessary, it is not sufficient alone for a plaintiff to establish that it is entitled to injunctive relief. *See Contracting, Consulting, Eng'g LLC v. United States*, 104 Fed. Cl. 334, 353 (2012) ("Although plaintiff's entitlement to injunctive relief depends on its succeeding on the merits, it is not determinative

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

because the three equitable factors must be considered, as well.") (citing *PGBA, LLC*, 389 F.3d at 1228-29).

## C. Supplementing The Administrative Record

The United States Court of Appeals for the Federal Circuit has held that the "focal point" of the Court's review of an agency's procurement decision "'should be the administrative record already in existence, not some new record made initially in the reviewing court.'" *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009) (quoting *Camp v. Pitts*, 411 U.S. 138, 142 (1973)). By limiting its review to the "record actually before the agency" the Court guards against "using new evidence to 'convert the 'arbitrary and capricious' standard'" applicable to bid protest actions "'into effectively *de novo* review.'" *Id.* at 1380 (quoting *Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000)). And so, the "parties' ability to supplement the administrative record is limited" and the administrative record should only be supplemented "if the existing record is insufficient to permit meaningful review consistent with the APA." *Id.* at 1379-81; *see also Caddell Constr. Co., Inc. v. United States*, 111 Fed. Cl. 49, 93 (2013); *DataMill, Inc. v. United States*, 91 Fed. Cl. 722, 732 (2010) (Plaintiff "bears the burden of explaining why the agency-assembled administrative record is insufficient.").

This Court has interpreted the Federal Circuit's directive in *Axiom* to mean that supplementation of the administrative record is permitted to correct mistakes and fill gaps. *L-3 Commc'ns EOTech, Inc. v. United States*, 87 Fed. Cl. 656, 672 (2009). But, supplementation of the administrative record is not permitted when the documents proffered are unnecessary for an effective review of the government's procurement decision. *Id.* And so, supplementation of the administrative record is appropriate when necessary to provide the Court with a record containing the information upon which the agency relied when it made its decision, as well as any documentation revealing the agency's decision-making process. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *see also Beta Analytics Int'l, Inc. v. United States*, 61 Fed. Cl. 223, 225 (2004) ("'[S]upplementation might be necessary to help explain an agency's decision and thereby facilitate meaningful judicial review of the agency decision, particularly when a subjective value judgment has been made but not explained.'") (quoting *Orion Int'l Techs. v. United States*, 60 Fed. Cl. 338, 343-44 (2004) (finding that supplementation is warranted when it is missing "relevant information that by its very nature would not be found

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

in an agency record--such as evidence of bad faith, information relied upon but omitted from the paper record, or the content of conversations")).

## IV.    ANALYSIS

In its motion for judgment upon the administrative record, Parcel 49C challenges the GSA's evaluation process for the RLP upon five grounds.  First, Parcel 49C alleges that the GSA should have determined that Trammell Crow is ineligible for award of the FCC Lease due to an organizational conflict of interest that cannot be mitigated and because Trammell Crow was not the single owner of the property that it proposes for the FCC Lease at the time its proposal was submitted to the GSA.  Second, Parcel 49C alleges that certain requirements in the RLP unduly restrict competition and prejudice Parcel 49C.  Third, Parcel 49C alleges that the GSA improperly required Parcel 49C to provide certain NEPA-related documentation in connection with Parcel 49C's offer, in violation of the RLP's terms and applicable law.  Fourth, Parcel 49C alleges that the GSA's evaluation of responsive proposals was improper because the agency did not consider certain move-related and relocation costs in connection with its evaluation of offerors' prices and because the GSA's IGE had not been properly documented by the agency. Lastly, Parcel 49C alleges that the GSA failed to conduct meaningful discussions with Parcel 49C regarding its proposed price.

The government and Trammell Crow both counter that the administrative record in this matter shows that the GSA conducted a reasonable evaluation process for the RLP, in accordance with the requirements of the RLP and applicable law.  For the reasons discussed below, the Court agrees.  And so, the Court **DENIES** Parcel 49C's motion for judgment upon the administrative record and **GRANTS** the government's cross-motion for judgment upon the administrative and Trammell Crow's cross-motion for judgment upon the administrative record.

### A.    Supplementation Of The Administrative Record Is Not Warranted

As a preliminary matter, the Court must deny Parcel 49C's request to supplement the administrative record in this case with certain expert reports commissioned by Parcel 49C, because these reports do not fill any gaps in the administrative record and directly address the legal issues that the Court must resolve in this matter.  *See generally* Pl. Mot. to Supp.  In its motion to supplement, Parcel 49C seeks to supplement the administrative record with an expert engineering systems design and services report prepared by ███████████████. and an

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

expert engineering report prepared by ████, Inc. *Id.* Parcel 49C commissioned these expert reports to support its challenge to the RLP's ceiling height and dual power feed requirements. *Id.*

Parcel 49C argues that these expert reports should be added to the administrative record because they will ensure effective judicial review of this matter. *Id.* A review of the administrative record and the subject reports reveals, however, that Parcel 49C's request to supplement the extensive administrative record in this case is without merit.

First, it is well established that the Court may permit a party to supplement the administrative record if such supplementation is meaningful to judicial review. *L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672. But, it is also well established that supplementation of the administrative record with matters that address the legal issues before the Court is not appropriate. *Id.* (denying supplementation of the administrative record because plaintiff's proffered declaration "directly addresses the dispute before the court–whether the government's decision to eliminate [the protester] from this competition . . . was arbitrary or capricious"). In this case, Parcel 49C seeks to supplement the administrative record with expert reports that directly address one of the legal disputes in its bid protest—whether the RLP's ceiling height and dual power feed requirements are rationale. *See generally* Pl. Mot. to Supp; AR at 188-89, 204-07. It is not appropriate for the Court to supplement the administrative record with this kind of information. *L-3 Commc'ns EOTech*, 87 Fed. Cl. at 672. And so, Parcel 49C's request that the Court do so in this case is without merit.

Supplementation of the administrative record with the subject expert reports is also not appropriate because these reports do not fill a gap in the administrative record. The government has filed an extensive administrative record in this matter, which it has subsequently amended and supplemented, to ensure that the administrative record contains the information that the GSA considered in evaluating proposals responsive to the RLP. *See generally* 1st AR; AR; SAR. While the expert reports that Parcel 49C seeks to add to the administrative record do provide an alternative point of view about the merits of the RLP's ceiling height and dual power feed requirements, these reports simply do not fill any gaps in the administrative record about the GSA's evaluation process for this procurement. *RhinoCorps Ltd. Co.,* 87 Fed. Cl. at 282 (denying supplementation of the administrative record with facts that substitute plaintiff's

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

opinion for the agency's determinations).  Given this, supplementing the administrative record

with these expert reports would run afoul of the Federal Circuit's clear directive in *Axiom* that

the "focal point" of the Court's review in a bid protest matter should be the administrative record

already in existence and not a record made in the reviewing court.  *Axiom Res. Mgmt.*, 564 F.3d

at 1379.

**B.      The Administrative Record Shows That
         The GSA Conducted A Reasonable Evaluation
         Process In Accordance With The RLP And Applicable Law**

The administrative record in this matter also shows that the GSA's evaluation process for

the RLP was both reasonable and in accordance with the requirements of the RLP and applicable

law.  The Court reviews the GSA's actions with respect to the evaluation process for the RLP

under the arbitrary and capricious standard and the Court will not substitute its judgment for that

of the agency.  *See* 28 U.S.C. § 1491(b)(4); *Citizens to Pres. Overton Park*, 401 U.S. at 415;

*Cincom Sys., Inc.*, 37 Fed. Cl. at 672.  Applying this framework, the Court addresses each of

Parcel 49C's five challenges to the GSA's evaluation process in connection with the RLP below.

**1.      Parcel 49C's Claim That Trammell Crow Is Ineligible
         For Award Is Unsubstantiated By The Record Evidence**

As an initial matter, the administrative record does not substantiate Parcel 49C's claim

that Trammell Crow is ineligible for award of the FCC Lease.  Parcel 49C challenges Trammell

Crow's eligibility for an award upon two grounds.  First, Parcel 49C contends that Trammell

Crow is ineligible for award due to an organizational conflict of interest that cannot be mitigated.

Pl. 2d. Mem. at 20-21, 28-31.  Second, Parcel 49C also contends that Trammell Crow is

ineligible for award because Trammell Crow has not complied with the RLP's single owner

requirement.  Pl. 2d. Mot. at 2; Pl. 2d. Mem. at 2, 17-20, 31-33.  For the reasons discussed

below, neither of Parcel 49C's arguments are supported by the administrative record.

**a.      Parcel 49C Has Not Demonstrated The Existence
         Of An Unmitigated Organizational Conflict Of Interest**

First, the administrative record shows that the GSA extensively investigated a potential

organizational conflict of interest arising from the business relationship between Trammell Crow

and the broker for the FCC Lease, CBRE.  The administrative record also shows that the GSA

appropriately determined that such an OCI could be, and had been, mitigated in this case.

19

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

The United States Court of Appeals for the Federal Circuit has held that the FAR obligates an agency to conduct an organizational conflict of interest analysis for significant conflicts and that contracting officers are given broad discretion in determining whether a potential conflict of interest is significant. *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010) (holding that agencies are only required to document "significant potential conflicts"); 48 C.F.R. § 9.504(a)(2). "'A significant potential conflict [of interest] is one which provides the bidding party a substantial and unfair competitive advantage during the procurement process on information or data not necessarily available to other bidders.'" *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1386 (Fed. Cir. 2011) (quoting *PAI Corp.*, 614 F.3d at 1352). In addition, an organizational conflict of interest exists when, "because of other activities or relationships with other persons, a person is unable or potentially unable to render impartial assistance or advice to the Government, or the person's objectivity in performing the contract work is or might be otherwise impaired, or a person has an unfair competitive advantage." 48 C.F.R. § 2.101. And so, the FAR obligates a contracting officer to "analyze planned acquisitions in order to . . . [a]void, neutralize, or mitigate significant potential conflicts before contract award." 48 C.F.R. § 9.504(a)(2).

In this case, the administrative record demonstrates that the GSA identified and properly investigated an OCI arising from the business relationship between CBRE and Trammell Crow on two separate occasions, to ensure the integrity of the procurement process for the FCC Lease. In this regard, the record evidence shows that CBRE first disclosed its dual agency relationship with Trammell Crow to the GSA in April 2016. AR at 2928-31. The record evidence also shows that, thereafter, the GSA's National Capital Region Regional Contracting Officer, Aliza Brown investigated the OCI and issued a "National Broker Contract Contracting Officer Finding and Determination" finding an organizational conflict of interest with respect to the relationship between CBRE and Trammell Crow that could be, and had been, mitigated. *Id*. at 2924-26.

After Parcel 49C commenced this matter, the GSA conducted a second investigation to determine whether Trammell Crow had an OCI due to its relationship with CBRE. *Id*. at 2918-21. Specifically, the administrative record demonstrates with respect to this OCI investigation that the GSA's COTR, Kevin Terry, "approached CBRE for information about the alleged conflict" and found that ██████████████████████████████████ ████████████████████████ *Id*. at 2919. In particular, the administrative record shows that

**Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order**

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Mr. Terry learned "that Trammel[l] Crow Company had its ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████ *Id*. at 2921. And so, on July 22, 2016, Mr. Terry issued findings concluding that that there is no unmitigated conflict of interest arising from the business relationship between CBRE and Trammell Crow.[4] *Id*.

The record evidence also shows that the GSA reasonably determined that the OCI involving CBRE and Trammell Crow could be, and had been, mitigated in this case. In this regard, Mr. Terry determined in his findings that "the ███████████ and safeguards [that CBRE has] in place that are adequate to mitigate the possibility of an internal organizational conflict of interest within CBRE itself, are certainly adequate to mitigate the possibile [sic] organizational conflict of interest that might exist between rival firms in common ownership." *Id*. at 2920. There is no dispute in this case that the CBRE's ██████ and other safeguards were in place when Trammell Crow submitted its offer for the FCC Lease. *Id*. at 2922. And so, the administrative record demonstrates that the GSA reasonably and appropriately determined that the OCI involving Trammell Crow and CBRE could be, and had been, mitigated.

Parcel 49C's argument that this OCI cannot be mitigated, because the CBRE personnel who evaluated Trammell Crow's proposal have a financial interest in selecting Trammell Crow for award, is also unsubstantiated by the administrative record. Pl. 2d. Mem. at 30-31. The record evidence makes clear that Trammell Crow ███████████ and the company operates independently from CBRE. AR at 2920-21. And so, these CBRE employees do not have a financial interest in the award of the FCC Lease to Trammell Crow.

Parcel 49C's contention that CBRE's "dual role as evaluator and simultaneous offeror creates the appearance of impropriety, which by itself warrants Trammel[l] Crow's disqualification," is similarly without support in the record evidence. Pl. 2d. Mem. at 30. Rather, the administrative record demonstrates that CBRE appropriately disclosed its dual agency relationship with Trammell Crow to the GSA and to all interested parties in this lease

---

[4] Mr. Terry also found that, "to the extent that there is an ongoing allegation of the existence of an unmitigated conflict of interest arising from the business relationship between CBRE and Trammel[l] Crow Company, it is in the interest of the United States to award the lease contract [to Trammell Crow]." AR at 2921.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

procurement to avoid any appearance concerns.  *Id.* at 2925.  And so, again, the record simply does not support Parcel 49C's argument that the OCI resulting from Trammell Crow's relationship with CBRE cannot be mitigated.[5]

> **b.** **Parcel 49C Has Not Demonstrated That Trammell Crow Violated The RLP's Single Owner Requirement**

The record evidence also does not substantiate Parcel 49C's argument that Trammell Crow is ineligible for award of the FCC Lease because Trammell Crow has not satisfied the RLP's single owner requirement.  Pl. 2d. Mem. at 18-20, 31-33, 59.  In this regard, Parcel 49C argues in essence that Trammell Crow is ineligible for award of the FCC Lease because the company was not the single owner of the parcel that it proposes for the FCC Lease at the time that Trammell Crow submitted its final proposal.  Pl. 2d. Mem. at 31-33.  A plain reading of the RLP makes clear, however, that the RLP does not require that an offeror be a single owner when the company submitted its proposal.

Specifically, the RLP requires that, "to qualify as one (1) building, the offered space must be owned by a single Offeror and the structures if more than one, must be connected internally on at least 60% of the offered floors, as determined by and at the discretion of the LCO."  AR at 1497, 1687-88.  The administrative record also shows that in its final proposal Trammell Crow represented to the GSA in the company's final proposal that Trammell Crow would comply with this requirement if awarded the FCC Lease.  *Id.* at 2782, 2807-08.  The administrative record also shows that Trammell Crow reaffirmed its intention to satisfy the RLP's single owner requirement in an opinion letter from the company's special counsel, which described in detail the process through which Trammell Crow could form a new entity to qualify as a single owner under the terms of the RLP upon award of the FCC Lease.  *Id.* at 2782, 2807-08.

Given this factual evidence, the administrative record plainly demonstrates that Trammell Crow has stated its intention to satisfy the RFP's single owner requirement if awarded the FCC

---

[5] Parcel 49C's reliance upon FAR § 9.505-3 to argue that the GSA's OCI determination with respect to Trammell Crow and the FCC Lease is improper and similarly misguided.  As the government notes in its motion, Section 9.505-3 has no application to the FCC Lease at issue here.  48 C.F.R. § 9.505-3 (requiring that contracts for the evaluation of offers for products or services shall not be awarded to a contractor that will evaluate its own offers or those of a competitor without proper safeguards to ensure objectivity); Def. Reply at 18-20.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Lease. The RLP requires nothing more of Trammell Crow in this regard. *Id.* at 1497, 1687-88. And so, the GSA reasonably determined that Trammell Crow is eligible for award of the FCC Lease and that the company will comply with the RLP's single owner requirement if awarded the FCC Lease.

### 2.    The RLP's Requirements Do Not Unduly Restrict Competition

Parcel 49C's argument that the RLP's ceiling height and dual power feed requirements unduly restrict competition are similarly without support in the administrative record. Pl. 2d. Mem. at 45-53. This Court has recently held that, when examining whether a particular procurement requirement unduly restricts competition, the Court inquires whether the restrictive requirements are required to meet the government's minimum needs. *Id.*; *Am. Safety Council, Inc.*, 122 Fed. Cl. 426, 435 (2015); *see also* 41 U.S.C. § 253a(a).[6] If a solicitation requirement violates the prohibition against restrictive terms that are not required to meet the government's minimum needs, the requirement is deemed to be unduly restrictive and an agency's decision to include the requirement in the solicitation will be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Id.* at 436 (citing *Redland Genstar, Inc. v. United States,* 39 Fed. Cl. 220, 231 (1997); *see also Wit Assocs., Inc. v. United States*, 62 Fed. Cl. 657, 662 (2004) ("A solicitation must seek proposals that meet an agency's minimum needs, or else the solicitation represents an undue, improper restriction on competition. . . ").

The Federal Circuit has also held that a plaintiff bears the burden of showing that a restrictive solicitation term "is so plainly unjustified as to lack a rational basis." *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286-87 (Fed. Cir. 2010). And so, to determine whether a requirement is unduly restrictive here, the Court asks both whether the requirement "is so plainly unjustified as to lack a rational basis," and whether the allegedly restrictive term is required to meet the government's minimum needs. *Id.*; *Am. Safety Council, Inc.*, 122 Fed. Cl. at 435. The Federal Circuit has also held that an agency's preferences with respect to a procurement are entitled to great weight. *Savantage Fin. Servs., Inc.*, 595 F.3d at 1286. And so, determining the agency's minimum needs is a matter that falls within the broad discretion of the

---

[6] The Competition in Contracting Act ("CICA") requires full and open competition through the use of competitive procedures. 41 U.S.C. § 3301(a)(1).

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

agency–and not a matter for the Court to second guess.  *Savantage* at 1286; *Wit Assocs., Inc.*, 62 Fed. Cl. at 662.

Here, the administrative record clearly shows that the RLP's ceiling height requirement is rational and designed to meet the government's legitimate needs, because this requirement will ensure that the FCC has adequate space to conduct the agency's press and public relations events on the first floor of the FCC's new headquarters.  AR at 668-69.  In particular, the RLP requires that "[t]he first (1st) floor of the offered building must have a minimum finished ceiling height of 11'6.'" *Id*. at 1497.  The administrative record makes clear that the RLP's ceiling height requirement will permit the FCC "to provide unobstructed views of the entire space anywhere within the room . . . . [and l]arge monitors . . . mounted to walls throughout the room to provide visibility for the audience of any presentations." *Id*. at 668-69.  The need to have suitable space for press and public relations events is a legitimate need of the FCC, and the RLP's ceiling height requirement reasonably addresses this need.  And so, the administrative record demonstrates that the RLP's ceiling height requirement is a rational requirement designed to meet the FCC's legitimate needs in this case.  *Savantage. Fin. Servs.*, 595 F.3d at 1286-87.

The administrative record also demonstrates that the RLP's dual power feed requirement−which requires that the power and communication circuits in the FCC's new headquarters have more than one point of entry−is also rationale and designed to meet the FCC's minimum needs.  *See* AR at 1497 (RLP at Exhibit B ¶ 11).  In this regard, the RLP provides, in relevant part, that:

> The Government requires power and communication circuits that have more than one point of entry coming into the Building (multiple independent conduits coming from the street to the facility, with at least 25 feet of physical separation). . . . The Government requires redundancy for communications and power. Communications requires dual redundant 10-gigabit circuit, with more than one cable infrastructure.

*Id*. at 526, 1497 (Exhibit B, paragraph 11).  The government also represents that the FCC's Public Safety & Homeland Bureau Command Center ("PSHSB")−which coordinates the FCC's activities with respect to, among other things, public safety, homeland security and national security−is housed within the FCC's headquarters.  *Id*. at 687, 1498, 1588-89; s*ee also* 47 C.F.R. § 0.191(b).  And so, to ensure that the PSHSB can perform its mission, the RLP requires power redundancy through dual power feeds at the FCC's new headquarters.  AR at 1498, 1588-89.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Again, the RLP's dual power requirement is both rational and intended to meet a demonstrated need upon the part of the FCC to fulfill its public safety mission. Given this, the dual power feed requirement does not unduly restrict the competition for the FCC Lease. *Savantage Fin. Servs.*, 595 F.3d at 1287; *Am. Safety Council, Inc.*, 122 Fed. Cl. at 435. And so, the Court will not set aside this reasonable solicitation requirement.

Lastly, it is also important to note that, while there may be other options for meeting the FCC's needs with respect to public relations and public safety, re-examining those options is not the role of this Court when determining whether the RLP's requirements unduly restrict competition. *Savantage Fin. Servs.*, 595 F.3d at 1286 ("And determining an agency's minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for[the] court to second guess.'") (citations omitted) (brackets existing). The government has demonstrated that both the ceiling height and dual power feed requirement in the RLP are rational. As a result, Parcel 49C has not met its burden to show that these RLP's requirements unduly restrict competition.

### 3. The RLP's NEPA-Related Requirements Are Also Reasonable

To the extent that Parcel 49C can challenge the RLP's requirements with respect to NEPA compliance in this litigation, the record evidence also shows that these requirements are reasonable.[7] In its motion, Parcel 49C argues that the RLP's NEPA-related requirements are unreasonable, and that Parcel 49C should be exempt from these requirements, because Parcel 49C will not construct a new building if awarded the FCC Lease. AR at 54-58; Pl. 2d Mem. at ¶¶ 47-56. For the reasons discussed below, Parcel 49C's claim is without merit.

With respect to the NEPA compliance, the RLP provides, in relevant part, that:

> The Government reserves the right to reject any offer where (i) the NEPA-related documentation provided by the Offeror for the offered Property is inadequate, (ii) the offer entails unacceptably adverse impacts on the human environment, (iii) the identified adverse impacts cannot be readily

---

[7] It is undisputed in this case that Parcel 49C did not raise its challenge to the RLP's NEPA-related requirements before it submitted its offer for the FCC Lease. *See* AR at 287-293. This Court has long recognized that an offeror wishing to challenge the terms of a solicitation must do so before the close of the proposal process. *Blue & Gold Fleet, L.P.*, 492 F.3d at 1313 (holding that a protester who knew the agency's interpretation of a solicitation but failed to challenge it before bids were due, waived its ability to object afterwards). And so, Parcel 49C has waived this claim under *Blue & Gold Fleet*.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

mitigated, or (iv) the level of NEPA analysis is more extensive than is acceptable to the Government (*e.g.*, offers must be of a nature that would allow NEPA to be satisfied by preparation of a Categorical Exclusion (CATEX) NEPA study or an Environmental Assessment (EA) with or without mandatory mitigation).

*Id.* at 1438-39. The record evidence also shows that the GSA determined that it was necessary for all offerors to comply with these requirements so that the agency could determine the environmental impact of the award of the FCC Lease. *Id.* at 1444, 1449-50.

Parcel 49C's numerous challenges to the RLP's NEPA-related requirements lack support in the administrative record for several reasons. First, contrary to Parcel 49C's contentions in this case, the RLP clearly requires that all offerors, including Parcel 49C, provide NEPA documentation to be eligible for award of the FCC Lease. *Id.* at 1438-39, 1444, 1449-50. Second, the administrative record similarly does not support Parcel 49C's contention that Parcel 49C should be exempt from the RLP's NEPA-related requirements, because the company will not ███████████████████████████ if awarded the FCC Lease. *Id.* at 26, 38; Pl. 2d Mem. at ¶¶ 47-56. Rather, the administrative record shows that the GSA determined that Parcel 49C would have to ████████████████████ if awarded the FCC Lease and that ██████████████████████████ *Id.* at 26 ("[T]he government anticipated ██████████████████████████ should the incumbent Lessor prevail in the procurement.").

In addition, Parcel 49C's argument that it is entitled to a Categorical Exclusion ("CATEX") from certain NEPA requirements also lacks evidentiary support. The administrative record makes clear that the RLP requires that Parcel 49C, and all other offerors, provide all relevant NEPA-related documentation to the GSA before the agency would take any action with respect to a CATEX. *Id.* at 1438-39, 1444, 1449-50. Given this, there is ample evidence in the record to demonstrate that the GSA properly determined that Parcel 49C and all other offerors must fully comply with the RLP's NEPA-related requirements.

### 4. The GSA Appropriately Evaluated The Costs Associated With The FCC Lease Consistent With The RLP

Parcel 49C's attempt to set aside the GSA's evaluation process for the RLP due to alleged errors in the evaluation of the price factor for the solicitation are similarly without merit. Pl. 2d. Mem. at 34-44. In this regard, Parcel 49C puts forward two arguments. First, Parcel 49C

contends that the GSA failed to properly consider certain move-related and relocation costs, and the impact of such costs on the price for the FCC Lease. *Id*. at 34-37. Second, Parcel 49C contends that the GSA's IGE for the RLP was unreasonable and not developed in accordance with the terms of the RLP. *Id*. at 37-43; Pl. Reply at 27-36. For the reasons discussed below, Parcel 49C's arguments are belied by the record evidence.

With respect to move-related and relocation costs, a plain reading of the RLP makes clear that the RLP did not require the GSA to consider such costs when evaluating responsive proposals. The RLP provides, in relevant part, that the GSA will consider and add "[t]he cost of relocation of furniture, telecommunications, replications costs, and other move-related costs [to the gross present value cost], *if applicable*." AR at 1447 (emphasis supplied). This language does not require that the GSA consider move-related or relocation-related costs in its evaluation of an offeror's price. *Id*. Rather, this provision makes clear that the GSA has the discretion to consider such costs, if the contracting officers deems the costs applicable. *Id*.

In this case, the administrative record demonstrates that the GSA's contracting officer for the RLP reasonably determined that it was not necessary for the GSA to consider certain move-related and relocation costs during the evaluation of responsive proposals, because the cost of staying in the incumbent building and moving to another building were similar. *Id*. at 37. The RLP does not prohibit the GSA from exercising its discretion regarding these costs in this manner. AR at 1447. And so, Parcel 49C's claim to the contrary is simply without merit.

The administrative record in this case also shows that the GSA appropriately developed the IGE for this procurement. This Court has long recognized that, "[g]enerally, independent government estimates represent the agency's best estimate of the most reasonable current price of the products or services being procured." *Process Control Techs. v. United States*, 53 Fed. Cl. 71, 77 (2002) (quotation omitted). While an agency is not required to support its IGE with "exhaustive detail," it must "be able to demonstrate the basis for the estimate" when the IGE "is questioned." *Nutech Laundry & Textile, Inc. v. United States*, 56 Fed. Cl. 588, 594 (2003). And so, this Court has also held that an agency may utilize prior experience– historical information– to create the IGE and that "agencies are 'given broad latitude in establishing [a] method to evaluate price proposals.'" *MED Trends, Inc. v. United States,* 102 Fed. Cl. 1, 7 (2011) (citations omitted).

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

The administrative record here contains ample support for the GSA's IGE. In particular, the administrative record demonstrates that the GSA engaged in a lengthy and thoughtful process to develop the IGE, by first commissioning the development of a program of requirements for the FCC's new headquarters and then developing the IGE. AR at 310-18, 1577-1683. In this regard, the record evidence shows that the GSA engaged the architectural firm OLBN to study the FCC's space needs. *Id*. at 336-442; SAR at 2. The record evidence also shows that, after studying the FCC's space needs and "compiling a summary of improvements required by FCC, OBLN priced its estimate of the costs to accomplish the work, based upon its professional knowledge of the costs prevailing in the Washington DC market for the work described." SAR at 2.

The Declaration the GSA's Project Manager for the RLP, Cirilo Paulo, also demonstrates that the GSA further modified the cost estimates provided by OBLN to develop the GSA's IGE for this procurement. Specifically, Mr. Paulo states in his declaration that he compared the costs in OLBN's estimates with his own experience on a similar NASA project to formulate the IGE. *Id*. at 2-3. Mr. Paulo's declaration also makes clear that he made several adjustments to the costs in OLBN's estimate based upon his experience and expertise. *Id*. at 3. For example, Mr. Paulo states in his declaration that he increased certain costs contained in OLBN's estimate because of his awareness that construction costs have been increasing due to greater construction activity in the Washington, DC market. *Id*. at 3-4. In addition, Mr. Paulo also describes several specific adjustments that he made to OLBN's cost estimates:

> In response to these concerns, and in recognition that an IGE is intended to provide a basis for the tenant agency to budget adequate funds for the anticipated build-out, I made adjustments to certain cost estimates in the POR. These changes included both increasing assumed unit costs, as well as decreasing assumed administrative charges. I also corrected certain assumptions as to what Tenant Improvement Allowance (TIA) and Building Specific Amortized Capital (BSAC) funds would be available to defray out-of-pocket build-out costs.
>
> a. I increased the per square foot construction cost estimates for the general office space and both the Low Cost Special Space and High Cost Special Space build-outs.
>
> b. I increased the TIA from $35.00 to $46.74 to reflect the correct allowance available for this lease procurement.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

c. I deleted the costs of a swing move from the "stay in place" scenario to reflect that the Government would only pay for one move. Move costs were thus $5.00 per usable square foot for both scenarios.

d. I subtracted the BSAC, which is an allowance available to FCC to fund security costs, from both scenarios. The BSAC is an additional allowance available for the new lease, which would decrease the FCC's out-of-pocket build-out costs.

e. I decreased both scenario's [sic] design cost percentage from ███percent to ███ percent. This was done to reflect the fact that architectural firms are willing to take on large dollar projects such as this one for a lesser overall percentage charge than is the case for smaller dollar projects.

f. I decreased both scenario's [sic] lessor's fee from █ percent to █percent. Once again, this is to reflect the market's acceptance of a lower percentage commission on large dollar projects.

*Id.* at 3-4 (internal citations omitted). And so, the administrative record demonstrates that the GSA appropriately and independently developed the IGE in accordance with the terms of the RLP. *Id.* at 1-4; AR at 310-18, 336-442, 1577-1683.

Lastly, Parcel 49C's argument that the GSA erred in this procurement by failing to revise the IGE after receiving responsive proposals is without any legal or factual support. In fact, Parcel 49C cites to no statute or case to support this novel proposition. *See generally* Pl. 2d. Mem. Given this, Parcel 49C has simply not met its burden to show that the GSA's evaluation process was unreasonable, or that it has been prejudiced by the agency's actions in any way.

**5.     Parcel 49C's Claim That The GSA Failed To Conduct Meaningful Discussions Is Unsubstantiated By The Record Evidence**

Parcel 49C's final challenge to the GSA's evaluation process—that the GSA failed to conduct meaningful discussions regarding Parcel 49C's proposed price—is equally flawed. Pl. 2d. Mem. at 58-59. This Court has long recognized that discussions regarding a proposal submitted in response to a government solicitation are deemed to be "meaningful if they 'generally lead offerors into areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit.'" *Advanced Data Concepts, Inc.*, 43 Fed. Cl. 410, 422 (1999) (internal quotations and citations omitted), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000); *Process Control Techs.*, 53 Fed. Cl. at 81(2002); *World Travel Serv. v. United States*, 49 Fed. Cl. 431, 439 (2001). The Court has also recognized that agencies have no obligation to discuss in detail all inadequate aspects of a proposal. *Process*

29

*Control Techs.*, 53 Fed. Cl. at 81; *see also Labat-Anderson v. United States*, 42 Fed. Cl. 806, 835 (1999). Rather, an agency should tailor the discussions to the offeror and an agency's advice that an offeror's proposed price is higher than the government's estimate satisfies the requirement to conduct meaningful discussions. *World Travel Serv.*, 49 Fed. Cl. at 439; *Process Control Technologies*, 33 Fed. Cl. at 81. And so, the decision to conduct discussions—and the scope of any such discussions—is left to the judgment of the contracting officer. *World Travel Serv.*, 49 Fed. Cl. at 439; *Process Control Technologies*, 33 Fed. Cl. at 81.

Here, there is ample evidence in the administrative record to show that the GSA held meaningful discussions with Parcel 49C. Indeed, the record evidence shows that the GSA communicated with Parcel 49C during the evaluation of Parcel 49C's proposal and that the GSA identified some deficiencies with respect to Parcel 49C's proposal. AR at 1702-04. Specifically, the GSA noted that Parcel 49C's proposal did not contain certain █████████████████ required by the RLP. *Id.* The GSA also expressed a concern about how Parcel 49C's proposal addressed the RLP's ████████████ requirement. *Id.* at 1707, 1712.

More importantly, the record evidence also shows that the GSA did not identify Parcel 49C's proposed price as an area that required amplification or correction. AR at 1702-04, 1707-08, 1710-12, 2880-81, 2884. Given this, the GSA had no obligation to discuss Parcel 49C's proposed price, nor did the agency have any obligation to discuss every other area where the Parcel 49C's proposal could be improved. 48 C.F.R. § 15.306(d)(3). And so, again, the administrative record demonstrates that the GSA conducted meaningful discussions with Parcel 49C and, thus, does not support Parcel 49C's claim to the contrary.

### C.   Parcel 49C Has Not Shown That It Is Entitled To Injunctive Relief

Given the many weaknesses in Parcel 49C's challenges to the GSA's evaluation process, Parcel 49C has also not demonstrated that it is entitled to the injunctive relief that it seeks in this case. When determining whether to grant injunctive relief, the Court considers: (1) whether plaintiff has succeeded upon the merits of the case; (2) whether plaintiff will suffer irreparable harm if the Court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief. *PGBA, LLC*, 389 F.3d at 1228-29; *see also Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983). In addition, where, as here, the evidence

demonstrates that a plaintiff will not succeed upon the merits of its claims, a plaintiff cannot prevail upon a claim for injunctive relief. *Cf. Altana Pharma AG v. Teva Pharm. USA, Inc.*, 566 F.3d 999, 1005 (Fed. Cir. 2009) (citing *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001)) ("Although the factors are not applied mechanically, a movant must establish the existence of both of the first two factors to be entitled to a preliminary injunction" or a temporary restraining order); *Nat'l Steel Car, Ltd. v. Canadian Pacific Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004) (finding that a plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon its motion for permanent injunctive relief), *reh'g* and *reh'g en banc* denied.

As discussed above, Parcel 49C has not demonstrated that any of its five challenges to the GSA's evaluation process for the FCC Lease are supported by the administrative record, or the relevant law. Rather, the facts of this case make clear that the GSA's evaluation process was reasonable and complied with the requirements of the RLP. Because Parcel 49C cannot demonstrate actual success upon the merits of its claims here, Parcel 49C cannot prevail upon its motion for permanent injunctive relief. *Nat'l Steel Car, Ltd.*, 357 F.3d at 1325.

### D.    The Parties' Other Pending Motions

As a final matter, the parties have filed several other motions that the Court must also resolve. Parcel 49C has filed a motion for leave to file a sur-reply to the government's motion for judgment upon the administrative record and a motion to file its notice withdrawing Counts I-V and Count XII of the first amended complaint under seal. *See generally* Pl. Mot. for Sur-Reply, Pl. Mot. to Seal. The government has also filed a partial motion to dismiss Parcel 49C's OCI claim, upon the ground that this claim is unripe. *See generally* Def. Mot.

To aid the Court in the resolution of this matter, the Court **GRANTS** Parcel 49C's motions for leave to file a sur-reply to the government's motion for judgment upon the administrative record and to file its notice under seal. Because the GSA has now completed the investigation into the alleged organizational conflict of interest involving Trammell Crow, the Court **DENIES**, as moot, the government's partial motion to dismiss.

### V.    CONCLUSION

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

In sum, the administrative record in this case demonstrates that the GSA conducted a reasonable evaluation process for the RLP at issue in this litigation and that the agency's evaluation process complied with the terms of the RLP and applicable law. Given this evidence, Parcel 49C has simply not shown that the GSA's actions here were arbitrary, capricious, an abuse of discretion, or not in accordance with the RLP or applicable law.

And so, for the foregoing reasons, the Court:

(1) **GRANTS** the government's motion for judgment upon the administrative record and Trammell Crow's motion for judgment upon the administrative record;

(2) **DENIES** Parcel 49C's motion for judgment upon the administrative record;

(3) **DENIES** Parcel 49C's motion to supplement the administrative record;

(4) **GRANTS** Parcel 49C's motion to file certain documents under seal and motion for leave to file a sur-reply; and

(5) **DENIES**, as moot, the government's partial motion to dismiss.

Judgment shall be entered accordingly.

Each party shall bear their own costs.

Some of the information contained in this Memorandum Opinion and Order may be considered protected information subject to the protective order entered in this matter on April 6, 2016. This Memorandum Opinion and Order shall therefore be filed under seal. The parties shall review the Memorandum Opinion and Order to determine whether, in their view, any information should be redacted in accordance with the terms of the Protective Order prior to publication.

The Court hereby **ORDERS** the parties to **FILE**, by December 22, 2016, a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction.

**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby
LYDIA KAY GRIGGSBY
Judge

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# Exhibit 15

## UNITED STATES COURT OF FEDERAL CLAIMS

### BID PROTEST

| | |
|---|---|
| Parcel 49C Limited Partnership, ) | |
| ) | |
| Plaintiff, ) | Case No. 16-427C |
| ) | Judge Lydia Kay Griggsby |
| v. ) | |
| ) | |
| United States of America, ) | **FILED UNDER SEAL** |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| Trammell Crow Company, ) | |
| ) | |
| Defendant-Intervenor ) | |

### NOTICE OF APPEAL

Pursuant to Rule 58.1 of the Rules of the United States Court of Federal Claims ("RCFC"), notice is hereby given that Plaintiff Parcel 49C Limited Partnership ("Parcel 49C") appeals to the United States Court of Appeals for the Federal Circuit from the November 30, 2016 Opinion and Order of the Court denying Parcel 49C's Motion for Judgment on the Administrative Record, and granting the Motions for Judgment on the Administrative Record of the Government and Trammell Crow Company.

Respectfully submitted,

Dated: November 30, 2016          By:    /s/ Richard J. Conway
                                         Richard J. Conway
                                         BLANK ROME LLP
                                         1825 Eye Street, NW

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

Washington, DC 20006-5403
(202) 420-2235 (Telephone)
(202) 822-9544 (Facsimile)
RConway@blankrome.com
*Counsel for Parcel 49C*

Of Counsel:
Michael J. Slattery
BLANK ROME LLP
405 Lexington, Avenue
New York, NY 10174-0208
(212) 885-5155 (Telephone)
(202) 822-9544 (Facsimile)
MSlattery@blankrome.com

Larry D. Blust
HUGHES SOCOL PIERS RESNICK & DYM, LTD.
70 West Madison Street
Suite 4000
Chicago, IL 60602
(312) 604-2672 (Telephone)
(312) 604-2673 (Facsimile)
lblust@hsplegal.com

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

## CERTIFICATE OF SERVICE

I hereby certify that on this date of November 30, 2016, I caused a copy of the

foregoing Plaintiff's Notice of Appeal to be served via electronic mail on the following:

William J. Grimaldi
Trial Attorney
U.S. Department of Justice
Civil Division - Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 616-0471
Fax : (202) 514-8624
william.j.grimaldi@usdoj.gov

Stuart W. Turner
ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, D.C. 20001
Telephone: 202-942-5000
Stuart.Turner@APORTER.COM


            /s/ Richard J. Conway
            Richard J. Conway
            BLANK ROME LLP
            1825 Eye Street, NW
            Washington, DC 20006-5403
            (202) 420-2235 (Telephone)
            (202) 822-9544 (Facsimile)
            RConway@blankrome.com
            *Counsel of Record for Parcel 49C*

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# Exhibit 16

# In the United States Court of Federal Claims

BID PROTEST
No. 16-427C
Filed Under Seal: December 14, 2016
NOT FOR PUBLICATION

|  |  |  |
|---|---|---|
| PARCEL 49C LIMITED PARTNERSHIP, | ) ) ) ) | |
| Plaintiff, | ) ) | Notice of Appeal; Jurisdiction; RCFC |
| v. | ) ) | 62.1. |
| THE UNITED STATES, | ) ) ) | |
| Defendant, | ) ) | |
| v. | ) ) ) | |
| TRAMMELL CROW COMPANY, | ) ) ) | |
| Defendant-Intervenor. | ) ) | |

*Richard J. Conway*, Counsel of Record, *Daniel A. Broderick*, Of Counsel, Blank Rome LLP, Washington, DC, *Michael J. Slattery*, Of Counsel, Blank Rome, LLP, New York, NY, *Larry D. Blust*, Of Counsel, Hughes Socol Piers Resnick & Dym, Ltd., Chicago, IL, for plaintiff.

*William J. Grimaldi*, Trial Attorney, *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, *Michael P. Klein*, Assistant Regional Counsel, United States General Services Administration, Washington, DC, for defendant.

*Stuart W. Turner*, Counsel of Record, *Ronald A. Schechter*, Of Counsel, *Amanda Johnson*, Of Counsel, Arnold & Porter LLP, Washington, DC, for defendant-intervenor.

## ORDER DENYING PLAINTIFF'S
## MOTIONS FOR INJUNCTIVE RELIEF

GRIGGSBY, Judge

Pending before the Court are Parcel 49C Limited Partnership's ("Parcel 49C") motion for an injunction pending appeal and emergency motion for a temporary restraining order directing the government to withhold award pending resolution of plaintiff's motion for an injunction

1

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

pending appeal (docket entry nos. 83, 85). For the reasons discussed below, the Court denies these motions.

## I.      BACKGROUND

Parcel 49C filed the complaint in this pre-award bid protest matter on April 4, 2016, and it challenged several actions taken by the United States General Services Administration ("GSA") in connection with the GSA's evaluation of proposals in response to a request for lease proposals ("RLP") to procure office space for the headquarters of the Federal Communications Commission ("FCC Lease"). As relief, Parcel 49C sought a court order directing the GSA to reject the proposal submitted by the defendant-intervenor, Trammell Crow Company ("Trammell Crow"), for the FCC Lease or, alternatively, enjoin the GSA from awarding the FCC Lease. 2d. Am. Compl. at 43-44.

On November 30, 2016, the Court issued a Memorandum Opinion and Order that, among other things, denied Parcel 49C's motion for judgment upon the administrative record, granted the government's motion for judgment upon the administrative record and the defendant-intervenor Trammell Crow's motion for judgment upon the administrative record, and entered final judgment in favor of the government and Trammell Crow. *Parcel 49C Ltd. P'ship v. United States*, No.16-427C, at 2 (Fed. Cl. Nov. 30, 2016). On November 30, 2016, Parcel 49C filed a notice of appeal of the Court's decision. *See generally* Pl. Notice of Appeal.

On December 6, 2016, Parcel 49C filed a motion for an injunction pending appeal. *See generally* Pl. Mot. for Inj. On December 12, 2016, Parcel 49C filed an emergency motion for a temporary restraining order directing the government to withhold award pending resolution of plaintiff's motion for an injunction pending appeal. *See generally* Pl. Mot. for TRO.

In these motions for injunctive relief, Parcel 49C requests that the Court enjoin an award of the FCC Lease during the pendency of Parcel 49C's appeal of the Court's November 30, 2016, Memorandum Opinion and Order and direct the government to refrain from awarding the FCC Lease to Trammell Crow until the Court addresses Parcel's 49C's motion for an injunction pending appeal. *Id*. The Court must **DENY** Parcel 49C's motions.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

## II.   DISCUSSION

As an initial matter, the Court does not possess jurisdiction to consider plaintiff's motions.  It is well-established that "[t]he filing of a notice of appeal . . . confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal."  *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam)(citations omitted); *Judd v. United States*, No. 15-586C, 2015 WL 7574003, at *1 (Fed. Cl. Nov. 25, 2015).  Parcel 49C filed a notice of appeal in this case on November 30, 2016.  *See generally* Pl. Notice of Appeal.  Thereafter, Parcel 49C filed its two motions for injunctive relief on December 6, 2016, and December 12, 2016.  Pl. Mot. for Inj.; Pl. Mot. for TRO.  Parcel 49C's notice of appeal divests the Court of jurisdiction to consider these motions.  *Griggs*, 459 U.S. at 58.  And so, the Court must deny these motions for lack of jurisdiction.

The Court also denies Parcel 49C's motions for injunctive relief pursuant to Rule 62.1 of the Rules of the United States Court of Federal Claims ("RCFC").  In this regard, RCFC 62.1 (a) provides that:

> If a timely motion is made for relief that the court lacks authority to grant because of an appeal that has been docketed and is pending, the court may:
>
> (1) defer considering the motion;
> (2) deny the motion; or
> (3) state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.

RCFC 62.1.  And so, under the circumstances presented here, RCFC 62.1 allows the Court to defer consideration of Parcel 49C's motions, deny the motions, or to alert the United States Court of Appeals for the Federal Circuit that the Court would consider or grant the motions if the case were remanded for certain purposes.[1]  RCFC 62.1; *see also Dobyns v. United States*, No. 8-700C, 2014 WL 7934306 (Fed. Cl. Dec. 1, 2014).

A plain reading of Parcel 49C's motions for injunctive relief here make clear that Parcel 49C seeks the same injunctive relief that the Court previously declined to grant to Parcel 49C in the Court's November 30, 2016, Memorandum Opinion and Order.  Namely, Parcel 49C

---

[1] "RCFC 62.1, like its Federal Rules of Civil Procedure counterpart, provides a procedure for the court to issue an 'indicative ruling' on a motion for relief that is barred by a pending appeal."  *Dobyns*, 2014 WL 7934306, at *1.

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

requests that the Court enjoin the award of the FCC Lease to Trammell Crow Company. *See generally* Pl. Mot for Inj.; Pl. Mot. for TRO.

As the Court previously held in its Memorandum Opinion and Order, the many weaknesses in Parcel 49C's challenges to the GSA's evaluation process for the subject lease demonstrate that Parcel 49C is not entitled to this injunctive relief. *Parcel 49C Ltd. P'ship*, No.16-427C, at 30-31 (Fed. Cl. Nov. 30, 2016); *see also PGBA, LLC v. United States*, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004) ("In deciding whether a permanent injunction should issue, a court considers: (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.") (citation omitted). Indeed, as discussed in detail in the Court's Memorandum Opinion and Order, the facts of this case demonstrate that the GSA conducted a reasonable evaluation process for the FCC Lease and that the agency's evaluation process complied with the requirements of the RLP and applicable law.

Under such circumstances, Parcel 49C cannot prevail upon its renewed requests for injunctive relief in this matter. And so, the Court denies Parcel 49C's motion for an injunction pending appeal and emergency motion for a temporary restraining order directing the government to withhold award pending resolution of plaintiff's motion for an injunction pending appeal. RCFC 62.1.

### III.    CONCLUSION

In sum, the filing of Parcel 49C's notice of appeal in this matter divests the Court of jurisdiction to consider its subsequent requests for injunctive relief. In addition, the facts in the matter also show that the Court must deny these motions pursuant to RCFC 62.1. And so, for the foregoing reasons, the Court **DENIES** Parcel 49C's motion for an injunction pending appeal and emergency motion for a temporary restraining order directing the government to withhold award pending resolution of plaintiff's motion for an injunction pending appeal.

Some of the information contained in this Order may be considered protected information subject to the Protective Order entered in this matter on April 6, 2016. This Order shall therefore be filed under seal. The parties shall review the Order to determine whether, in their view, any

4

information should be redacted in accordance with the terms of the Protective Order prior to publication.

The Court hereby **ORDERS** the parties to **FILE**, by **December 28, 2016**, a joint status report identifying the information, if any, that they contend should be redacted, together with an explanation of the basis for each proposed redaction.


**IT IS SO ORDERED.**

s/ Lydia Kay Griggsby

LYDIA KAY GRIGGSBY

Judge

Material Deleted From This Page Pursuant To U.S. Court Of Federal Claims Protective Order

# **<u>EXHIBIT 17</u>**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Parcel 49C Limited Partnership          **v.**          United States

Case No. _____ 2017-1315 _____

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

_____

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Parcel 49C Limited Partnership | None | None |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Larry D. Blust, Hughes Socol Piers Resnick & Dym, Ltd., 70 West Madison Street, Suite 4000, Chicago, IL 60602

_____

December 9, 2016                              /s/ Richard J. Conway
_____          _____
Date                                                Signature of counsel

Please Note: All questions must be answered          Richard J. Conway
                                                     _____
                                                     Printed name of counsel

cc: _____

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Parcel 49C Limited Partnership        **v.**        United States

Case No. _____ 2017-1315 _____

## CERTIFICATE OF INTEREST

Counsel for the:

☐ (petitioner) ☒ (appellant) ☐ (respondent) ☐ (appellee) ☐ (amicus) ☐ (name of party)

certifies the following (use "None" if applicable; use extra sheets if necessary):

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Parcel 49C Limited Partnership | None | None |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |

4.  The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court (**and who have not or will not enter an appearance in this case**) are:

Larry D. Blust, Hughes Socol Piers Resnick & Dym, Ltd., 70 West Madison Street, Suite 4000, Chicago, IL 60602

March 10, 2017
_____
Date

/s/ Richard J. Conway
_____
Signature of counsel

Please Note: All questions must be answered

Richard J. Conway
_____
Printed name of counsel

cc: _____

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE MOTIONS OR BRIEFS CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER

**Motion / Response / Reply** Containing Material Subject to a Protective Order

☑    This <u>motion</u>, response, reply complies with the limitations set forth in Fed. Cir. R. 27(m) and contains [*state the number of*] 0 _____ words (including numbers) marked as confidential, or

☐    This motion, response, reply does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this motion, response, or reply.

---

**Briefs** Containing Material Subject to a Protective Order

☐    This brief complies with the limitations set forth in Fed. Cir. R. 28(d) and contains [*state the number of*] _____ words (including numbers) marked as confidential, or

☐    This brief does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion is requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this brief.

---

/s/ Richard J. Conway
_____
(Signature of Attorney)

Richard J. Conway
_____
(Name of Attorney)

Representing Plaintiff-Appellant Parcel 49C Limited Partnership
_____
(State whether representing appellant, appellee, etc.)

March 10, 2017
_____
(Date)

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on ___March 10, 2017___
by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

Richard J. Conway                                          /s/ Richard J. Conway

        Name of Counsel                                Signature of Counsel

Law Firm                     Blank Rome LLP

Address                      1825 Eye Street NW

City, State, Zip             Washington, DC 20006

Telephone Number             (202) 420-2235

Fax Number                   (202) 820-9544

E-Mail Address               RConway@BlankRome.com

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields